CULLEN AND DYKMAN, LLP
Michelle McMahon
44 Wall St.
New York, NY 10282
212-510-2296
mmcmahon@cullellp.com

Thomas R. Slome
100 Quentin Roosevelt Boulevard
Garden City, New York 11530-4850
516-296-9165
tslome@cullenllp.com

Attorneys for Newell Funding, LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In re:                                                    Chapter 11
                                                          Case No.: 19-12447 (SMB)

Bronx Miracle Gospel Tabernacle Word
of Faith Ministries, Inc.,

                                    Debtor.
-----------------------------------------------------------X

## MOTION OF NEWELL FUNDING, LLC TO APPOINT A CHAPTER 11 TRUSTEE OR IN THE ALTERNATIVE FOR RELIEF FROM THE AUTOMATIC STAY

Newell Funding, LLC ("Newell"), by and through its undersigned counsel, submits this motion (the "Motion") seeking to appoint a chapter 11 trustee, pursuant to 11 U.S.C. §1104(a), for Bronx Miracle Gospel Tabernacle Word of Faith Ministries, Inc. (the "Debtor") or, in the alternative, granting relief from the automatic stay pursuant to 11 U.S.C. §362(d) to permit Newell to complete a foreclosure sale. In support of this Motion, Newell submits the Declaration of Bruce Minkoff (the "Minkoff Decl.") and the Declaration of Michelle McMahon (the "McMahon Decl."), filed simultaneously herewith, and respectfully represents as follows:

## PRELIMINARY STATEMENT[1]

This bankruptcy case is yet another in a long line of obstructionist tactics by the Debtor to delay and hinder Newell's rights as a mortgage lender. It has been over ten years, numerous lawsuits with repetitive stay motions, and three unsuccessful bankruptcy filings (unsuccessful other than for delay). The Mortgage matured more than ten years ago, the Debtor has not made any payments on it in almost as many years and has abused both the State and Federal court systems to avoid collection. As has been determined by this Court and the State Court on multiple occasions, the Debtor has no basis to contest or vacate Newell's Judgment and no valid claims against Newell resulting from the foreclosure process. Nonetheless, through three bankruptcies and multiple State Court filings, the Debtor has obtained temporary stays of the sale of the Property four times (each time on the eve of a foreclosure sale) and continues to push the false narrative that it can contest and reduce the Judgment (or otherwise has claims against Newell) and can reorganize and retain the Property.

The facts are to the contrary, further demonstrating that this latest bankruptcy filing is no more than another tactic by the Debtor to hinder and delay Newell's rights. The Debtor has no equity in the Property, as it admits and has been confirmed by a recent appraisal. As with the Debtor's First Chapter 11 Case, the Debtor has not demonstrated any prospects to reorganize, having utterly failed to take any steps toward progressing this case, and has not complied with its obligations as a debtor-in-possession.

As set forth below and in the accompanying declarations, ample cause and sufficient evidence exist warranting both the appointment of a trustee under section 1104(a)(1) and (2) of

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the next sections of this Motion.

the Bankruptcy Code and granting Newell relief from the automatic stay under 362(d)(1), (2) and (4) of the Bankruptcy Code to permit it to complete its foreclosure sale of the Property.

In order to avoid a replay of the Debtor's current and past abuse, Newell respectfully requests that the Court appoint a trustee instead of lifting the automatic stay, without prejudice to Newell's right to renew that portion of its motion. A trustee can properly manage the bankruptcy case and, if appropriate, sell the Property and pursue avoidance claims. Newell recognizes that a trustee will likely require Newell to agree to an appropriate carve-out of its lien and Newell is prepared to negotiate such a carve-out. If the Court is not inclined to appoint a trustee, Newell requests that the Court grant it relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code, including *in rem* relief pursuant to section 362(d)(4) of the Bankruptcy Code.

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. Venue of the Debtor's case in this district is proper pursuant to 28 U.S.C. §§1408 and 1409. This matter is a core proceeding under 28 U.S.C. 157(b)(2)(A), (G) and (O).

2.      The statutory predicates for the relief sought herein are sections 1104(a) and 362(d) of Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

**The Mortgage and Foreclosure**

3.      On March 6, 2008, Newell made a loan to the Debtor in the principal amount of $425,000 (the "Loan") secured by a mortgage (the "Mortgage") upon the real property at 2910 Barnes Avenue, Bronx, New York, 10467 (the "Property"). Minkoff Decl., ¶3. The Loan matured on March 5, 2009. *Id.* The Debtor has not repaid the Loan. *Id.*

4.      The Debtor's pastor, Rev. Dr. Keith Elijah Thompson ("Rev. Thompson") and his

wife, Yvonne Thompson, guaranteed the Loan (the "Guarantors"). Minkoff Decl., ¶4.

5.      On January 23, 2015, Newell commenced a mortgage foreclosure action and was granted a judgment of foreclosure on March 2, 2017 (the "Judgment"), which determined that the amount owed to Newell was $1,196,033.99, together with interest from October 16, 2015 and additional amounts provided for in the Judgment. Minkoff Decl., ¶5 and Ex. A. The first foreclosure sale for the Property was scheduled for May 22, 2017.  *Id.* The Debtor sought and was denied a stay of the sale on May 19, 2017 by the State Court judge who had entered the Judgment. On same date scheduled for the sale, the Debtor filed its first bankruptcy case. *Id.*

**The Debtor's First Bankruptcy Case and Vacatur of the Automatic Stay**

6.      On May 22, 2017, the Debtor filed its first voluntary petition seeking relief under chapter 11 of the Bankruptcy Code (the "First Chapter 11 Case"), docketed as Case No. 17-11395 (SMB). Minkoff Decl., ¶6.

7.      The Debtor did not initially retain counsel and did not timely file its schedules or statement of financial affairs. As a result, on June 9, 2017, the Office of the United States Trustee (the "U.S. Trustee") filed a motion to dismiss the Debtor's bankruptcy case for cause. Minkoff Decl., ¶7. The U.S. Trustee withdrew the motion when the Debtor retained counsel and filed its schedules and statement of financial affairs. *Id.*

8.      The Debtor was also delinquent in filing its monthly operating reports, failing to file them for the first four months of its First Chapter 11 Case until October 2017. Minkoff Decl., ¶8.

9.      Other than setting a deadline to file proofs of claim, the Debtor took no other action to progress its First Chapter 11 Case, including to formulate or confirm a plan of reorganization. Minkoff Decl., ¶9.

10. After six months of virtually no action to move the First Chapter 11 Case forward, Newell filed a motion for relief from the automatic stay. Minkoff Decl., ¶10. The Debtor did not oppose the relief requested and, on December 13, 2017, this Court granted the motion. *Id.*

**The Second Scheduled Foreclosure Sale and Further State Court Action**

11. On December 14, 2017, after Newell was granted relief from the automatic stay in the Debtor's First Chapter 11 Case and while the Debtor's First Chapter 11 Case was still open, Newell noticed the second sale date for the Property for February 5, 2018. Minkoff Decl., ¶11.

12. On February 2, 2018, the Debtor filed an order to show cause in State Court initiating a motion to vacate the Judgment and sought to stay the sale. Minkoff Decl., ¶12. The State Court judge assigned to the case who had granted the Judgment and denied May 2017 stay application, Justice Barbato, was not available to hear the February 2018 stay application. The stay application was presented to a different State Court judge who, having no familiarity with the case, granted the application and stayed the sale, resulting in cancellation of the sale. *Id.*

13. The Debtor's motion to vacate the Judgment was ultimately decided by Justice Barbato, who on April 26, 2018 issued an order denying the motion and lifting the stay (the "April 2018 Decision"). Minkoff Decl., ¶13. In its April 2018 Decision, the State Court rejected the Debtor's attempt to vacate the Judgment and to bring claims against Newell. *Id., Ex. B.*

14. As more fully discussed below, on May 9, 2018, Newell noticed a third foreclosure sale of the Property for June 25, 2018. Minkoff Decl., ¶14. Two days before the sale date, Rev. Thompson, who had guaranteed the Mortgage, filed a personal bankruptcy case staying the sale. *Id.*

**Activity in the First Chapter 11 Case After the Stay Was Vacated**

15. After this Court lifted the stay to permit Newell to proceed with the foreclosure

sale, on January 8, 2018, the U.S. Trustee filed a second motion to dismiss the Debtor's First Chapter 11 Case. Minkoff Decl., ¶15. The U.S. Trustee based its motion on the facts that Newell had been granted relief from the stay to exercise its right under the Judgment to sell the Property, there was a continuing loss to the estate and no likelihood of rehabilitation. *Id.*

16.     On May 24, 2018, the Court granted the U.S. Trustee's motion and dismissed the Debtor's First Chapter 11 Case [Dkt. No. 64] (the "Dismissal Decision"). Minkoff Decl., ¶16 and Ex. C. In the Dismissal Decision, the Court rejected the Debtor's claims that it could rehabilitate because it could successfully challenge the Judgment and assert claims against Newell as well as that it had malpractice claims against its attorney in the foreclosure proceeding (the "Malpractice Claims"). *Id;* Dismissal Decision, pp. 4-5. The Court held that the Debtor's ability to contest the Judgment and its claims against Newell had been adjudicated by the State Court and denied. *Id.* at 5. The Court held that as a result, the Debtor could not base its rehabilitation on its claims against Newell. *Id.* Moreover, the Court held that the Debtor's alleged Malpractice Claims were speculative and could not be liquidated to fund a successful reorganization within a reasonable time. *Id.*

**The Third Scheduled Foreclosure Sale**

17.     As noted above, after the State Court lifted its stay and Newell noticed the sale for the third time (for June 25, 2018 at 2:00 p.m.), on June 22, 2018, the Debtor presented yet another order to show cause to the State Court, to stay the sale and to initiate another motion to vacate the Judgment. Minkoff Decl., ¶17. The order to show cause did not disclose the previous motion to vacate the Judgment, which had been denied by the order issued on April 26, 2018 and entered May 7, 2018. *Id.*

18.     Justice Barbato was not available to hear the stay application, so the stay application

was presented to a State Court judge who had no familiarity with the matter. Minkoff Decl., ¶18. The judge to whom the application was presented denied the stay request, but signed the order to show cause, thereby initiating another motion to vacate the Judgment. The judge made the order to show cause returnable on June 25, 2018 at 9:30 a.m. so that Justice Barbato could decide the stay request before the scheduled time for the sale. *Id.*

19. Bruce Minkoff appeared in the State Court on June 25, 2018. Minkoff Decl., ¶19. While he was waiting for the case to be called, he learned that Rev. Thompson, who was at the time a guarantor of the Loan, three days earlier had filed a voluntary petition for bankruptcy relief under chapter 7, as discussed below, which stayed the sale. *Id.*

20. When the case was called on June 25, 2018 and Justice Barbato was informed of the bankruptcy filing, he marked the motion as stayed and instructed the attorneys to notify the court when the bankruptcy stay was lifted so that a new return date for the motion and a schedule for submission of papers could be set. Minkoff Decl., ¶20.

**Rev. Thompson's Personal Bankruptcy and Vacatur of the Automatic Stay**

21. Rev. Thompson's June 22, 2018 voluntary chapter 11 petition was docketed as Case No. 18-11898 (MEW). Minkoff Decl., ¶21.

22. On September 5, 2018, Newell filed a motion for relief from the automatic stay. Minkoff Decl., ¶22. Rev. Thompson did not oppose the relief requested and, on October 2, 2018, this Court granted the motion. *Id.* The order granting this relief also released Rev. Thompson from his guaranty. *Id.*

**Further State Court Action and Fourth Scheduled Foreclosure Sale**

23. After relief from the stay was granted in Rev. Thompson's bankruptcy case, a return date for the motion to vacate the Judgment, which had been initiated by the order to show cause

signed on June 22, 2018 and stayed by Rev. Thompson's bankruptcy case, was rescheduled for November 26, 2018. Minkoff Decl., ¶23.

24.     Newell opposed the motion and cross-moved to dismiss the Guarantors from the foreclosure proceeding and to release their guaranties to prevent them from being able to further abuse the court systems with frivolous delay tactics. By Order dated May 3, 2019 and entered on May 7, 2019, the Debtor's motion was denied, Newell's cross-motion was granted, the Guarantors were dismissed from the foreclosure proceeding and the guaranties were released (the "May 2019 Decision"). Minkoff Decl., ¶24 and Ex. D.

25.     On June 14, 2019, Newell noticed the fourth sale of the Property for July 29, 2019. Minkoff Decl., ¶25. The day before the sale, the Debtor filed this case staying the sale of the Property yet again. *Id.*

**The Debtor's Current Bankruptcy Case**

26.     On July 28, 2019, the Debtor filed its second voluntary petition for relief (the "Second Chapter 11 Case") seeking relief under Chapter 11 of the Bankruptcy Code docketed as Case No. 19-12447 (SMB). *See* Dkt. No. 1.

27.     Since commencement of the Second Chapter 11 Case, the Debtor has continued to operate its business and manage its property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Second Chapter 11 Case.

28.     To date, the Debtor has not filed any monthly operating reports.

29.     The Debtor has not sought or obtained Bankruptcy Court approval for its continued use of Newell's cash collateral. Newell has not consented to the use of its cash collateral and apprised the Debtor of this lack of consent through a letter to Debtor's counsel dated September

11, 2019.  McMahon Decl., Ex. A.

30.     The Debtor has not filed any motions to retain professionals.

31.     The Debtor has not set a deadline for creditors to file claims (a "Bar Date").

32.     Nearly four months ago, on August 27, 2019, the U.S. Trustee held the meeting of creditors and equity security holders required by section 341 of the Bankruptcy Code (the "341 Meeting"). Excerpts of the cited portions of an unofficial transcript of this meeting are attached to the McMahon Decl. as Exhibit B (the "341 Tr."). At the 341 Meeting, the Debtor announced its intention to obtain refinancing for the Loan and confirm a plan of reorganization. 341 Tr., pp. 23-24. However, the Debtor was unable to respond to several of the questions and requests for information posed by Newell about the financing and its financial affairs. Notably, the Debtor was unable to provide proof of insurance on the Property. 341 Tr., p. 12. The Debtor and its counsel promised to respond to these requests if presented by email. *Id.* The Debtor did not produce any of the requested information or documents despite repeated email requests.

33.     On September 9, 2019, Newell filed a motion seeking discovery, including requests for document production (the "Document Requests"), an inspection of the Property and a Fed. R. Civ. P. 30(b)(6) deposition (the "Deposition"). On October 3, 2019, the Court granted Newell's motion in its Order Granting Motion Of Newell Funding, LLC For Entry Of An Order Pursuant To Bankruptcy Rule 2004 [Dkt. No. 30] (the "2004 Order"). The Debtor refused on multiple occasions to comply with the 2004 Order. Newell was required to seek this Court's intervention to compel the Debtor's appearance at the Deposition and production of documents responsive to the Document Requests. *See* Dkt. Nos. 32 and 35. On the eve of the Debtor's deadline to produce documents, the Debtor filed a motion seeking a 30-day extension to December 3, 2019. *See* Dkt. No. 31. Newell opposed this extension and sought and was granted a court conference. *See* Dkt.

No. 32. On November 13, 2019, the parties stated on the record that the Debtor would produce a representative for Deposition on November 15, 2019, and the Court directed the Debtor to produce documents to Newell by November 27, 2019 and to produce proof of insurance covering the Property within 24 hours. *See* Dkt. No. 34. The Court also directed the Debtor to file a motion to retain its counsel by this date. The Debtor produced proof of certain deficient Property Insurance Policy (the "Property Insurance Policy") but to date has not produced any other documents responsive to the Document Requests or sought to retain its counsel.

34.     The Property Insurance Policy fails to satisfy almost all the requirements agreed to by the Debtor in the Mortgage, including but not limited to the following:

- Mortgage §1.9(a):

    - Insurance must be for 100% of full replacement cost in so called "at-risk" form.

    - Insurance must cover the following which are listed as exclusions in the policy: flood, earthquake, underground hazards, collapse and explosion.

    - Insurance requires coverage for replacement cost and agreed amount endorsements or the equivalents thereof (with no reduction for depreciation), an endorsement covering the costs of demolition and increased costs of construction attributable to the enforcement of laws, building codes and/or ordinances.  This latter requirement is expressly excluded in the Property Insurance Policy §5(e).

- Mortgage §1.9(d)(ii) – Insurance must be issued by a company licensed to do business in the state in which the mortgaged property is location.  The insurer on the Property Insurance Policy is not licensed in New York. Property Insurance Policy, p.1.

- Mortgage §1.9(d)(iii) and (iv) – Newell is not named as an additional insured or loss payee.

- Mortgage §1.9(d)(v) – the Property Insurance Policy does not include subrogation waivers.

- Mortgage §1.9(d)(vi) – the Property Insurance Policy deductible exceeds the $2,000 per loss limit.

- Mortgage §1.9(d)(vii) – the Property Insurance Policy cancellation provision does not satisfy the 30-day notice requirement for cancellation for non-payment.

- Mortgage §1.9(d)(viii) – Property Insurance Policy does not provide that no act, omission or negligence of Newell or any other names insured shall affect or limit the insurer's obligations under the Property Insurance Policy.

The Debtor was advised of these deficiencies by letter to its counsel dated November 30, 2019. McMahon Decl., Ex. C.

35.     At the Deposition on November 15, 2019, the Debtor produced Bernel Arthur Richardson ("Richardson"), a deacon with the Debtor. Richardson testified that he was not familiar with and was unable to answer questions regarding the value of the Debtor's Property, insurance, income, expenses, bankruptcy filing, schedule of assets and liabilities, statement of financial affairs, mortgage, alleged claims against Newell, plan of reorganization, or the Document Requests. Excerpts of the cited portions of the transcript of this Deposition are attached to the McMahon Decl. as Exhibit D (the "Richardson Tr."). In fact, Richardson testified that he had not read the Document Requests referenced in the Deposition Notice and could not recall if he had read the Deposition Notice identifying the topics to be addressed at the Deposition. Richardson Tr., p. 49:5-25 and 50:10-14. In response to the questions regarding who would have information regarding the forgoing topics, Richardson named Rev. Thompson in almost every instance. Richardson Tr., p. 50:23-25, 52 and 53:2-7. As a result, Newell was again forced to seek Court intervention to compel the Debtor's agreement to produce Rev. Thompson for Deposition and the Debtor responded to Newell's request for a conference by offering to make Rev. Thompson available on December 12, 2019. *See* Dkt. No. 34.

36.     The Debtor did not file a motion to retain its counsel by November 27, 2019 as directed by the Court. Instead, Debtor's counsel filed his Motion for Withdrawal of Counsel [Dkt. No. 37] (the "Withdrawal Motion"). The Withdrawal Motion also sought an additional extension

of the Debtor's deadline to produce documents responsive to the Document Requests, from the extended date of November 27, 2019 to an unspecified date "thirty days from the date that [the Debtor] locates new counsel." Withdrawal Motion, ¶17. Debtor's counsel cited the following reasons for his withdrawal:

- Communication problems;

- Inability to obtain information regarding the Debtor's "alleged intentions" regarding the resolution of the Chapter 11 Case;

- Difficulty in obtaining information from the Debtor;

- Debtor's making of requests of counsel that counsel does not believe are warranted under existing law; and

- additional information Debtor's counsel offered only to provide to the Court for in camera inspection.

Withdrawal Motion, ¶¶11-13 and 16. Newell has objected to the request for additional time to produce documents responsive to the Document Requests and on a limited basis to Debtor's counsel's request to withdrawal, including on the grounds that counsel should continue to represent the Debtor in order to timely respond to this Motion and represent the Debtor at the December 12, 2019 Deposition.

37.     The Debtor's exclusive period to file a plan expired on November 25, 2019. The Debtor has not filed a plan and does not appear willing or able to do so.

**The Debtor's Assets and Liabilities**

38.     The Debtor has scheduled only two significant assets – the Property and alleged "wrongful foreclosure" claims against Newell. Schedule A/B [Dkt. No. 11]. The Debtor did not schedule the Malpractice Claim alleged in its First Chapter 11 Case nor has it ever pursue that claim. 341 Tr., p. 23. This Court previously found that such claim was speculative and could not form the basis for a reorganization. Dismissal Decision, pp. 4-5. The assertion that the Debtor will

fund a reorganization based on the Property and the purported claims against Newell is illusory and intentionally misleading. First, as to the alleged claims against Newell, they have been denied multiple times by state and federal courts. Minkoff Decl., ¶26. The Debtor has repeatedly tried to assert claims against Newell related to the foreclosure and to vacate the Judgment, which have been rejected multiple times by the State Court and were rejected by this Court. *Id.* In its Dismissal Decision, the Court held that such claims were foreclosed by the Judgment. *Id;* Dismissal Decision, p. 5. The Court also noted that the Debtor nonetheless attempted to bring such claims and vacate the Judgment before the State Court, and both were denied by the State Court each time. *Id.* The State Court specifically found that it had heard and denied such claims when it issued its original summary judgment ruling resulting in the Judgment and that the Debtor did not allege any new facts that would entitle it to relief from that Judgment. Minkoff Decl., ¶26; April 2018 Decision, p. 6. After the Debtor's First Chapter 11 Case was dismissed, the issues were raised again and denied by the May 2019 Order of the State Court. Minkoff Decl., ¶26. The Debtor has raised these same claims three times in the State Court – in the Judgment, the April 2018 Decision and the May 2019 Decision - and has raised these same claims before this Court in its First Chapter 11 Case. Each and every time its claims have been denied. Minkoff Decl., ¶27; April 2018 Decision, pp. 6-8; May 2019 Decision, pp. 1-2; Dismissal Decision, pp. 4-5.

39. The Debtor's only remaining asset to which creditors can look for payment is the Debtor's residual interest in the proceeds of the Property. However, the Debtor admits that it has no equity in the Property. The Debtor scheduled the value of the Property at $800,000. Schedules A/B and D. The Debtor scheduled Newell's claim, which the Debtor acknowledges is secured by the Property, at $1,200,000. Schedule D. The Property value is confirmed by an appraisal of the Property (the "Appraisal") recently obtained by Newell during its inspection of the Property. The

Appraisal values the Property at $765,000 at its present use and $1,060,000 at its market value of the highest and best use. McMahon Decl., Ex. E.

40.     Further, the Property continues to degrade under the Debtor's control. The Debtor has failed to make timely repairs of the Property and it is unclear whether the ongoing renovations to the Property are being done by licensed professionals with necessary permits. The testimony of the Debtor's representatives at the 341 Meeting and Deposition was contradictory with respect to the renovations. The Debtor's representative at the Deposition, Richardson, testified that the renovations were completed by licensed professionals with the necessary permits. Richardson Tr., pp. 9:2-25, 10-18, 19:2-6. He also testified that the services related to such renovations were paid for by the Debtor. Richardson Tr., p. 10:12-18. He stated that permits necessary for such renovations were in the process of being obtained, even though the work was in progress. Richardson Tr., p. 10:8-25 and 11:2. This testimony contradicts the testimony of Rev. Thompson at the 341 Meeting.  Rev. Thompson testified that some of the renovations were done by parishioners on a volunteer basis. 341 Tr., pp. 18-19. He testified that the Debtor had not hired an architect or contractors for the renovations. 341 Tr., p. 18. He also testified that no permits were needed. 341 Tr., p. 19.  Similarly, with respect to certain water damage to the Property occurring in November 2018, Rev. Thompson testified that the repairs were complete, but Richardson testified at the Deposition that these repairs were not yet complete. *Compare* 341 Tr., pp. 13-14 *with* Richardson Tr., pp. 20:21-25 and 21:2-17.  It is also unclear whether an insurance claim for this damage has been made, but no payment has been received on any claim despite the passage of more than a year. 341 Tr., pp. 14-15; Richardson Tr., p. 21:20-25 and 22:2-13.

41.     The Debtor has no willingness or ability to formulate a plan. The Debtor has consistently resisted selling the Property and continued to incur liabilities it cannot pay. The

Debtor's valid scheduled liabilities exceed $1,464,825.61.[2] The Debtor has no valuable assets from which to pay these claims. *See* ¶¶38-40, *supra*. Of these claims, approximately $300,000 are scheduled as unsecured loans from the Debtor's parishioners. Schedule E/F, Part 2 [Dkt. No. 14].

42.     The facts have not changed since the Court dismissed the Debtor's First Chapter 11 Case. The Debtor has no equity in the Property, no other assets and no ability to confirm a plan. The Debtor has taken no action to formulate or confirm a plan and is not complying with its obligations as a debtor-in-possession.  The Debtor's conduct in and out of its chapter 11 cases, demonstrating dishonesty, incompetence and gross mismanagement, and the interests of creditors (there are no equity security holders) warrant the appointment of a trustee to for the benefit of its creditors. Alternatively, these facts also support granting Newell relief from the automatic stay, including *in rem* relief, to proceed with the State Court foreclosure sale of the Property.

## **MOTION**

43.     Newell respectfully requests that this Court appoint a Chapter 11 trustee to take control of the Debtor's Second Chapter 11 Case, pursuant to sections 1104(a)(1) and (2) of the Bankruptcy Code, based on overwhelming cause and the best interests of the Debtor's creditors. In the alternative, Newell requests that that this Court grant it relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code, including *in rem* relief pursuant to section 362(d)(4) of the Bankruptcy Code, based on all the forgoing facts.

---

[2] Claims totaling $2.8 million held by 829 Holding Corp. and Keyess Corp., who are also listed as co-debtors on a debt owed to Newell on Schedule H, were scheduled in the Second Chapter 11 case, but not the First Chapter 11 Case, nor did these entities file proofs of claim. *Compare* First Chapter 11 Claims Register and First Chapter 11 Summary of Assets and Liabilities for Non-Individuals [First Chapter 11 Dkt. No. 15] with Second Chapter 11 Case Summary of Assets and Liabilities for Non-Individuals [Dkt. No. 17]. Rev. Thompson testified at the 341 Meeting that the Loan was cross-collateralized with property owned by these entities and that the Debtor was obligated to these entities. 341 Tr., pp. 21-22. Rev. Thompson also testified that there were documents supporting these liabilities. *Id.* These documents were requested in the Document Requests, but none were produced. Newell is not aware of any current liability owed to it or the Debtor by these entities. Minkoff Decl., ¶28.

# I.    APPOINTMENT OF A TRUSTEE

44. Under section 1104(a) of the Bankruptcy Code, the Court is empowered to appoint

a trustee:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, ... or

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate....

11 U.S.C. §1104(a). Under section 1104(a), there are two independent bases for appointing a trustee in a chapter 11 case. Section 1104(a)(l) provides that an independent trustee must be appointed "upon the showing of cause-inclusive of fraud, dishonesty, incompetence or gross management of the debtors' affairs by current management." *In re Ashley River Consulting, LLC,* No. 14-13406(MG), 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. March 31, 2015). *See also In re V Savino Oil & Heating Co., Inc.,* 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989). If cause does not exist under section 1104(a)(2), a court may still, in its discretion, appoint a trustee under section 1104(a)(2). *See In re China Fishery Grp. Ltd (Cayman),* No. 16-11895(JLG), 2016 WL 6875903, at *14 (Bankr. S.D.N.Y. Oct. 28, 2016). "The twin goals of the standard for the appointment of a trustee should be protection of the public interest and the interests of creditors . . . and facilitation of a reorganization that will benefit both the creditors and the debtors .... " *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 168 (Bankr. S.D.N.Y. I990) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 232 (1977), U.S. Code Cong. & Admin. News 1978, p. 6192). The requirements of both sections 1104(a)(1) and (2) of the Bankruptcy Code are met and support appointment of a trustee.

## A.    Cause Exists Rendering Appointment of a Trustee under Section 1104(a)(1) Mandatory

45.    Upon a finding of cause, the appointment of a trustee is mandatory. *In re Futterman*, 584 B.R. 609, 616 (Bankr. S.D.N.Y. 2018); *In re The 1031 Tax Group, LLC*, 374

B.R. 78, 86 (Bankr. S.D.N.Y. 2007). The factors listed in section 1104(a)(1) - fraud, dishonesty, incompetence, or gross mismanagement are not exhaustive - and the Court may consider other factors, including pre-and post-petition misconduct of the debtor's management when making the determination that "cause" exists for the appointment of a trustee. *Id.* "Other factors warranting the appointment of a trustee under section 1104(a)(l) include conflicts of interest, inappropriate relations between corporate parents and subsidiaries, misuse of assets and funds, inadequate record keeping and reporting, failure to disclose relevant and material information, lack of credibility and creditor confidence, and various other similar instances of conduct." *In re Ancona,* No. 14-10532(MKV), 2016 WL 7868696, at *9 (Bankr. S.D.N.Y. Nov. 30, 2016).

46.     The Court has wide latitude to determine what conduct rises to the level of constituting cause to appoint a trustee. *Id.* It is the duty of the debtor-in-possession to preserve the property of the estate for the benefit of creditors and to minimize damage to the estate. *In re Ionosphere Clubs, Inc.,* 113 B.R. at 169. Appointment of a chapter 11 trustee is proper where, as here, the debtor defaults in its responsibilities. *Ancona,* No. 14-10532(MKV), 2016 WL 7868696 at *10. When a debtor-in-possession is incapable of performing this vital duty, or when creditors' confidence evaporates, a chapter 11 trustee must be appointed. *See, e.g., V. Savino Oil & Heating Co.,* 99 B.R. at 525-26; *In re McCorhill Publ'g, Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987). The Debtor's conduct both before and in this Second Chapter 11 Case evinces many of these factors and demonstrates dishonesty, incompetence and gross mismanagement. A trustee must be appointed for cause.

<u>*Debtor's Misuse of Bankruptcy Relief*</u>

47.     The Debtor's extensive history of misusing the State and Federal Courts to hinder, delay and further damage its largest creditor constitutes cause. *See* ¶¶5-26, *supra*. The Loan

matured and Debtor defaulted on the Loan more than ten years ago. *See* ¶5, *supra*. Since then, Newell obtained the Judgment and has sought to enforce its right to sell the Property four times. *See* ¶¶5-26, *supra*. Through several State Court actions, two bankruptcies by the Debtor and one bankruptcy by its principal, Rev. Thompson, the Debtor has continuously sought to hinder and delay, and successfully hindered and delayed, Newell's efforts to enforce its rights under the Judgment, constituting bad faith and sufficient cause.

48.     The claims that the Debtor continues to allege against Newell will not relieve it of its liability under the Judgment or provide a source of recovery for its creditors, and the Debtor knows it. As previously held by this Court and the State Court, such claims were heard, determined and denied by the State Court in the Judgment. *See* ¶16, *supra*. The Debtor cannot reasonably believe that such claims remain and could provide any basis for continuing to resist sale of the Property, yet it continues to push this false narrative, demonstrating further bad faith as well as dishonesty.

49.     As with its First Chapter 11 Case, the Debtor has refused to comply with its obligations as a debtor-in-possession.  The Debtor has not filed monthly operating reports. *See* ¶28, *supra*. The Debtor has not complied with Section 363(c)(2) of the Bankruptcy Code with respect to its use of Newell's cash collateral. The Debtor has neither Newell's consent or Court approval for its continued use of cash collateral. *See* ¶29, *supra*. The Debtor has not filed motions to approve retention of professionals, including after being directed to do so, and is on the cusp of being without counsel. *See* ¶36, *supra*. The Debtor cannot appear *pro se* and is aware of this fact. Withdrawal Motion, ¶15. The Debtor continuously refuses to comply with its obligations under the 2004 Order and still has not produced documents responsive to the Document Requests. *See* ¶¶33-35, *supra*. The only document it has produced - the Property Insurance Property Insurance

Policy – proves that the Debtor's insurance fails numerous important requirements for the insurance agreed upon in the Mortgage. *See* ¶34, *supra*. The Debtor's refusal to comply with even the most basic requirements the Bankruptcy Code imposes on a debtor-in-possession constitutes cause supporting the appointment of a trustee.

<u>*Debtor Continues to Incur Debts is Cannot Pay*</u>

50.     The Debtor continues to incur additional debt that it has no ability or intention of paying. *See* ¶41, *supra*. The Debtor's valid scheduled liabilities exceed $1,464,825.61.[3] The Debtor has no valuable assets from which to pay these claims. *See* ¶¶38-40, *supra*. Approximately $300,000 of the Debtor's scheduled claims are loans by individuals that the Debtor has testified are parishioners of the Debtor. *See* ¶41, *supra*. It is not clear whether these are true loans or charitable contributions. The Debtor's representative testified that with respect to his loan it was a supported by a promissory note with no maturity date. Richardson Tr., p. 32:10-25 and 33:2-16. The Debtor has failed to produce any promissory notes, which were requested in the Document Requests. If these transactions are loans then the Debtor is fraudulently inducing its congregation into granting it loans it cannot pay, and if they are donations then the Debtor has fraudulently included these as claims in its schedules. Either explanation constitutes cause.

<u>*The Debtor has no Intention or Ability to Reorganize*</u>

51.     Finally, the Debtor has no more willingness or ability to reorganize and confirm a plan than it did when the Court dismissed the Debtor's First Chapter 11 Case. The Debtor has scheduled only two significant assets – alleged claims against Newell and any residual interest of the estate in the Property. As discussed above, neither asset has value for the estate. The Debtor has no legitimate claims against Newell. *See* ¶16, *supra*. The Debtor also has no equity remaining

---

[3] This calculation excludes 829 Holding Corp. and Keyess Corp., which do not hold valid claims. *See* ¶41, n. 2, *supra*.

in the Property. Under either the present use value or the market value, the Judgment exceeds the value of the Property. *See* ¶39, *supra*. There are no available assets to fund a plan and the Debtor cannot show that it has the ability to obtain the requisite votes to confirm a plan in light of Newell's certain votes to reject any such plan, both as a secured and unsecured creditor.

52.     The Debtor allegedly intends to confirm a plan funded by (i) increasing donations, (ii) hospitality or rental revenue from a yet-to-be-completed event space,[4] (iii) grants and (iv) potential financing. The Debtor has not taken even the first steps in formulating a plan. The Debtor has not set a Bar Date. *See* ¶31, *supra*. The Debtor's representative produced for the Deposition, Richardson, was not able to testify to the existence of any projections of the amount that the Debtor will need to confirm a plan. Richardson Tr., p. 46: 25 and 47:2-5. Nor, was he able to testify that the Debtor has projected how much it would need to raise from each potential funding source or what it would do if it was not able to raise such amounts. Richardson Tr., p. 36:14-25, 38:2-11, 45:19-22, 48:3-24. Debtor's counsel himself has stated that he was not able to obtain "the frank and open disclosure necessary to achieve the Debtor's alleged intentions regarding the resolution of the Chapter 11 proceeding." Withdrawal Motion, ¶12.

53.     Further, the Debtor's proposed sources of funding are illusory and insufficient. The Debtor's intentions to raise funds for a plan from its parishioners – through increased donations and hospitality or rental revenue – is both speculative and abusive. As noted above, the Debtor has no projections about the amounts that it can, or needs to, raise from these sources. Richardson Tr., p. 36:14-25 and 38:2-11. Moreover, the Debtor has already obtained more than $300,000 from

---

[4] At the 341 Meeting, Rev. Thompson testified that the Debtor anticipated funding its plan in part through renting out its renovated facilities for events. 341 Tr., p. 20. However, the Debtor's representative testified at the Deposition that this funding was from hosting "hospitality events" which he described as bake sales and excursion events for parishioners. Richardson Tr., p. 37 and 38:2-11. Both testified that the renovations were not completed. Richardson Tr., pp. 10:19-25 and 11:2; 341 Tr., pp. 16-18.

its parishioners to support the purchase of property it cannot afford. *See* ¶41, *supra.* As set forth herein, the Debtor has no viable plan and frankly cannot afford the Property. Continuing to obtain funds – as either donations or loans – from its parishioners for property it cannot afford is misleading or abusive.

54.     The grants that the Debtor is seeking are uncertain and insufficient to fund any Debtor plan and post-confirmation obligations, even if such a plan existed.  Richardson testified that the Debtor is seeking three grants – two of which are in progress and one that is based on a not-yet-existent child care center to be run out of the Property. Richardson Tr., p. 39:8-25, 40-45 and 46:1. The two grants that are in progress total only $50,000, and the larger of these grants ($35,000) is a one-time only grant that will not provide a source of on-going funding.  Richardson Tr., p. 40:14-25 and 41:2-15. The Debtor has not applied for the third grant, which is in an unspecified amount and would be based on the Debtor running a yet-to-be-licensed daycare center out of the Property. Richardson Tr., p.43:15-25, 45-46:2-24. This third grant is too speculative to be considered a potential source of plan funding. The Debtor cannot offer any assurance that it will receive these grants, but even if it does, the Debtor has no idea whether this will be sufficient to fund a plan.

55.     Finally, the Debtor has not started seeking any replacement financing. Richardson testified the Rev. Thompson had not yet had conversations with the Debtor's heads of ministries regarding refinancing the Mortgage.  Richardson Tr., p. 48:3-24. Richardson was not aware of any communications with potential financing sources.  Richardson Tr., p. 48:2 and 49:2-4. At no point over the last ten years has the Debtor been able to obtain alternate financing to pay the Judgment. Nor is such financing likely to be available, affordable or sufficient to satisfy Newell's secured claim and fund a plan based on the appraised value of the Property. *See* ¶¶41-42, *supra*. There is

no credible basis to believe that the Debtor will be able to obtain replacement financing to fund a plan.

56.     In sum, the Debtor's ideas about how to fund a plan of reorganization are just that, ideas. The Debtor has taken no concrete steps – including communicating with its unretained counsel – to formulate or fund a plan. Nor, will be it be able to do so absent a sale of the Property, an action it refuses to consider. Ample cause exists mandating appointment of a trustee.

## B. Appointment of a Trustee under Section 1104(a)(2) is in the Best Interests of Creditors

57.     Section 1104(a)(2) creates a flexible standard and allows the appointment of a trustee even when no "cause" exists. *In re Euro-American Lodging Corp.*, 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007); *Ionosphere Clubs, Inc.,* 113 B.R. at 168 (internal citations omitted). When deciding whether a trustee should be appointed under section 1104(a)(2) a court will consider: (1) debtor's trustworthiness; (2) past and present performance and the potential for reorganization; (3) whether creditors have confidence in present management; (4) and the benefits of appointing trustee balanced against the cost of appointment. *Euro-American Lodging Corp., 365 B.R. at 427; Ionosphere Clubs, Inc., 113 B.R. at 168; China Fishery Group Limited (Cayman), 2016 WL 6875903 at *14; In re Soundview Elite, Ltd., 503 B.R. 571, 583 (Bankr. S.D.N.Y. 2014)*. The Court has discretion in assessing the above factors to determine whether to appoint a trustee. *China Fishery Group Ltd. (Cayman)*, 2016 WL 6875903 at *14. With respect to whether a trustee should be appointed under section 1104(a)(2), courts "eschew rigid absolutes and look [ ] to the practical realities and necessities." *Id.*; *Ionosphere Clubs, Inc.*, 113 B.R. at 168.

58.     All of these factors are met based on the facts set forth in detail above and further support appointment of a trustee. The Debtor has proven itself untrustworthy through more than

a decade of misuse of the State and Federal court systems to thwart Newell's efforts to collect on the Judgement. *See* ¶¶5-26, *supra.* The Debtor has also failed to satisfy even the most basic of its obligations as a debtor-in-possession. *See* ¶¶28-37, *supra.* The Debtor has no assets and there is no likelihood of reorganization. *See* ¶¶42 and 51-55 *supra.* Based on all the foregoing, there is no basis for any creditor to have confidence in the Debtor. The Debtor's parishioner's faith in the Debtor's intentions is not confidence; it is faith. Richardson Tr., p. 33:14-16 ("Q: What is your understanding as to when that promissory note will be repaid? A: When the Church can."). Finally, the benefits of appointing a trustee far outweigh the cost of appointment. A trustee will presumably seek to sell the Property capturing the higher market value to maximize recovery to the Debtor's estate and protect the integrity of this process. Such "savings will offset the additional cost resulting from the trustee's appointment." *Euro-Am. Lodging Corp.,* 365 B.R. at 432. As noted above, Newell is willing and prepared to negotiate an appropriate carve-out arrangement with a trustee.

59. The foregoing overwhelming evidence supports the appointment of a Trustee under section 1104(a)(1) and (2) of the Bankruptcy Code based on cause and the best interests of the Debtor's creditors.

## II. RELIEF FROM THE AUTOMATIC STAY

60. Section 362(d) of the Bankruptcy Code provides that the Court may grant relief from the automatic stay (the "Stay"):

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> > (A) the debtor does not have an equity in such property; and
> >
> > (B) such property is not necessary to an effective reorganization;

. . .

    (4)   with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved . . .

        (B)   multiple bankruptcy filings affecting such real property.

    If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

11 U.S.C. §362(d)(1), (2) and (4). The facts set forth above satisfy the requirements of all three of the subsections of section 362(d) of the Bankruptcy Code cited above and entitle Newell to relief from the Stay.

### A.  The Stay Should be Lifted for Cause Based on Lack of Adequate Protection

    61.     The Debtor has utterly failed to adequately protect Newell's interest in the Property. "[L]ack of adequate protection of an interest in property" is explicitly referenced in section 362(d)(l) of the Bankruptcy Code as providing "cause" for the Court to lift the automatic stay. 11 U.S.C. § 362(d)(l). Courts have construed section 362(d)(l) of the Bankruptcy Code to mean that a debtor must give a secured creditor "reasonable assurance that the value of its secured interest in an item of property is, and will continue to be, protected by the debtor." *In re Hamilton*, 100 B.R. 385, 388 (N.D. Ill. 1989) (citing *In re Cooley*, 37 B.R. 590, 592 (Bankr. E.D. Pa. 1984)). Further, there is "lack of adequate protection" where "the value of [creditor's] collateral is declining as a result of the stay." *In re Elmira Litho, Inc*., 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994). A secured creditor "must, therefore, prove this decline in value – or the threat of a decline – in order to

establish a *prima facie* case" for relief from the stay. *Id.* A "threat" of decline in value includes the failure to maintain Property Insurance Property Insurance Policy or the failure to keep the property in a good state of repair. *Id.* at 902, n.9. Under section 362(g)(2) of the Bankruptcy Code, the Debtor has the burden of proof on the adequate protection issue once Newell presents evidence of a threat of decline in value of its collateral. 11 U.S.C. § 362(g)(2).

62.     Newell has established a threat of a decline in value in several respects. First, the Property Insurance Property Insurance Policy fails to satisfy almost every requirement of the Mortgage for insurance coverage for the Property. *See* ¶34, *supra* (noting deficiencies including, lack of full replacement coverage cost, lack of coverage for flood, earthquake, underground hazards, collapse and explosion, insurer is not licensed in New York, Newell is not named as a loss payee or additional insured and deductible exceeds agreed limit). Accordingly, there is a clear threat to Newell's interest in the Property due to the lack of adequate insurance.

63.     Second, it is unclear that the Debtor is adequately repairing and renovating the Property, with licensed professionals and required permits.  *See* ¶40, *supra*. The Debtor has also failed to obtain payment from insurance for damages that occurred more than a year ago. *Id.* It is not clear that the Debtor has even submitted a claim. *Id.*

64.     The Debtor has not filed its monthly operating reports accounting for the use of Newell's cash collateral.  *See* ¶28, *supra.* Newell has not consented to the use of its cash collateral and has apprized the Debtor of this lack of consent. *See* ¶29, *supra.* The Debtor has not sought or obtained Bankruptcy Court approval for such use. *Id.* Section 363(c)(2) of the Bankruptcy Code prohibits a debtor-in-possession from using cash collateral unless each entity with an interest in such cash collateral consents or the court authorizes such use. Newell is not adequately protected against any decrease in its cash collateral from the Petition Date.

65.     In view of such threats to Newell's interest, the Debtor must present evidence and carry its burden of proof that Newell's interest in the Property is adequately protected, which it cannot do.

66.     All these facts overwhelmingly demonstrate cause for relief from the automatic stay.

**B.    The Stay Should be Lifted for Cause Based on the Debtor's Bad Faith**

67.     "It is well established that a debtor's lack of good faith in filing a petition for bankruptcy constitutes sufficient 'cause' to lift the stay" under section 362(d)(l) of the Bankruptcy Code. *In re MacInnis*, 235 B.R. 255, 259 (S.D.N.Y. 1998) (citing *In re Sonnax Indus.*, 907 F.2d 1280, 1287 (2d Cir. 1990)). *See also In re Project Orange Assocs.*, LLC, 432 B.R. 89, 112 (Bankr. S.D.N.Y. 2010) ("Bad faith may be sufficient 'cause' to lift the stay."); *In re Kornhauser*, 184 B.R. 425, 428 (Bankr. S.D.N.Y. 1995) ("[l]t is well settled that a bad faith filing constitutes 'cause' for relief from the automatic stay.").

68.     Courts have considered the following factors in determining bad faith on a motion for relief from the automatic stay under section 362(d)(l) of the Bankruptcy Code:

- the debtor has only one asset;

- the debtor has few unsecured creditors, whose claims are small in relation to those of the secured creditors;

- the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

- the debtor's financial condition is, in essence a two-party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

- the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

- the debtor has little or no cash flow;

- the debtor can't meet current expenses including the payment of personal property

and real estate taxes; and

- the debtor has no employees.

*In re 68 West 127 St., LLC*, 285 B.R. 838, 843 (Bankr. S.D.N.Y. 2002), citing *In re C-TC 9th Ave. P 'ship*, 113 F.3d 1304 (2d Cir. 1997). "It is the totality of circumstances, rather than any single factor, that will determine whether good faith exists." *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997). *See also C-TC 9th Ave. P'ship*, 113 F.3d at 1312 ("[A] determination of bad faith requires a full examination of all the circumstances of the case; it is a highly factual determination but also one that may sweep broadly."). As noted by the Court in *MacInnis*, "[n]umerous courts have found bad faith where a debtor possessing a single asset has no realistic chance for rehabilitation of any ongoing business and files a bankruptcy petition in the hopes of gaining relief from another action that essentially involves the resolution of a two-party dispute." *MacInnis*, 235 B.R. at 260. *See also In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309 (Bankr. S.D.N.Y. 2001) (granting motion for relief from stay and finding bad faith where the bankruptcy petition was filed on the eve of mortgage foreclosure, the debtor had only one asset, no employees, produced no income or discernable cash flow, and had very few unsecured creditors who would benefit from a chapter 11 reorganization, and the case was essentially a two-party dispute the filing of which was to stop the foreclosure action).

69. All the discernable factors are met here. The Debtor has only one valid scheduled asset – the Property. *See* ¶39, *supra*. The Loan has been in maturity default for more than a decade and the Property is in foreclosure and has been scheduled for four separate foreclosure sales. *See* ¶¶5-26, *supra*. The amount of the Judgment ($1,196,033.99) exceeds the amount owed to the rest of the Debtor's valid creditors cumulatively ($350,386)[5] by more than three times. Moreover,

---

[5] This calculation excludes 829 Holding Corp. and Keyess Corp., which do not hold valid claims. *See* ¶41, n. 2, *supra*.

$300,000 of these claims are alleged loans from the Debtor's parishioners that may be disguised donations. *See* ¶50, *supra*. Accordingly, the Debtor's financial issues are a two-party dispute between the Debtor and Newell that would have been resolved by the State Court but for the Debtor's continued obstruction through its abuse of the State and Federal Court systems. *See* ¶¶5-26, *supra*. As detailed above, the Debtor has sought stays through bankruptcy filings and State Court motion practice on four separate occasions, each on the eve of a scheduled foreclosure sale. *Id*. Due to the Debtor's failure to file monthly operating reports, Newell, and this Court, are unable to assess the Debtor's cash flow, ability to pay current expenses or number of employees. The Debtor should not benefit from its failure to provide information required of a debtor-in-possession related to these factors.

70.     The *68 West 12 7 St.* Court cautioned that the bad faith factors "ultimately do no more than assist the exercise of discretion in deciding when a debtor has improperly invoked the Bankruptcy Code, or is improperly hiding behind the automatic stay to speculate with the creditor's collateral because it is not able, or not trying, to confirm a chapter 11 plan." *68 West 127 St.*, 285 B.R. at 844. This is precisely the case here. The Debtor cannot afford the Property and has consistently used the State and Federal Court systems to avoid its liabilities and deny this reality. The Debtor has demonstrated that it has no ability to obtain refinancing and has no willingness or ability to confirm a plan. The Debtor does not have a reasonable probability of reorganizing and emerging from the bankruptcy. *See 68 West 127 St.*, 285 B.R. at 844 (citing *C-TC 9th Ave. P 'ship*, 113 F.3d at 1301 and *In re Cohoes Indus. Terminal, Inc.,* 931 F.2d 222 (2d Cir. 1991)). There is ample evidence satisfying all the discernable cited factors and demonstrating the Debtor's bad faith, on which it bears the burden of proof, which also supports relief from the Stay.

**C. Newell Should Be Granted Relief from the Stay Because There Is No Equity in the Property and It Is Not Necessary to an Effective Reorganization**

71.     Pursuant to section 362(d)(2) of the Bankruptcy Code, a creditor is entitled to relief from the automatic stay if the debtor lacks equity in the property and the property is not necessary to an effective reorganization. *See* 11 U.S.C. § 362(d)(2). Newell has the burden of proof on the lack of equity and any party opposing this motion has the burden of proof that the Property is necessary to an effective reorganization. 11 U.S.C. § 362(g).

72.     While the Bankruptcy Code does not define "equity," courts look to the generally understood meaning of the term as the value of a property over the amount of all secured liens. *See e.g., Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assocs., Ltd),* 61 F.3d 197, 207 (3d Cir. 1995) ("When Congress enacted the present-day Bankruptcy Code, however, the generally understood meaning of equity interest was the value of a property above all secured liens.") (referencing Black's Law Dictionary 634 (4th ed. 1968)); *In re Thomas*, 2017 WL 123746, *2 (Bankr. S.D.N.Y. Jan. 5, 2017) ("Courts use simple arithmetic to calculate the equity in a property, subtracting the total claims from the value of the property. If the value of claims against a property exceeds the value of the property, the debtor has no equity in the property.") (internal citations omitted). Newell easily satisfies its burden through the attached Appraisal. The Appraisal shows that the value of the Property at either valuation metric is less than the amount of the Judgment. *See* ¶39, *supra*. Moreover, the Debtor has scheduled the Property at a value substantially less than the amount of the Judgment. *Id*. Accordingly, the Debtor has no equity in the Property.

73.     With respect to the second prong, the Debtor bears the burden to demonstrate that the Property is "necessary to an effective reorganization." 1 I U.S.C. §§362(d)(2)(B) and (g). "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective

reorganization that is in prospect." *United Sav. Ass 'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 375-76 (1988) (emphasis in the original). Stated otherwise, "there must be 'a reasonable possibility of a successful reorganization within a reasonable time'." *Id*. at 376. *See also 68 West 127 St.,* 285 B.R. at 848 (under section 362(d)(2)(B), the debtor must show "that its plan has a reasonable prospect of success within a reasonable time.") (citing *Pegasus Agency v. Grammatikakis (In re Pegasus Agency, Inc.)*, 101 F.3d 882, 886 (2d Cir. 1996) and *Timbers of Inwood Forest*, 484 U.S. at 375-76). As such, "mere dreams" of reorganizing are insufficient to meet the debtor's burden under section 362(d)(2)(B). *In re New Era Co*., 125 B.R. 725, 730 (S.D.N.Y. 1991) (finding that both elements of section 362(d)(2) have been satisfied and affirming bankruptcy court's granting relief from the automatic stay). As set forth in detail above, the Debtor has no ability to confirm a plan. *See* ¶¶51-56, *supra*. Moreover, the Debtor has taken no steps toward formulating or funding a plan and no plan is possible within a reasonable time. *Id*. The Debtor's mere dream of finding a way to afford the Property and confirm a plan is not sufficient to satisfy its burden of proof. Relief from the Stay should be granted.

**D. Newell Should Be Granted *In Rem* Relief under Section 362(d)(4) of the Bankruptcy Code Because the Debtor's Multiple Bankruptcy Filings – Including this Second Chapter 11 Case – are a Scheme to Delay, Hinder and Defraud Newell**

74. Newell is also entitled to relief under Bankruptcy Code section 362(d)(4)(B) because the Debtor's Second Chapter 11 Case, as well as its numerous other State and Federal Court filings affecting the Property, are part of a scheme to delay, hinder or defraud Newell. *In re Richmond*, 513 B.R. 34, 38 (Bankr. E.D.N.Y. 2014); *In re Montalvo*, 416 B.R. 381, 386 (Bankr. E.D.N.Y. 2009). The Debtor's intent can be inferred from the circumstances of the case alone, and an evidentiary hearing is not required. *Richmond*, 513 B.R. at 38; *Procel v. U.S. Trustee (In re Procel),* 467 B.R. 297, 308 (S.D.N.Y. 2012). Multiple bankruptcy filings alone – and here we

have three – indicate such intent. *Id.* Other important factors taken into account when determining whether *in rem* relief is appropriate under Bankruptcy Code section 362(d)(4) include "[t]he extent of the efforts by a debtor to prosecute his bankruptcy case and the '[t]he timing and sequencing of the filings'" *Richmond*, 513 B.R. at 38 (quoting *Montalvo*, 416 B.R. at 387); *see also In re GEL, LLC,* 495 B.R. 240, 249 (Bankr. E.D.N.Y. 2012). Furthermore, successive bankruptcies filed in close proximity to each other solely for the purpose of frustrating the foreclosure sale of property, have been found to have been filed with the intent to hinder, defraud, or delay creditors. *See, e.g., GEL, LLC,* 495 B.R. at 249.

75.     The Debtor has filed two separate bankruptcy cases and Rev. Thompson has filed a personal bankruptcy case, each staying a scheduled foreclosure sale of the Property on the eve of such sale. *See* ¶¶5-26, *supra*. In addition, the Debtor filed numerous — and usually repetitive and always unsuccessful — pleadings in State Court seeking to stay the foreclosure sale and vacate the Judgment. *Id*. The Debtor has continued to baselessly attack the Judgement and assert claims against Newell even though these claims have been denied multiple times. The Debtor has raised these same claims three times in the State Court – in the Judgment, the April 2019 Decision and the May 2019 Decision – and has raised these same claims before this Court in its First Chapter 11 Case and each time its claims have been denied. *See* ¶¶16 and 38, *supra*. Moreover, in both its First Chapter 11 Case and Second Chapter 11 Case the Debtor has wholly failed to satisfy its obligations as a debtor-in-possession and progress its case toward a successful reorganization. *See* ¶¶7-10, 28-33 and 35-37, *supra*. The forgoing amply indicate that the Debtor seeks only to continue its decade-long effort to hinder and delay Newell's efforts to foreclose on the Property and collect on the Judgement. Newell is entitled to *in rem* relief under section 362(d)(4) of the Bankruptcy Code to put an end to the Debtor's scheme.

## CONCLUSION

76.     The Property should be removed from the Debtor's control – either through the appointment of a chapter 11 trustee or granting Newell relief from the Stay with *in rem* relief. There is overwhelming evidence supporting both the appointment of a trustee under section 1104(a)(1) and (2) of the Bankruptcy Code and relief from the Stay under 362(d)(1), (2) and (4) of the Bankruptcy Code. Newell respectfully requests that the Court appoint a trustee to avoid further scheming by the Debtor. A trustee can liquidate any other assets and pursue any avoidance actions. In the alternative, Newell requests that the Court grant it relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code, including *in rem* relief pursuant to section 362(d)(4) of the Bankruptcy Code.

## WAIVER OF FED. R. BANKR. P. 4001(a)(3)

77.     If the Court grants relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code, Newell respectfully request that the Court grant a waiver from Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides that "[a]n order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(l) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 4001(a)(3). If the order is effective immediately, such relief will merely permit Newell to schedule the fifth, and hopefully final, sale of the Property and immediate relief in restarting that proceeding will not prejudice the Debtor's estate.

## NO PRIOR REQUEST

78.     No prior request for the relief requested herein has been made to this or any other Court.

WHEREFORE, for all the foregoing reasons, Newell respectfully requests that the Court grant the relief requested herein and grant such other and further relief as is just and appropriate.

Date: December 9, 2019                    **CULLEN AND DYKMAN LLP**

*/s/ Michelle McMahon*
Michelle McMahon
44 Wall St.
New York, NY 10282
212-510-2296
mmcmahon@cullenllp.com

Thomas R. Slome
100 Quentin Roosevelt Boulevard
Garden City, New York 11530-4850
516-296-9165
tslome@cullenllp.com

# CERTIFICATE OF SERVICE

I, Michelle McMahon, hereby certify that on December 9, 2019, a true a correct copy of the foregoing Motion Of Newell Funding, LLC To Appoint A Chapter 11 Trustee Or In The Alternative For Relief From The Automatic Stay, Notice thereof and the supporting Declaration of Bruce Minkoff and Declaration of Michelle McMahon were served upon all parties listed below via First Class Mail and CM/ECF:

US Trustee's Office
Attn: Serene Nakano, Esq.
US Federal Office Building
201 Varick St., Room 1006
New York, New York 10014

Cardenas Islam & Associates PLLC
Barak P. Cardenas, Esq.
175-61 Hillside Avenue, Suite 302
Jamaica, New York 11432

*/s/ Michelle McMahon*