CULLEN AND DYKMAN, LLP
Michelle McMahon
44 Wall St.
New York, NY 10282
212-510-2296
mmcmahon@cullenllp.com

Thomas R. Slome
100 Quentin Roosevelt Boulevard
Garden City, New York 11530-4850
516-296-9165
tslome@cullenllp.com

Attorneys for Newell Funding, LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In re:                                                    Chapter 11
                                                          Case No.: 19-12447 (SMB)
Bronx Miracle Gospel Tabernacle Word
of Faith Ministries, Inc.,

                                    Debtor.
-----------------------------------------------------------X

## <u>DECLARATION OF MICHELLE MCMAHON</u>

I, Michelle McMahon, hereby declare, pursuant to the penalties of perjury under 28 U.S.C. § 1746, that the following statements are true and correct:

1.      I am a partner with Cullen and Dykman, LLP, counsel for Newell Funding, LLC ("Newell"), a secured creditor of Debtor Bronx Miracle Gospel Tabernacle Word of Faith Ministries, Inc. f/k/a Bronx Miracle Gospel Tabernacle, Inc. (the "Debtor"). I make this Declaration in support of Newell's motion for appointment of a Trustee under section 1104(a)(1) and (2) of the Bankruptcy Code and granting Newell relief from the Stay under 362(d)(1), (2) and (4) of the Bankruptcy Code (the "Motion"). Capitalized terms used but not defined in this Declaration shall have the meanings ascribed to them in the Motion.

2.　　I sent the letter attached hereto as Exhibit A to Debtor's counsel informing the Debtor that Newell has not consented to the use of its cash collateral.

3.　　On August 27, 2019, the U.S. Trustee held the meeting of creditors and equity security holders required by section 341 of the Bankruptcy Code. Excerpts of the portions of an unofficial transcript of this meeting cited in the Motion are attached hereto as Exhibit B.

4.　　On November 29, 2019, I sent the letter attached hereto as Exhibit C to Debtor's counsel informing the Debtor that the Property Insurance Policy fails to satisfy almost all the requirements for insurance agreed to by the Debtor in the Mortgage as detailed in the letter.

5.　　On November 15, 2019, Newell conducted a deposition of the Debtor's designated representative, Bernel Arthur Richardson. Excerpts of the portions of a transcript of this deposition are attached hereto as Exhibit D.

6.　　Newell obtained an Appraisal of the Property dated October 21, 2109, a copy of which is attached hereto as Exhibit E.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 9, 2019

*/s/ Michelle McMahon*
Michelle McMahon

# EXHIBIT A

**CULLEN**and**DYKMAN**LLP

44 WALL STREET
NEW YORK, NEW YORK 10005-2407
TELEPHONE: 212.732.2000 • FAX: 212.742.1219

MICHELLE MCMAHON, ESQ.
PARTNER
DIRECT DIAL: (212) 510-2296
E-MAIL: MMCMAHON@CULLENANDDYKMAN.COM

September 11, 2019

**VIA EMAIL**
Cardenas Islam & Associates, PLLC
Barek Cardenas, Esq.
175-61 Hillside Ave., Ste 302
Jamaica, NY 11432
Email: barak@cardenasislam.com

      Re:    *Bronx Miracle Gospel Tabernacle Word of Faith Ministries, Inc.,* Case
              No. 19-12447 (SMB)

Dear Mr. Cardenas:

Cullen and Dykman LLP represents Newell Funding, LLC ("Newell") with respect to the above-referenced Chapter 11 bankruptcy case of Bronx Miracle Gospel Tabernacle Word of Faith Ministries, Inc. (the "Debtor"). Pursuant to Bankruptcy Code section 363(c)(2), a debtor is prohibited from using, selling or leasing cash collateral unless the entity with an interest in such cash collateral consents to such use, sale or lease or the court, upon notice and a hearing, authorizes such use, sale or lease. Newell does not consent to the Debtor's use of any of the rents, revenues, receipts, income, earnings, issues, accounts receivables and profits derived from the Mortgaged Property as defined in the Mortgage and Security Agreement by and between Newell and the Debtor dated March 6, 2008. Accordingly, the Debtor is prohibited from using, selling or leasing any such cash collateral unless and until the Debtor has complied with the provisions of section 363(c)(2).

Section 363(c)(4) provides, and Newell hereby demands, that the Debtor immediately segregate and account to Newell for any cash collateral, including but not limited to any tithing, donations, rents or other income from use of the Mortgaged Property in its possession, custody or control.

Finally, please provide Newell with an accounting of the amount of the Debtor's cash and cash accounts as of July 28, 2019 and a date and time for its accountant or other representative to inspect the Debtor's books and records.

                    Sincerely,

                    */s/ Michelle McMahon*

                    Michelle McMahon

cc:     Newell Funding LLC (via email)
        Bruce Minkoff, Esq (via email)

# EXHIBIT B

SN = Serene Nakano; DR = Debtor 's Representative; DC = Debtor's Counsel; CC = Creditor's Counsel; Other Rep = Ramona Daliah; MM = Michelle McMahon

## FIRST RECORDING

Today is August 27, 2019, the time is now 2:50pm. This is the meeting of the creditors for the case Bronx Miracle Gospel Tabernacle Word of Faith Ministries, Inc. case #19-12447SMB. My name is Serene Nakano, I'm an attorney with US Trustee's Office and I'll be presiding over today's meeting of creditors.

SN - At this time, I would like to swear in the Debtor's representative. Sir, do you solemnly swear or affirm to tell the truth, the whole truth and nothing but the truth.

DR - Yes

SN - Thank you, could you please state your full name and spell your last name and speak up so the mike can pick up your voice.

DR - My name is Keith Elijah Thompson, the spelling of the last name is THOMPSON

SN - Do you go by Doctor or Reverend?

DR - Reverend.

SN - Reverend, I have a few instructions before we get started. As you can see, this meeting is being recorded so it is necessary for you to respond to my questions verbally, the machine can't take down a shake of a head or a nod as an answer. Do you understand that?

DR – Yes.

SN – If you don't understand the question I'm asking, just ask me to rephrase it I'll do my best. Finally, if the witness rather than counsel would respond to my questions I would prefer that if however the witness needs to consult with counsel this is perfectly fine. Would counsel please identify himself.

DC – Counsel is Barak Cardenas, Cardenas Islam & Associates, my address is 17561 Hillside Avenue, Jamaica, New York 11432. I am counsel for the Debtor Bronx Miracle Gospel Church.

SN – And for the Creditor.

CC – Michelle McMahon from Cullen and Dykman for Newell Funding.

SN – And the other appearance.

Other Rep - Ramona Daliah, Consultant and Paralegal for Cardenas Islam.

SN – Reverend what is the Debtor's business address?

DC – Ah for the Bronx Miracle Gospel Tabernacle Word of Faith Ministries, would that be sufficient?

MM – Ah potentially, I'll have to look at it, if not, we can follow up. Ok, this answers for general liability but no real property insurance.

DC – Its for general liability which was what was requested.

MM – Ok, so the Church doesn't maintain insurance on the real property?

DC – I mean he would have to answer that question.

DR – Yeah, sure, that's the insurance that they have

DC – That's the insurance that the um church has?

DR – That's the insurance for the property.

MM – Ok, but

DC – Liability insurance

MM – Right

DC – So if the Church is sued, or if there is anything of that nature.

MM – Right, but if the real property burns to the ground, there's no insurance covering that?

DC – I believe there is

DR – What (NOT CLEAR)

Other Rep – I believe that there is I believe we sufficed that. I think it might be (NOT CLEAR)

DC – She's asking if you have insurance should something happen to the property?

DR – Absolutely, yes, yes

Other Rep – yes they have dwelling insurance

DR – Yes, that's the insurance

MM – Could I get a statement

Other Rep – we already have a copy of that when they loaned him the money (NOT CLEAR)

MM – Yes but that was

DC – why don't we do this

MM - a long time ago at this point

DC – my email address is Barak@cardenasislam.com If there are any documents that you are requesting as a result of your questioning today. I would request that you make that request in writing through my email

MM – Will do

DC – And then of course we will take it under advisement and then we will discuss my client.

MM – Then with respect to each of these insurance policies, are the premium current?

DR – Yes

MM – Are there any real property tax arrearages? Past due?

DR – It is a tax exempt.

DC – I would say that number one the church is a tax exempt institution

MM – And it still has tax exempt status?

DC – So and it should still have tax exempt status so it should not have, there should not be any arrearages.

MM – Ok, on Schedules E & F, there was listed a priority unsecured claim owned to the New York City Department of Finance, that's not for a tax liability?

DC – So apparently there was an issue that needs to be resolved regarding the regarding taxes. That's something that we'll going to be dealing with as well. They should not owe taxes, however there appears to be, there does appear to be a bill regarding taxes that should not be upon the property due to their tax exempt status. That is something that we are going to be seeking to be resolved as well through the bankruptcy.

MM – OK, so that reflects taxes on the property that are disputed.

DC – Yes

MM – OK. Are there any building violations against the property?

DR – Well, non again, there are lights that there you park your car around there and I think they, that there's a there is a ticket they write for that but not that, you know for the, you know maybe the person that was there before we move in there was you know which we are trying to solve with them and clear it up.

MM – So with respect to the priority unsecured claim reflected owed to the New York Department of Buildings on Schedule E and F, you're saying those are related to parking violations that preexisted your purchase of property?

DR – No not preexisting I think a car, I did have my own car around there and they they you know they give tickets, I did have my car there and

DC – If there are any violations on the property we will give you a copy of the records

MM – OK. Ok, in you 1007 Declaration you alleged that there was water damage to the property in November 2018 and subsequent water damage resulting from heavy rainfall. Has this damage to the building been repaired?

13

DR – Yes we its taken care of

MM – And has the condition that permitted the damage from the rainfall been remedied so as to prevent future damage?

DR – No

(NOT CLEAR) – Say that again

DR – Can you repeat that again?

MM – So has whatever condition that permitted heavy rainfall to damage the building been remedied so that going forward when we get a big rain storm there won't be further damage to the property.

DR – I meant (NOT CLEAR) yeah go head

DC – Alright so just so you understand

DR – Yes

DC – There was rain damage to the property.

DR – Um hum

DC – Has that rain damage was repaired?

DR – Yes

DC – Ok, when you repaired that rain damage, did you, did your contractor also repair the issue that would cause future rain damage?

DR – That's also repaired.

DC – Yes

MM – Was an insurance claim for the damage filed?

DR – Um no we did not, the insurance

Other Rep – The November

DR – Um hum

Other Rep – Ok, was not filed

DR – Yeah

Other Rep – Ok, you were in talking with the owner

DR – Right, right

Other rep – And this one here. you were fixing it yourself

DR – Yeah I'm fixing it we fix it ourselves.

MM – Ok

DR – Because what happened they was a fire next door and they pour

MM – Oh well I'll come to the fire damage questions

Other Rep – No that was

MM – That was related to the

(NOT CLEAR) - November

DR – Yeah that was related to November you know and then this they the fire truck sprayed the water and you know what I mean and even broke through windows but we're taking care of that until you know until everything is taken care of.

MM – So your neighbors insurance is responsible for that?

DR – Well they but we don't wait for them to do it, we do it before

MM – Oh yes but you could still file a claim for the damages

DR – yes

MM – including the repair cost and things

DR – yes

MM – So are you working with your neighbors' insurance company then to file a claim through their insurance for that?

DR – Well the person who in charged of that said they will take care of it but at the same time they don't wait for them to take care of we take care of it ourselves not with our insurance.

DC – Did you file an insurance claim regarding the damage?

MM – Either with your own?

DC – yes or no

MM – Or someone else's insurance?

DR – Do we (NOT CLEAR) No. I don't think they did file (NOT CLEAR)

DC – It sounds to me like he doesn't remember or he's not sure so what I can do

MM – Follow up

DC – I can follow up and find out whether a claim was filed.

MM – Ok, In your 1007 Declaration you also state that certain renovations are being done to the building. Can you describe those renovations and what the status of them are?

DR – Well, the renovation that we have done to the building, we have new, we fix up the bathroom, youth bathroom, the balcony and we you know we do extensive renovations through to put it in excellent condition.

MM – And so those renovations are in progress right now?

DR – Well, some of them is already completed.

MM – Ok, what is completed and what's still in progress?

DR – Well, what is in progress is just we painting up the place nicely and you know we getting some new windows and etcetera.

MM – Ok and what remains to be renovated?

DR – Well, that there, well there's nothing else after that just take care of it will be in good standing.

DC – Ok

(NOT CLEAR)

DC – Are there renovations that are you going to be completing in the future?

DR – Yes

MM – What renovations are you going to be completing in the future?

DR – Well, um, the renovation in which I'm completing in the future is the you know we, we are fixing

DC – Do you remember what renovations you need to complete in the future?

DR – In the future?

DC – Yes

DE – Well ok

DC – Do you remember?

DR – Yes

DC – Ok, what renovations do you need to complete in the future to the property?

(NOT CLEAR)

DR – Explain that, I know what you mean

Other Rep – Explain to them currently what you're working on downstairs.

DR – ok

Other Rep – and what's that's going to do and help you

DR – Ok, downstairs we are, we are fixing up downstairs in the way that we can have the community to utilize the place to have wedding, repast, you know, baby shower, etcetera, and even if the community needed for anything special birthday celebration and etcetera, so that's what we are, we are working on and

DC – So are we talking about you doing renovations to the basement.

DR – yes

DC – You're going to be doing renovations to the basement in the future so that you can, so that you can rent it out for that, for the parishioners to use?

DR – For the parishioners and for the community

DC – And for the community?

DR – Yeah, not only for the parishioners and community but for all the Church

DC – Are you talking about Hall space?

DR – Yes

DC – Ok, is there are there any renovations that have been completed?

(NOT CLEAR)

DR – Yes that what

DC – If you don't remember you can say you don't remember

DR – I indicated bathrooms, don't I mention that?

MM – You did

DC – Anything else?

DR – And the balcony is completed

DC – Um hum

DR – And you know and certain rooms are completed.

DC – Rooms?

DR – Yeah

DC – OK

DR – Because there, you know like for school etcetera you know, its all completed

DC – ok

DR – The place is

MM – So there aren't any future renovations to be done?

DC – He didn't say that

DR – I did not say (NOT CLEAR)

MM – You just said they were all completed

DR – (NOT CLEAR)

DC – He said, I know, I know, cause I asked him what renovations he completed

MM – Yeah

DC – He said what renovations was completed but also before that he said that they were renovations that were going to be done to the basement so that they can rent out Hall space.

DR – Right

MM – Ok, and that's going to be subdivide, I mean what are those renovations? Is it just a cement box now and you're building it out? Or?

DR – I, I think I mentioned to you if I'm not mistaken, that we intend to put new windows in and make a nice flooring and you know, fix up the walls so nicely. Think I mentioned that.

Other rep – (NOT CLEAR) Kitchen

DR – And the kitchen, well you know, she remind me of the kitchen, the kitchen also, you know.

MM – And those are renovations that are going to be in the future?

DR – Well we would say future, future current, current future.

MM – So you started them and there on going?

DR – Yes, so they're, we are working on it even as I speak, you know.

MM – Ok

DR – So things are working

MM – And have you hired contactors or architects to do this work?

DR – Well basically we not changing anything, we just

Other Rep – Updating

DR – We updating

Other rep – (NOT CLEAR)

DR – So when I, that's why I say we new windows and you know what I mean, so we not tearing down and rebuild. It's just like if that window, we just change window, put in new windows and make it look more updated and I indicated to you painting don't I.

MM – So more like redecorating then renovations?

18

DR – Absolutely. Absolutely

MM – OK, so you don't need permits for any of this then?

DR – No, no because you're not changing anything. We just um, we just um, you know I had mentioned to you painting.

MM – And so um what do you expect the cost of these redecorations to be?

DR – Well you know, we have um, someone for, one parishioner that I working along with us and people come in and you know through I work with other churches to, other pastors who are skillful, they come and they help us, you know. (NOT CLEAR)

MM – So the church isn't paying out of pocket for this, it's relying on in kind contributions?

DR – Well, well basically, um not that much, you know, you know like a, like, you know, folks will come and they will you know, they do work and we also, you know it depends on what the work is, you know, but there are certain work we pay for, its certain work we don't pay for.

MM – Ok, and for the work that you have to pay for, where did those funds come to pay for that?

DR – Well as I indicated, remember so we have a church and the parishioner they will give fund for the up keeping of place and to help to renovate.

MM – And is that generally where the Debtor gets its funds from parishioner donations?

DR – Beg pardon?

MM – And is that generally where the Church gets the funds that it uses to operate from parishioner donations?

DR – Well basically, sometime when there are certain thing they give extra toward that, you know.

MM – But on an ongoing basis, Sir, moving away from the renovations, on an ongoing basis for its operating cost like paying the Con Ed bill, paying the Verizon bill, paying wages, where does the money from that for the Church come from?

DR – Well, you know, in Church, if you have, what you call, um tithings and offerings, right, and then you have if you doing something else then the folks will given extra for that so you know so so that's (NOT CLEAR)

MM – Ok, so either as a regular part of tithings or as a part of a special donation funds from the Church come from donations from the parishioners?

DR – Yeah, the parishioner and from friends.

MM – And does the Debtor keep records of these donations?

DR – Well, absolutely

MM – Going back for a second, you referenced that your intention with these renovations or redecorations was to eventually rent out facilities for events and banquets. Does, does the Church have the appropriate insurance to host events or will it be obtaining it?

DR – Well, I, you know, when its, when we get to that bridge, then I think we'll cross it.

DC – The Church is not hosting those events yet, however, when the time comes, when the work is complete and they can actually host those events, then they will get the appropriate insurance.

MM – And when do they anticipate that the, that that will be complete?

DC – Do we have the timetable?

DR – Timetable?

DC – To complete the renovations and then to start renting out the space.

DR – I would say, um, by, by December I believe we will be in good position.

MM – Going back to your petition, you have listed on there, 20 of your largest unsecured creditor and other than my client Newell, there's a number other loans issued by individuals. Are there documents memorializing those loans?

DR – Would you explain that what she just said?

DC – Ok, so when you filed for bankruptcy

DR – um hum

DC – You listed your top 20 creditors

DR – Um hum

DC – OK, they, it included Newell Funding but it included other individuals

DR – Um hum

DC – Ok, those creditors loaned money to the Church.

DR – Right

DC – Are there any loan documents related to those loans? Documentation evidencing that they lent money to the Church?

(NOT CLEAR)

DR – Yeah, that's what we use, we say promissory note, you know.

DC – So there are promissory notes.

DR – Yes, yes

DC – Evidencing those, that debt.

MM – Ok, I'll send you the email and we'd like to get copies of those. And um, the individuals who gave these loans are these parishioners of the Church?

DR – Some of them.

MM – And who are the others?

DR – What you say?

MM – Um, who are the others who are not parishioners?

DR – They were parishioners before but they, you know, sometimes

MM – Ok so current or former?

DR – yes, right, but they were members of the Church

MM – Ok, and your Schedules E & F, the Debtor has scheduled unsecured claims in the amount of $1.4 million dollar each held by 829 Holding Corp and Keyess Corp, what are the nature of these claims? Where do these come from?

DR – Counsel

Other rep – Maybe we should discuss that outside

DC – Can we have a minute?

SN – Um hum, of course.

SN – Ok, we're bank on the record in Bronx Miracle.

(NOT CLEAR) – Yes

MM – So on your Schedules E & F, you have listed unsecured debts owed to 829 Holding Corp and Keyess Corp each owed $1.4 million dollars by the Debtor. What is the basis for that liability?

DR – It's the Church (NOT CLEAR)

SN – Can you speak up so?

DR - Yeah, The Church owe, owe them money.

MM – Ok, and are there

DC – Can I, Can I give a more specific answer to that question?

MM – That would be wonderful.

DC – Ok, so in discussing this matter with my client, ah, what happed is that when initially when the church took out a loan from Newell Funding, at the same time, there was cross-collateralization to property that was owed by these other 2 entities. Ah, as a result of that, the church, it, owes money to both of those 2 entities.

21

MM – And are there documents relating this liability?

DC – Yes

MM – OK, we'll get copies of those too. And so then in a related question, on your Schedule G, you have listed that 829 Holding Corp and Keyess Corp are co-debtors on the debt with the Debtor owed to Newell.

DC – Yes

MM – This is related to that same transaction?

DC – Yes

MM – OK. And these are all the same documents that represent not only that they are, obligators on the loan that's scheduled to Newell but that they're also obligated to the Debtor for this? Or did the Debtor's obligated to them for this amount?

DC – That's correct.

MM – Ok. And in your Schedule A & B part 9 you listed a 2019 appraisal of the property. Um so you obtained a updated appraisal earlier this Spring?

Other Rep – Yes, um, Newell Funding had provided um, an appraisal, ah for $700, that the Church was valued at $700,000.

MM – Predating the last bankruptcy, right?

Other rep – Right. And we had a an appraiser come in and they gave us a different amount but we wanted to be fair to both sides so we um we wanted to compare apples to apples and not apples to oranges and the comps were different, ok, so what we did is we took um a middle of the road valuation that's were, how we came up with that.

DC – The answer to that question is that there is a new appraisal and yes the new appraisal (NOT CLEAR, LAUGHTER)

MM – Ok. And what is the value of the new appraisal?

Other Rep – Um, 2.9.

MM – Ok, and I'll add that to my list I want to get a copy of that appraisal too please.

MM – Ok. In your Schedule A & B part 11, you've also listed as an assets an alleged wrongful foreclosure claim against Newell, valued at $3,000,000, what is the basis for this claim?

DC – If you could send me email

MM – Add this to my list

DC – I could respond to that.

(NOT CLEAR)

MM – And what is the basis for valuing at $3,000,000?

DC – Again same answer

MM – Same? In the prior bankruptcy, you listed as a asset a legal malpractice claim against the Debtor's insure, the Debtor's counsel in the foreclosure action. Was this?

DC – I'm sorry?

MM – In the prior bankruptcy?

DC – In the prior bankruptcy that was dismissed

MM – Yes

DC – before, over a year ago?

MM – Correct. There was listed as, one of the few significant assets of the Debtor that there was a legal malpractice claim against its attorneys. Was this malpractice claim ever brought?

DC – The answer to that question is no.

MM – And then, um, I think we got into a little bit of this earlier, but in terms of how the Debtor plans to reorganize through this case, could you give us some broad strokes and what your intentions are?

DR – Could you explain that for me?

Other rep – She wants to know, um, how you're going to, um, be generating more revenue to the Church, maybe you should explain about the downstairs, maybe you should explain about um the grants that are being, you're seeking grants and the grants that are scheduled to come in.

DR – Don't, did I mention that didn't we answer that already?

Other rep – Yes, I thought that we kind of addressed that but if its

DC – I, I, I mean, my client kind of a did a address that during the 341 hearing, however, um I believe, um, based on my, my clients answer and from our prior discussions that the plan is through raising money through parishioners also through the potential of obtaining a DIP loan on, and a, and through resolution to try to see if there is a possibility of resolving the Newell Funding loan.

MM – And resolving that

DC – And if you send me a request by email, I can provide a better answer by going through with my client as to everything they are doing at this time, what they plan to do in the future.

MM – OK

DC – Cause they, cause it includes a bunch of different things there also, as I said they're doing renovations, ah, to a few of the Halls in order to raise money that way by renting those out. Also

by raising money through their parishioners which is where they get the majority of their money anyway, and also through them to try to raise money by obtaining loan parts as well.

MM – OK.  And do you intend then to proceed through confirmed plan?

DC – Yes

MM – Ok, I think that covers everything and I'll follow up with you with the email on the few items we discussed for follow up.

DC – Sure.

SN – Thank you very much, this meeting is closed.


END OF RECORDING

# EXHIBIT C



MICHELLE MCMAHON, ESQ.
PARTNER
DIRECT DIAL: (212) 510-2296
E-MAIL: MMCMAHON@CULLENANDDYKMAN.COM

November 29, 2019

**BY EMAIL**

Cardenas Islam & Associates PLLC
Barak P. Cardenas, Esq.
175-61 Hillside Avenue, Suite 302
Jamaica, New York 11432

Re:  *In re Bronx Miracle Gospel Tabernacle, Inc.,* Case No. 19-12447
     Notice of Noncompliance – Purchase Money Mortgage and Security Agreement

Mr. Cardenas:

As you are aware, my firm represents Newell Funding LLC ("Newell") with respect to the above-referenced bankruptcy case of Bronx Miracle Gospel Tabernacle, Inc. (the "Debtor"). Newell is in receipt of a copy of the Debtor's policy number HLYNYF113473564-003 (the "Policy") issued by Illinois Union Insurance Company (the "Insurer") insuring the Mortgaged Property as defined and mortgaged by that certain Purchase Money Mortgage and Security Agreement dated March 6, 2008 (the "Mortgage") between the Debtor, as mortgagor, and Newell, as mortgagee.

Please be advised that the Policy is non-compliant with the insurance requirements of the Mortgage. Specifically, the Policy fails to satisfy almost all of the requirements of Mortgage, including but not limited to the following:

- Mortgage §1.9(a):

  o Insurance must be for 100% of full replacement cost in so called "at-risk" form.

  o Insurance must cover the following which are listed as exclusions in the Policy: flood, earthquake, underground hazards, collapse and explosion.

  o Insurance requires coverage for replacement cost and agreed amount endorsements or the equivalents thereof (with no reduction for depreciation), an endorsement covering the costs of demolition and increased costs of construction attributable to the enforcement of laws, building codes and/or ordinances. This latter requirement is excluded in Policy §5(e).

- Mortgage §1.9(d)(ii) – Insurance must be issued by a company licensed to do business in the state in which the mortgaged property is location. The Insurer on the Policy is not licensed in New York. Policy, p.1.

- Mortgage §1.9(d)(iii) and (iv) – Newell is not named as an additional insured or loss payee.
- Mortgage §1.9(d)(v) – the Policy does not include subrogation waivers.
- Mortgage §1.9(d)(vi) – the Policy deductible exceeds the $2,000 per loss limit.
- Mortgage §1.9(d)(vii) – the Policy cancellation provision does not satisfy the 30-day notice requirement for cancellation for non-payment.
- Mortgage §1.9(d)(viii) – Policy does not provide that no act, omission or negligence of Newell or any other names insured shall affect or limit the insurer's obligations under the Policy.

Failure to comply with section 1.9 of the Mortgage is an event of default under the Mortgage. Mortgage §2.1(d). Newell does not waive this event of default or consent to any insurance policy that is less than fully compliant with Mortgage §1.9. This letter is not a demand for payment or any action that would be prohibited by the automatic stay of section 362 of the United States Bankruptcy Code.

Sincerely,

*/s/ Michelle McMahon*

Michelle McMahon

cc:     Newell Funding LLP (via email)
        Serene Nakano (via email)

# EXHIBIT D

```
 1              Richardson
 2      Q.    I'm going to turn now to the
 3   debtor's property, the church itself.  I
 4   understand there have been some
 5   renovations in the church.  Is that true?
 6   Have there been renovations?
 7      A.    Yes.
 8      Q.    And could you describe those?
 9      A.    The renovations have included
10   minor repairs on the second and third
11   floors and ongoing work in the fellowship
12   hall which is considered the basement.
13      Q.    And what kind of repairs?
14      A.    The repairs on the second and
15   third floor, basically replace doors, lay
16   tiles and painting.
17      Q.    And same question with respect
18   to the work that you've described?
19      A.    The work in the basement
20   included -- and is ongoing, included
21   removal of garbage, removal of Sheetrock,
22   and replacement of windows, and electrical
23   work.
24      Q.    And with respect to the
25   electrical work, who performed that work?
```

```
1                    Richardson
2        A.     The work is being performed
3   under the supervision of a licensed
4   electrician.
5        Q.     And did the church hire that
6   electrician?
7        A.     Yes.
8        Q.     And was a permit needed for that
9   work?
10       A.     A permit is in the process of
11  being obtained.
12       Q.     And who paid for those
13  renovations?
14       A.     The renovations were paid for by
15  the church.
16       Q.     Out of which funds?
17       A.     Out of the general operating
18  funds.
19       Q.     And you mentioned that some of
20  those renovations were ongoing?
21       A.     Yes.
22       Q.     When are they anticipated to be
23  completed?
24       A.     We are projected -- the Pastor
25  and the worker is projecting completion
```

```
1              Richardson
2    approximately January of 2020.
3         Q.    Okay.  I would like to show you
4    some photos that were recently taken
5    during an inspection of the property that
6    I'm going mark as Exhibit 1.
7              (Whereupon, Exhibit 1,
8         inspection photos, was marked for
9         identification, as of this date.)
10        Q.    Okay.  So on this first page,
11   what is depicted in this picture?
12        A.    It's a kitchen.
13        Q.    And where is the kitchen located
14   in the church?
15        A.    In the basement.
16        Q.    And is this kitchen part of the
17   renovations?
18        A.    The kitchen will be part of the
19   renovations.
20        Q.    So it's still in progress?
21        A.    Yes.
22        Q.    Is this a gas or electric stove?
23        A.    That is beyond my knowledge.
24        Q.    And who was doing the
25   installation for the appliances in this
```

1                    Richardson

2    bathroom?

3         A.    The licensed plumber.

4         Q.    And did you have a permit for

5    this work?

6         A.    That I do not know.

7         Q.    Okay.  Next page, Page 6 of

8    Exhibit 2.  What is depicted in this

9    picture?

10        A.    A bathroom.

11        Q.    And where is it located in the

12   church?

13        A.    This is the men's room.

14        Q.    And where is that located in the

15   church?

16        A.    On the lower level.

17        Q.    And was this part of the new

18   renovations?

19        A.    No.

20        Q.    Okay.  Going to Page 7 of

21   Exhibit 2, what does this depict?

22        A.    The boiler room.

23        Q.    And is this boiler part of the

24   renovations?

25        A.    No.

```
 1                Richardson

 2      Q.    Okay.  Going to Page 8 of

 3  Exhibit 2, what does this picture depict?

 4      A.    I have no idea.

 5      Q.    Is it an electrical closet

 6  within the church?

 7      A.    That, I do not know.

 8      Q.    Okay.  Going to page 9 of

 9  Exhibit 2, what does this picture depict?

10      A.    The kitchen.

11      Q.    And what renovations -- is this

12  part of the renovations to the church?

13      A.    Yes.

14      Q.    And which part of the

15  renovations does this show?  What's being

16  renovated?

17      A.    The kitchen will be renovated.

18      Q.    And what is being installed

19  here?

20      A.    That, I do not know.

21      Q.    Was there water damage to the

22  property in November of 2018?

23      A.    Yes.

24      Q.    And what was the extent of that

25  damage?
```

```
1                    Richardson

2        A.    To the best of my knowledge, the

3   extent of the damage included broken

4   windows on the lower level and seepage of

5   water into the basement -- or the

6   Fellowship Hall.

7        Q.    And were those -- was that

8   damage repaired?

9        A.    No.

10       Q.    Okay.  Do you intend to have

11  that damage repaired?

12       A.    That damage was caused by a fire

13  at the adjacent building.

14       Q.    Okay.  So those windows are

15  still broken and the property is still

16  water damaged?

17       A.    Yes.

18       Q.    And there's no plan in place to

19  fix that damage?

20       A.    The church has reached out to

21  its insurance agent to contact the

22  insurance company of the other building.

23       Q.    And who reached out to the

24  insurance agent?

25       A.    The Pastor.
```

```
1                    Richardson
2       Q.    And when did he do that?
3       A.    That, I am not sure.
4       Q.    And do you know who is the
5  insurance company?
6       A.    That I will have to get back to
7  you, the name of the company.
8       Q.    Have you received any
9  information from the insurance company,
10 regarding this claim?
11      A.    No.
12      Q.    Was there a formal claim made?
13      A.    That, I do not know.
14      Q.    So you also don't know the
15 status of any claim?
16      A.    No, I do not.
17      Q.    And the Pastor would know that
18 information?
19      A.    That, I cannot answer.
20      Q.    But the Pastor was the one who
21 had the communication with the insurance
22 company?
23      A.    To the best of my knowledge,
24 yes.
25      Q.    And is there anyone else who
```

1          Richardson

2     dispute the New York Department of

3     Buildings claim filed in the case -- or

4     scheduled in the case?

5          A.    We're in the process of

6     presenting what is called a cure remedy,

7     at the Department of Buildings in lower

8     Manhattan, and we intend to have that

9     matter advocated in our interest.

10         Q.    Okay.  The debtor's schedules

11    also listed a number of creditors whose

12    claims were described as loans, are you

13    familiar with these loans?

14         A.    I'm familiar with mine.

15         Q.    Okay.  Then with respect to

16    yours, could you describe when and how

17    that came about?

18         A.    My loan came about during the

19    time when the church first moved in there.

20    There was some immediate repairs that had

21    to be made, and the church members,

22    including myself, made loans to the

23    church, to assist in addressing those

24    issues.

25         Q.    And is this loan reflected in a

1              Richardson

2    document?

3         A.    What do you mean in a document?

4         Q.    Is there a note or an agreement?

5         A.    There are promissory notes.

6         Q.    And what the terms of the

7    promissory note?

8         A.    That, I will have to get back to

9    you on.

10        Q.    How much money was your

11   promissory note for?

12        A.    To the best of my knowledge,

13   $8,000.

14        Q.    What is your understanding as to

15   when that promissory note will be repaid?

16        A.    When the church can.

17        Q.    And who drafted the note?

18        A.    The promissory note?

19        Q.    Yes.

20        A.    The promissory note was drafted

21   by the administrator of the church.

22        Q.    Okay.  And who signed on behalf

23   of the debtor?

24        A.    The Pastor.

25        Q.    Okay.  And why was this

1          Richardson

2    by engaging in an ongoing membership

3    drive.  We intend to increase donations to

4    our hospitality unit, which has increased

5    its sales at the church.  We have a

6    Facebook ministry that was initiated to

7    bring in new members that would lead to

8    more tithes and offerings.  That's

9    internally.  Externally we have a

10   not-for-profit that would bring in -- seek

11   to bring in outside grants to utilize the

12   space within the church that would

13   generate funds.  It's an ongoing process.

14        Q.    And does the debtor have

15   projections as to how much it will

16   increase donations and when?

17        A.    That, I will have to get back to

18   you on.

19        Q.    And has the debtor considered

20   how a recession may impact any projections

21   it has regarding increased donations?

22        A.    No.

23        Q.    And what will the debtor do if

24   it can't increase donations?

25        A.    That, I cannot answer.

```
 1                  Richardson
 2      Q.    With respect to the hospitality
 3  income that you had referred to --
 4      A.    Uh-huh.
 5      Q.    -- is that related to plans to
 6  rent out the renovated event space?
 7      A.    No.
 8      Q.    What is that related to?
 9      A.    The hospitality relates to a
10  series of events that the church hosts.
11  Sell products at the church, coffee, cake.
12  We are in the process of selling dinners.
13  We are in the process of giving trips.
14  That's what that involves.
15            MR. CARDENAS:  Off the record.
16            (Discussion held off the
17      record.)
18            MS. McMAHON:  Back on the
19      record.
20  By MS. McMAHON:
21      Q.    And are these efforts that you
22  described something the church has
23  recently started?
24      A.    Yes.
25      Q.    And when did you start that?
```

```
 1              Richardson
 2      A.    We started those events in --
 3  beginning in August of 2019.
 4      Q.    And what income has the debtor
 5  received, since those started in August?
 6      A.    I cannot answer that.  I do not
 7  know.
 8      Q.    Does the debtor have any
 9  projections about how much income it can
10  bring in from those activities?
11      A.    That, I do not know.
12      Q.    Does the debtor keep track of
13  the cost of these activities?
14      A.    Yes.
15      Q.    And what is the cost of these
16  activities since August?
17      A.    Since August the cost of the
18  hospitality, which is the one that's most
19  popular, is zero, because it's all done
20  through contributions from the members.
21  They provide the supplies, so there's no
22  direct cost to the church, just income to
23  the church.
24      Q.    And does the debtor have
25  insurance in place that covers hosting
```

```
 1                Richardson
 2   those types of events or trips?
 3        A.    Yes.
 4        Q.    Is that the liability insurance
 5   that was provided to the United States
 6   trustee?
 7        A.    That, I don't know.
 8        Q.    You mentioned that the debtor
 9   has a nonprofit organization that is
10   working on obtaining grants?
11        A.    Yes.
12        Q.    What grants is it seeking?
13        A.    It is seeking grants from
14   foundations and from government.
15        Q.    Which foundations?
16        A.    That, I will not answer.  I
17   would not put that information out at this
18   time.
19        Q.    Who would know that?
20        A.    I know that, but I cannot --
21   that's a trade secret.  I would not want
22   to put the --
23        Q.    That's definitely not a trade
24   secret.
25             MR. CARDENAS:  Let me have a
```

```
1              Richardson
2    conversation with my client.
3              MS. McMAHON:  Off the record.
4         (Discussion held off the
5    record.)
6         (Recess taken.)
7         MR. CARDENAS:  All right.  Back
8    on the record.  I have advised my
9    client he can answer the question, the
10   last question.
11             MS. USINGER:  Can you repeat the
12   question?
13        (Record read back.)
14   A.    We're seeking grants from the
15   Yankees Foundation, the New York State
16   Department of Labor, and the New York City
17   Department of Youth Services.
18   Q.    And have you completed -- with
19   respect to each one of those grants, have
20   you completed the grant request?
21   A.    Yes, with the exception of the
22   City of New York.
23   Q.    How much money is sought in each
24   grant?
25   A.    In each grant, approximately
```

```
 1                  Richardson

 2    $15,000 from the Yankees Foundation and

 3    $35,000 from the State of New York,

 4    Department of Labor.

 5         Q.    And are these one-time grants?

 6         A.    The Yankees is a renewable

 7    grant.  The New York State Department of

 8    Labor is a one-time grant.

 9         Q.    And what is the status of the

10    grant requests?

11         A.    At the moment, the Yankees

12    grant, we should receive a decision by the

13    ending of -- by the middle of December,

14    and the New York State, it's a matter of

15    us submitting some documents.

16         Q.    What additional documents need

17    to be submitted?

18         A.    Workman's Compensation

19    exemption.

20         Q.    When do you anticipate

21    submitting them?

22         A.    We submitted the documents.

23    We're waiting for clarity on Workman's

24    Compensation, and renewal of our public

25    charity registration.
```

```
1                 Richardson
2  receiving those?
3        A.    That, I cannot say.
4        Q.    And if the grants were awarded
5  to you, when would they be distributed?
6        A.    The Yankees is distributed
7  within 30 days of the announcement, within
8  30 days.  The State Department is
9  immediately.
10       Q.    And are those all one lump-sum
11 distributions or over time?
12       A.    No, it's all one lump sum.
13       Q.    And are there any other entities
14 from which you're seeking grants?
15       A.    Yes.  We are in the process of
16 putting together a proposal to submit to
17 New York City and New York State for
18 licensing of a family daycare.
19       Q.    So the church is intending to
20 run a daycare center?
21       A.    Yes.
22       Q.    Does the debtor have a license
23 to run a daycare center?
24       A.    Of course not, no.  In the part
25 of the process of submitting is to first
```

```
 1                    Richardson
 2    you have to have an estimated number of
 3    children you'd be providing daycare for?
 4         A.    Yes.
 5         Q.    And you would base that on the
 6    size of the space available or on
 7    expressions of interest to having people
 8    having children to enroll there?
 9         A.    Size of space available.
10         Q.    Okay.  And how many children do
11    you anticipate that you could accommodate?
12         A.    I am not an authority on that.
13    That, I cannot answer.
14         Q.    Who would be able to answer
15    that?
16         A.    We would be bringing in someone
17    from another daycare to give us technical
18    assistance.
19         Q.    And does the debtor have a
20    projection of how much income that could
21    bring in?
22         A.    At the moment, no.
23         Q.    And when does the debtor
24    anticipate that it would start that
25    program?
```

```
1                 Richardson
2       A.    We anticipate by March of 2020.
3       Q.    And you would -- are you
4  familiar with the licensing process, for
5  daycare?
6       A.    I am.
7       Q.    And you believe you could
8  accomplish obtaining a license for a
9  daycare center within that period?
10      A.    Yes.
11      Q.    Have you submitted an
12 application for that?
13      A.    No.  And the reason why, we'll
14 be joining with an existing daycare, and
15 we will come under them, under their
16 license.  We will be an outreach for a
17 time, and then we will take over, while
18 we're in the process of getting a license.
19      Q.    And their license permits
20 daycare to be offered at a location not
21 covered by their existing license?
22      A.    Yes.
23      Q.    Have you reviewed their license?
24      A.    Yes.
25      Q.    Does the debtor have an
```

```
 1                 Richardson

 2    estimation of how much money it would need

 3    to raise to fund its plan of

 4    reorganization?

 5         A.    That, I do not know.

 6         Q.    Who would know that?

 7         A.    The Pastor.

 8         Q.    Does the debtor have projections

 9    of the income and expense, including

10    distributions under a plan of

11    reorganization, for a period that would be

12    covered by the plan?

13         A.    That, I do not know.

14         Q.    Have you reviewed the proposed

15    plan of reorganization?

16         A.    I have not.

17         Q.    Do you know who has?

18         A.    No, I do not.

19         Q.    Do you know if one exists?

20         A.    I do not.

21         Q.    Are you familiar with how the

22    debtor intends to treat the claim of

23    Newell Funding of the plan?

24         A.    No, I do not.

25         Q.    Who would know that?
```

```
 1                    Richardson
 2        A.    The Pastor.
 3        Q.    Are you aware of any efforts by
 4   the debtor to refinance its mortgage?
 5        A.    I'm aware of conversations, yes.
 6        Q.    Conversations between whom?
 7        A.    Between the Pastor and the head
 8   of the various ministries.
 9        Q.    When you say "various
10   ministries," to what does that refer?
11        A.    Within the church, we have
12   several ministries, and the Pastor meets
13   with the ministries, and I guess will talk
14   about that.
15        Q.    What are the contents of that
16   conversation?
17        A.    The conversation has not yet
18   been held.
19        Q.    Okay.  So, the -- you're
20   testifying that the Pastor intends to have
21   conversation with the head of ministries
22   regarding refinancing the mortgages, but
23   has not yet?
24        A.    That's right.
25        Q.    Do you know if the debtor has
```

```
 1              Richardson
 2  had any communications with entities about
 3  refinancing outside of the church?
 4       A.    No, I do not.
 5       Q.    Are you aware that Newell
 6  Funding filed a motion seeking production
 7  of the documents from the debtor?
 8       A.    No, I'm not.
 9       Q.    Are you aware that Newell
10  Funding served a document request on the
11  debtor?
12       A.    No, I am not.
13       Q.    You have not been involved in
14  putting together a production of documents
15  in response to the document request?
16       A.    No, I am not.
17       Q.    Do you know who is involved in
18  that?
19       A.    The administrator of the church.
20       Q.    Anyone else?
21       A.    No.
22       Q.    With respect to this deposition,
23  what documents did you review, in
24  preparation for today, if any?
25       A.    The documents pertaining to the
```

```
 1              Richardson
 2   funding from foundations and outside
 3   sources.
 4        Q.   And what documents were those?
 5        A.   The proposal that was submitted,
 6   and the ongoing discussion that I have had
 7   with the funding sources.
 8        Q.   Anything else?
 9        A.   No.
10        Q.   Did you review the deposition
11   notice, before coming here today?
12        A.   For this deposition?
13        Q.   Yes.
14        A.   I'm not sure.  I don't remember.
15        Q.   Who made the decision to have
16   you testify as the witness here today?
17        A.   The decision was made by the
18   church, the Pastor, in consultation with
19   legal counsel.
20        Q.   What was the reason that you
21   were selected to be the witness?
22        A.   No reason was given to me.
23        Q.   I want to go back to some of the
24   items that we've been over that you
25   testified that you did not have knowledge
```

```
 1              Richardson
 2      A.    No.
 3      Q.    And with respect to the
 4   scheduled foreclosure claim against Newell
 5   Funding, who would have information
 6   related to that?
 7      A.    That, I do not know.
 8            MS. McMAHON:  Could we go off
 9      the record for a minute?
10            (Discussion held off the
11      record.)
12            MS. McMAHON:  Back on the
13      record.
14      Q.    I want to go back to the
15   question that I asked you when you took
16   the first break to talk to your attorney.
17   Without disclosing the substance of
18   conversations, did your counsel instruct
19   you as to how to answer the questions I've
20   asked you?
21      A.    No.
22      Q.    Okay.
23            MS. McMAHON:  That's all I have.
24      Thank you.
25            THE WITNESS:  That's it?
```

1        Richardson

2   MS. McMAHON:  That's it.

3   Off the record.

4   (Time Noted:  12:28 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2
UNITED STATES BANKRUPTCY COURT
3
SOUTHERN DISTRICT OF NEW YORK

4
------------------------------)

5
IN RE:

6
Bronx Miracle Gospel Tabernacle

7
Word of Faith Ministries, Inc.,

8
Debtor.

9

10
Chapter 11

11
Case No.:  19-12447 (SMB)

12
------------------------------)

13

14

15

16
                    DEPOSITION OF

17
          BERNEL ARTHUR RICHARDSON

18
               New York, New York

19
               November 15, 2019

20

21

22

23
Reported by:

24
AMANDA GORRONO, CLR

25
JOB NO. 172061

1

2                    November 15, 2019

3                    10:49 a.m.

4

5        DEPOSITION of BERNEL ARTHUR

6    RICHARDSON, on behalf of the

7    Defendant herein, held at CULLEN &

8    DYKMAN, LLP, 44 Wall Street, New

9    York, NY 10282, taken before Amanda

10   Gorrono, a Certified LiveNote court

11   reporter and Notary Public within

12   and for the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2   A P P E A R A N C E S:

 3

 4   CULLEN AND DYKMAN

 5   Attorneys for Newell Funding, LLC

 6       44 Wall Street

 7       New York, NY 10005

 8   BY:  MICHELLE McMAHON, ESQ.

 9   BY:  ELIZABETH USINGER, ESQ.

10

11

12

13

14

15   CARDENAS ISLAM & ASSOCIATES

16   Attorneys for the Witness

17       175-61 Hillside

18       Jamaica, NY 11432

19   BY:  BARAK CARDENAS, ESQ.

20

21

22

23

24   ALSO PRESENT:  RAMONA DALAI

25
```

1

2                    STIPULATIONS

3

4          IT IS HEREBY STIPULATED AND

5   AGREED by and between the attorneys for

6   the respective parties herein, that

7   filing, sealing and certification be and

8   the same are hereby waived.

9          IT IS FURTHER STIPULATED AND

10  AGREED that all objections, except as to

11  the form of the question shall be reserved

12  to the time of the trial.

13          IT IS FURTHER STIPULATED AND

14  AGREED that the within deposition may be

15  signed before any Notary Public with the

16  same force and effect as if signed and

17  sworn to before the Court.

18

19          *       *       *

20

21

22

23

24

25

```
 1              Richardson
 2    B E R N E L   A R T H U R
 3    R I C H A R D S O N,
 4         called as a witness, having been duly
 5         sworn by a Notary Public, was examined
 6         and testified as follows:
 7              THE REPORTER:  Please state your
 8         name and address for the record.
 9              THE WITNESS:  Bernel Arthur
10         Richardson, 4359 Furman Avenue, 3B,
11         Bronx, New York 10466-1515.
12              MS. McMAHON:  I'd like to,
13         before we get into the deposition, ask
14         if you'd be willing to stipulate that
15         all objections except as to form and
16         foundation will be preserved for a
17         hearing, if any, involving this
18         testimony.
19              MR. CARDENAS:  That's fine.
20    EXAMINATION
21    BY MS. McMAHON:
22         Q.   Good morning.
23         A.   Good morning.
24         Q.   Have you been deposed before?
25         A.   Once.
```

```
1                Richardson
2       Q.    I'll go through a little bit of
3   the procedures and the rules to
4   familiarize you with them beforehand.
5       A.    Okay.
6       Q.    You understand you'll be under
7   oath?
8       A.    Yes.
9       Q.    It will be the same as if you're
10  testifying at trial with the same effect.
11  And I'm going to be asking you questions
12  and you'll be answering them to the best
13  of your knowledge.  Don't guess or
14  speculate, just answer as to what you
15  know.
16      A.    Yes.
17      Q.    And for the court reporter,
18  please wait until I finish all of my
19  questions before you give your answer so
20  that we don't talk over each other.
21           And answer everything verbally,
22  so she can get down your answer, not a nod
23  of the head for a question.
24           If you have questions at any
25  time, just let me know.  I can rephrase
```

# EXHIBIT E

**<u>APPRAISAL REPORT</u>**

2910 BARNES AVENUE, WILLIAMSBRIDGE
BOROUGH OF THE BRONX
CITY AND STATE OF NEW YORK

# THE LANDMARK APPRAISAL GROUP, INC.
## REAL ESTATE APPRAISERS – CONSULTANTS

RICHARD D. FERRARONE, MAI, SRA
RICHARD F. WHITTEMORE, MAI, SRA

December 2, 2019

Thomas R. Borek
Newell Funding LLC.
235 Main Street Suite 330
White Plains, New York 10601

                            Re:  2910 Barnes Avenue, Williamsbridge
                                 Borough of the Bronx
                                 City and State of New York

Dear Mr. Borek:

      Pursuant to your recent request we have made an inspection and analysis of the above captioned property, which consists of a 10,000+/- square foot parcel of land (50' x 200'), improved with a building currently being utilized as a house of worship. The building was constructed circa 1943, and contains 9,000+/- square feet of gross floor area. At the time of inspection, the building showed signs of neglect, and was in need of significant upgrading and renovations. The site has 50+/- feet of road frontage along Barnes Avenue and 50+/- feet of road frontage along Mathews Avenue. There is outdoor on-site parking for 8+/- cars in the rear of the property.

      The purpose of this investigation and analysis was to estimate the *as is* **market value** of the fee simple interest of the subject property as of October 21, 2019, which as follows:

### ONE MILLION SIXTY THOUSAND ($1,060,000) DOLLARS*

*The above value reflects an estimated cost to raze and remove the existing 9,000 +/- square foot building at $90,000.00.  As we are not experts in demolition costs, we strongly recommend that a professional in this field make an accurate cost estimate.  Our final estimated value of the subject property may require modification after an expert demolition cost estimate is made.

At the request of the client we have also estimated the **Use value** (value of a specific property has for a specific use) of the subject property as of October 21, 2019, which was as follows:

**SEVEN HUNDRED SIXTY-FIVE THOUSAND ($765,000.00) DOLLARS**

A complete description of the property appraised, together with an explanation of the valuation procedure utilized, is contained in the body of the attached report. Your attention is directed to the Certification and the Contingent and Limiting Conditions upon which the value conclusion is based.

Respectfully submitted,
THE LANDMARK APPRAISAL GROUP, INC.

Richard D. Ferrarone, MAI, SRA
NY Certified General Appraiser #46-8732

Michael Litsky
NY Certified General Appraiser #46-47819

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................ i
SUMMARY OF SALIENT FACTS AND CONCLUSIONS ......................... ii
PHOTOGRAPH OF THE SUBJECT PROPERTY ............................... iv
CERTIFICATION .................................................... v
CONTINGENT AND LIMITING CONDITIONS ............................... vii

BRIEF DESCRIPTION OF THE SUBJECT PROPERTY ........................ 1
PURPOSE OF THE APPRAISAL ......................................... 2
DEFINITION OF VALUE ............................................. 2
PROPERTY RIGHTS APPRAISED ........................................ 3
INTENDED USER OF THE REPORT ...................................... 3
INTENDED USE OF THE REPORT ....................................... 3
IDENTIFICATION OF THE SUBJECT PROPERTY ........................... 4
CONSIDERATION OF EASEMENTS ....................................... 3
DATE OF INSPECTION .............................................. 4
THREE-YEAR OWNERSHIP HISTORY OF THE SUBJECT PROPERTY ............. 4
SCOPE OF WORK ................................................... 4
STATEMENT OF COMPETENCY ......................................... 5
ESTIMATED MARKETING TIME ........................................ 5
ESTIMATED EXPOSURE TIME ......................................... 6
BRONX BOROUGH DATA .............................................. 7
NEIGHBORHOOD DATA ............................................... 10
DESCRIPTION OF THE SUBJECT SITE ................................. 12
DESCRIPTION OF THE SUBJECT IMPROVEMENTS ......................... 14
ZONING ......................................................... 19
ASSESSMENT AND REAL ESTATE TAXES ................................ 24
HIGHEST AND BEST USE ............................................ 25
APPRAISAL PROCESS ............................................... 29
SALES COMPARISON APPROACH ....................................... 31
RECONCILIATION .................................................. 61
FINAL ESTIMATE OF MARKET VALUE FOR THE SUBJECT PROPERTY ......... 63

## ADDENDA

PHOTOGRAPHS OF THE SUBJECT PROPERTY
QUALIFICATIONS

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

**PROPERTY TYPE:**                   House of Worship

**LOCATION:**                         2910 Barnes Avenue, Williamsbridge
Borough of the Bronx
City and State of New York
(Block 4550, Lot 10)

**DATE OF VALUATION:**          October 21, 2019

**PROPERTY DESCRIPTION:**     The subject property consists of a consists of a 10,000+/- square foot parcel of land (50' x 200'), improved with a building currently being utilized as a house of worship. The building was constructed circa 1943, and contains 9,000+/- square feet of gross floor area. At the time of inspection, the building showed signs of neglect, and was in need of significant upgrading and renovations. The site has 50+/- feet of road frontage along Barnes Avenue and 50+/- feet of road frontage along Mathews Avenue. There is outdoor on-site parking for 8+/- cars in the rear of the property.

**ZONING:**                        "R6, General Residential District"

**REAL ESTATE TAXES:**          The subject property is currently tax-exempt as a religious facility.

**FLOOD ZONE DATA:**            According to the U.S. Department of Housing and Urban Development National Flood Insurance Program FEMA Flood Insurance Rate Map (Community Panel #3604970101F) dated September 5, 2007, the subject property is not located in a designated flood zone.

**HIGHEST AND BEST USE –** It is our opinion that the Highest and Best Use of the subject site is to demolish and remove the existing improvements and for the development of an apartment building in accordance with the current zoning requirements.

**FINAL ESTIMATE OF MARKET VALUE:**

                    **ONE MILLION SIXTY THOUSAND ($1,060,000) DOLLARS\***

\*The above value reflects an estimated cost to raze and remove the existing 9,000 +/- square foot building at $90,000.00. As we are not experts in demolition costs, we strongly recommend that a professional in this field make an accurate cost estimate. Our final estimated value of the subject property may require modification after an expert demolition cost estimate is made.

                  At the request of the client we have also estimated the **Use value** (value of a specific property has for a specific use) of the subject property as of October 21, 2019, which was as follows:

                  **SEVEN HUNDRED SIXTY-FIVE THOUSAND ($765,000.00) DOLLARS**



**FRONT VIEW OF THE SUBJECT PROPERTY**

2910 Barnes Avenue, Williamsbridge
Borough of the Bronx, New York

## CERTIFICATION

- The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial and unbiased professional analyses, opinions and conclusions.

- We have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

- We have previously appraised the subject property on August 24, 2017.

- We have no bias with respect to the property that is the subject of this report, or to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

- We have made personal inspections of the property that is the subject of this report.

- No one provided significant real property appraisal assistance to the persons signing this certification.

## CERTIFICATION (Continued)

- The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute; the Uniform Standards of Professional Appraisal Practice as set forth by the Appraisal Foundation; and the requirements of the Interagency Appraisal and Evaluation Guidelines dated December 2, 2010.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, Richard D. Ferrarone has completed the continuing education program for Designated Members of the Appraisal Institute.

The purpose of this investigation and analysis was to estimate the *as is* **market value** of the fee simple interest of the subject property as of October 21, 2019 which was as follows:

**ONE MILLION SIXTY THOUSAND ($1,060,000) DOLLARS\***

\*The above value reflects an estimated cost to raze and remove the existing 9,000 +/- square foot building at $90,000.00. As we are not experts in demolition costs, we strongly recommend that a professional in this field make an accurate cost estimate. Our final estimated value of the subject property may require modification after an expert demolition cost estimate is made.

At the request of the client we have also estimated the **Use value** (value of a specific property has for a specific use) of the subject property as of October 21, 2019, which was as follows:

**SEVEN HUNDRED SIXTY-FIVE THOUSAND ($765,000.00) DOLLARS**

Richard D. Ferrarone, MAI, SRA
NY Certified General Appraiser #46-8732

Michael Litsky
NY Certified General Appraiser #46-47819

vi

# CONTINGENT AND LIMITING CONDITIONS

The certification of the appraisers appearing in the appraisal report is made expressly subject to the following conditions as are set forth by the appraisers in the report:

1.  The appraisers assume no responsibility for matters of a legal nature affecting the property appraised or the title thereto, nor do the appraisers render any opinion as to the title, which is assumed to be good and marketable.  The property is appraised as though under responsible ownership.

2.  Any sketch in the report may show approximate dimensions and is included to assist the reader in visualizing the property.  Any survey included or referred to has been made by others.  The appraisers believe the above to be substantially correct.  Absolute accuracy is assumed.

3.  The appraisers are not required to give testimony or appear in court because of having made the appraisal with reference to the property in question, unless arrangements have been previously made therefore.

4.  Any distribution of the valuation in the report between land and improvements applies only under the existing program of utilization.  The separate valuations for land and building must not be used in conjunction with any other appraisal and are invalid if so used.

5.  The appraisers assume that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable.  The appraisers assume no responsibility for such conditions, or for engineering which might be required to discover such factors.

6.  Information, estimates, and opinions furnished to the appraisers, and contained in the report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished the appraisers can be assumed by the appraisers.

7.  It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a nonconformity has been stated, defined, and considered in the appraisal report.

8.  Disclosure of the contents of the appraisal report is governed by the Bylaws and Regulations of the professional

appraisal organizations with which the appraisers are
affiliated.

9. Neither all, nor any part of the content of the report, or
copy thereof (including conclusions as to the property value,
the identity of the appraisers, professional designations,
reference to any professional appraisal organizations, or the
firm with which the appraisers are connected), shall be used for
any purposes by anyone but the client specified in the report,
the borrower if appraisal fee paid by same, the mortgagee or its
successors and assigns, mortgage insurers, consultants,
professional appraisal organizations, any state or federally
approved financial institution, any department, agency, or
instrumentality of the United States or any state or the
District of Columbia, without the previous written consent of
the appraisers; nor shall it be conveyed by anyone to the public
through advertising, public relations, news, sales, or other
media, without the written consent and approval of the
appraisers.

10. On all appraisals subject to satisfactory completion, repairs,
or alterations, the appraisal report and value conclusions are
contingent upon completion of the improvements in a workmanlike
manner.

11. Unless otherwise stated in this report, the existence of
hazardous material, which may or may not be present on the
property, was not observed by the appraisers. The appraisers
have no knowledge of the existence of such materials on or in
the property. The appraisers, however, are not qualified to
detect such substances. The presence of substances such as
asbestos, urea-formaldehyde foam insulation, or other
potentially hazardous materials may affect the value of the
property. The value estimate is predicated on the assumption
that there is no such material on or in the property that would
cause a loss in value. No responsibility is assumed for any
such conditions or for any expertise or engineering knowledge
required to discover them. The client is urged to retain an
expert in this field, if desired.

12. The Americans with Disabilities Act (ADA) became effective
January 26, 1992. We have not made a specific survey or
analysis of this property to determine whether the physical
aspects of the improvements meet the ADA accessibility
guidelines. Since compliance matches each owner's financial
ability with the cost to cure the property's potential physical
characteristics, the real estate appraisers cannot comment on
compliance to ADA. A brief summary of physical aspects is
included in this report. It in no way suggests ADA compliance
by the current owner. Given that compliance can change with

each owner's financial ability to cure non-accessibility, the value of the subject does not consider possible noncompliance. Specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

# THE LANDMARK APPRAISAL GROUP, INC.
## REAL ESTATE APPRAISERS – CONSULTANTS

RICHARD D. FERRARONE, MAI, SRA
RICHARD F. WHITTEMORE, MAI, SRA

### APPRAISAL REPORT

**SUBJECT PROPERTY:**       2910 Barnes Avenue, Williamsbridge
Borough of the Bronx
City and State of New York
(Block 4550, Lot 10)

**OWNER OF RECORD:**       Bronx Miracle Gospel Tabernacle
World of Faith Ministry

**BRIEF DESCRIPTION OF THE SUBJECT PROPERTY:**

The subject consists of a 10,000+/- square foot parcel of land (50' x 200'), improved with a building currently being utilized as a house of worship. The building was constructed circa 1943, and contains 9,000+/- square feet of gross floor area. At the time of inspection, the building showed signs of neglect, and was in need of significant upgrading and renovations. The site has 50+/- feet of road frontage along Barnes Avenue and 50+/- feet of road frontage along Mathews Avenue. There is outdoor on-site parking for 8+/- cars in the rear of the property.

**PURPOSE OF THE APPRAISAL:**

The purpose of this investigation and analysis was to estimate the *as is* market value of the fee simple interest of the subject property as of October 21, 2019. In addition at the request of the client we have also estimated the **Use value** (value of a specific property has for a specific use) as of October 21, 2019.

**DEFINITION OF VALUE AND INTEREST APPRAISED:**

This appraisal has been prepared in accordance with the Federal Deposit Insurance Corporation (FDIC) Final Rules, 12 CFR Part 323.2(f), which incorporates the following market value definition:

**MARKET VALUE:**

*"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title to buyer under conditions whereby:*

*1) buyer and seller are typically motivated;*

*2) both parties are well informed or well advised, and acting in what they consider their own best interests;*

*3) a reasonable time is allowed for exposure in the open market;*

*4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*

*5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."*

**USE VALUE:**

*" Use Value is the value a specific property has for a specific use. In estimating the use value the appraiser focuses on the value the real estate contributes to the enterprise of which it is a part, without regard to the highest and best use of the property or the monetary amount that might be realized from its sale. Real property has both a "Use Value" and a "Market Value," which may be the same or different depending on the property and the market. Use Value appraisals often involve limited-market properties (properties of a type that has relatively few potential buyers at a particular time)."*

According to **"The Appraisal of Real Estate"**, 14th Edition (Chicago: Appraisal Institute, 2013), the property rights appraised herein are defined as follows:

**FEE SIMPLE INTEREST:**

*"Possession of a title in fee establishes the interest in property known as the fee simple estate-i.e., absolute ownership unencumbered by any other interest or estate.  A fee simple estate is subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."*

**INTENDED USER OF THE REPORT:**

This report is intended for use by Thomas R. Borek, and his associates and Newell Funding LLC. Use of this report by others is not intended by the appraisers.

**INTENDED USE OF THE REPORT:**

This report is intended only for use in providing an estimate of value of the fee simple interest in the subject property. This report is not intended for any other use.

3

**IDENTIFICATION OF THE SUBJECT PROPERTY:**

The subject property is situated on the eastern side of Barnes Avenue and western side of Matthews Avenue between Arnow Avenue and Williamsbridge Road in the Williamsbridge section of the Borough of the Bronx, City and State of New York. The property's postal address is 2910 Barnes Avenue, Bronx, NY 10467. The property is further known on the Assessment Roll of the Borough of Bronx and City of New York as Block 4550, Lot 10.

**CONSIDERATION OF EASEMENTS:**

There are no known easements which might have a negative impact on the marketability of the property.

**DATE OF INSPECTION:**

The subject property was inspected and photographed for the purpose of this appraisal on October 21, 2019.

**THREE-YEAR OWNERSHIP HISTORY OF THE SUBJECT PROPERTY:**

The subject is currently owned by Bronx Miracle Gospel Tabernacle World of Faith Ministry. There has been no known transfer of title in the past three years.

**SCOPE OF WORK:**

The scope of this appraisal is to inspect the property, consider market characteristics and trends, collect and analyze pertinent data, and develop a conclusion about the property's

market value.  In order to accomplish this the appraisers verified the public data available in the Borough Hall relative to the subject property as contained in the Office of the Assessor, and the Division of Land Records.  We researched information and interviewed officials in the Department of Taxation, and the Assessor's Office as it related to the date of the appraisal.  Other information was utilized from our own files.  Discussions with area real estate brokers were helpful in formulating the basis for an examination of the overall market in which the subject exists.

**STATEMENT OF COMPETENCY:**

In compliance with the competency provision of the USPAP, the appraisers of the subject property are familiar with the type of property, in the Borough of the Bronx, City and State of New York.  The appraisers have performed numerous appraisals of similar properties in the City of New York.  Richard D. Ferrarone and Michael Litsky are Certified General Appraisers in the State of New York.

**ESTIMATED MARKETING TIME:**

*"The reasonable market time is an estimate of the amount of time it might take to sell a property interest in real estate at the estimated market value level during the period immediately after the effective date of an appraisal."\**

\*Definition from The Appraisal Standards Board of The Appraisal Foundation, Advisory Opinion G-7, Approved September 16, 1992 on the Uniform Standards of Professional Appraisal Practice.

It is our opinion that the marketing time for the subject property is 12 months, assuming the property is properly priced and professionally marketed.

**ESTIMATED EXPOSURE TIME:**

*"The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market."\**

\*Definition from the Appraisal Standards Board of The Appraisal Foundation, Advisory Opinion G-6, Approved September 16, 1992 on the Uniform Standards of Professional Appraisal Practice.

An estimate has been made of the market value of the property utilizing the Sales Comparison and Income Capitalization Approaches to Value, taking into consideration current market conditions and the time necessary for the subject property to sell in the open market.  Based on our examination of the supply and demand for similar properties in the area, it is our opinion that at our estimated market value the subject property would have required a period of up to 12 months to effect a sale.

**BRONX BOROUGH DATA:**

The Bronx is the northernmost borough of the City of New York. It is bound on the west by the Hudson River, on the southwest by the Harlem River, on the southeast by the East River, and on the east by the Long Island Sound. The Borough of the Bronx borders Westchester County to the north, which connects it to the mainland.

The Bronx has a total land area of 42.03 square miles, which is 13.6% of the land area in New York City. It is the home of eight institutions of higher learning, one major sports complex (Yankee Stadium), internationally recognized zoological and botanical gardens, an environmental center, and many other cultural, commercial and recreational facilities that function in, and enhance this urban area.

According to the most recent census update (2017), the population of the Bronx was 1,455,720 people, representing an increase of 5.0% over the 2010 census population figure. The Bronx contains approximately 17% of the total population of New York City. The borough is fully developed and densely populated, with approximately 34,629 residents per square mile.

The borough is well-served by major vehicular roadways and modes of public transportation. The New York City Mass Transit Authority operates the bus system and the subway/elevated train system. Additional rail service is provided by the Metro-North Railroad, both the Harlem Line and the New Haven Division. The highway system in the Bronx is extensive and includes Interstates 95 and 87, the Bruckner Expressway, the Bronx River Parkway, the Henry Hudson Parkway

and the Hutchinson River Parkway.  Access to the other boroughs of the City of New York is gained via three major bridges in the Bronx, including the Throgs Neck Bridge, Whitestone Bridge and the Triboro Bridge.  The Bronx also accesses the Borough of Manhattan by several minor bridges, including the Henry Hudson Bridge, the Third Avenue Bridge and the Willis Avenue Bridge.

With all of its assets, the Bronx is also an area of contrasts where different lifestyles are reflected in the coexistence of viable communities alongside communities in need of renewal and rehabilitation.  Many fine neighborhoods such as Riverdale, Country Club and Pelham Bay are stable and expanding.  Co-op City provides excellent housing for some 60,000 people in the northeast Bronx.  However, there are still some areas in need of urban renewal. Evidence of urban decay is most prevalent in neighborhoods of the south Bronx such as the Melrose and Mott Haven sections, although significant progress has been made in recent years to improve these neighborhoods.

According to the U.S. Census Bureau, as of July 2016 the borough had 525,719 housing units, of which 19.1% were owner-occupied.  The 2016 median value of an owner-occupied single-family home was $363,600, and the median gross monthly rent was $1,098.  The median household income was reported at $35,302, and the per capita income was $18,896.  The percentage of Bronx residents living in poverty in 2016 was 28.6%.

Commercial development in the Bronx consists primarily of neighborhood shopping districts designed to serve the needs of the surrounding population.  Industrial development is concentrated

in the Hunts Point and Port Morris sections, although there are areas of industrial uses dispersed throughout the borough. The extensive transportation network and proximity to area employment centers and markets make the Bronx a viable area for residential, commercial and industrial uses.

**NEIGHBORHOOD DATA:**

   The subject property is situated on the eastern side of Barnes Avenue and western side of Matthews Avenue between Arnow Avenue and Williamsbridge Road in the Williamsbridge section of the Borough of the Bronx, City and State of New York. Properties lining Barnes and Matthews Avenues are primarily residential, and comprise five and six-story walk-up or elevator apartment buildings, and two-to-three story single and multi-family dwellings.

   The subject property is well situated with respect to vehicular arteries, as access to the Major Deegan Expressway (I-87) is located within 3 miles.  The Cross Bronx Expressway (I-95) is located within 8 miles south, which connects with the Whitestone and Throgs Neck Bridges (both located within 15 miles of the subject).  The Bronx River Parkway is located 1 mile west.  Easy access to the Triboro Bridge and Brooklyn Queens Expressway, the New England Thruway (Interstate 95), and the Long Island Expressway is provided by the local interstate road network.  Public transportation in the subject area is satisfactory, with bus service connecting all sections of the Bronx and New York City.

   In conclusion, the subject property is located within a convenient residential neighborhood of the Bronx.  Its proximity to regional interstate roadways enhances its desirability as a residential location.



**LOCATION MAP**

**<u>DESCRIPTION OF THE SUBJECT SITE:</u>**

The subject parcel is situated on the eastern side of Barnes Avenue and western side of Matthews Avenue between Arnow Avenue and Williamsbridge Road in the Williamsbridge section of the Borough of the Bronx, City and State of New York. The site is rectangular in configuration, and has frontage of 50+/- feet on the eastern side of Barnes Avenue, and 50+/- feet on the western side of Matthews Avenue. The depth of the site is 200+/- feet. According to our calculations, the total lot area is 10,000+/- square feet, or 0.23+/- acre.

Topographically, the parcel is generally level at street grade, and appears to have sufficient drainage.

Barnes Avenue is a two lane, two-way macadam roadway having two curbside parking lanes. It is improved with sidewalks, curbs, storm sewers and streetlights. Available public utilities include water, gas, electricity, sanitary sewers and telephone.

According to the U.S. Department of Housing and Urban Development National Flood Insurance Program FEMA Flood Insurance Rate Map (Community Panel #3604970101F, dated 9/5/07), the subject property is located within "Zone X", which is not considered a flood hazard zone.

The appraisers have conducted no soil borings in order to determine whether there are any existing subsoil conditions. The estimate of market value is contingent on there being no subsoil conditions which might adversely affect the continued use of the site.



**SITE MAP**

**DESCRIPTION OF THE SUBJECT IMPROVEMENTS:**

                          The subject property is improved with a building currently being utilized as a house of worship. The building was constructed circa 1943, and contains 9,000+/- square feet of gross floor area. At the time of inspection, the building showed signs of neglect, and was in need of significant upgrading and renovations. There is outdoor on-site parking for 8+/- cars in the rear of the property that gains access from Mathews Avenue.

**CONSTRUCTION FEATURES** for the subject building are as follows:

**Exterior Walls:** The exterior walls are primarily brick.

**Windows:** The windows are primarily double-hung units.

**Roof:** The roof is flat, and finished with a rubberized surface with a reflective coating.

**Floors:** The floors are a combination of hardwood, wall to wall carpeting and linoleum tile. Some of the flooring would benefit from updating, and/or replacement. The bathrooms have ceramic tile flooring.

**Interior Walls:** The interior walls are a combination of painted plaster or sheetrock. Some of the walls would benefit from updating and/or replacement.

**Ceilings:**  The ceilings are combination of acoustical panels and painted plaster or sheetrock. Some of the ceilings would benefit from updating, and/or replacement.

**Bathroom Facilities:**  There two lavatories located in the basement.  The women's room has two stalls, and two vanity sinks.  The men's room has three stalls and a sink. There is one bathroom on the second and two on the third floor which were recently upgraded. They were previously not functional.

**HVAC:** The building is served by gas fired "Reznor" heaters hung from the ceiling which service the first-floor sanctuary. The remaining rooms are serviced by electric heaters. There is an old boiler located in the basement which was not functioning at the time of inspection.

**Electric:**  The building is served by an electrical system which appears to be old and out dated for todays present demand.  However, it is difficult to discern its level of adequacy, and an electrical technician should inspect the system to see if upgrades are necessary.

**Quality and Condition:**  The subject is a building, which is judged to be of typical masonry construction quality.  The building shows signs of significant neglect, and was in need of significant upgrading and renovations. Components such as the roof, walls, flooring, electric and HVAC systems should be inspected for possible upgrade recommendations. We attempted to point out those items of deferred maintenance which are

obvious, however with a building of this size and age, additional inspections by professional contractors are recommended. The bathrooms on the upper floors were recently updated and the general purpose room in the basement was it the process of being updated at the time of inspection.

**Layout:** The first level of the building is 5,000+/- square feet in size and contains the sanctuary and two small offices. The main entrance is at the front of the building. This leads to a foyer, with doorways to sanctuary and staircases leading to the basement and upper levels. The offices are adjacent to the foyer. The sanctuary is a large open room with a cathedral ceiling. The altar is located to the front of the sanctuary. There storage closets in the rear of the building with a doorway leading to the rear parking area.

The staircases lead to upper levels and basement. The second floor is 2,000+/- square feet in size and contains a balcony overlooking the sanctuary and a separate meeting room. The balcony provides additional seating. The third level is 2,000+/- square feet in size and contains a meeting room and a one-bedroom apartment which was not habitable. There is one bathroom on the second and two on the third floor which were recently upgraded. They were previously not functional.

The basement contains the men and women's bathroom, a general-purpose room, kitchen and storage and utility rooms. The kitchen and general-purpose room were in the process of being upgraded at the time of inspection.

**Site Improvements:**    There are concrete walkways at the front of the building along Barnes Avenue and rear of the site along Matthews Avenue. There is a parking area for 8+/- cars in the rear of the building. The parking area is accessed from a curb cut along Mathews Avenue In addition there is a small masonry building in rear of the main building which we did not gain access. As per information provided to us the building was in need of repairs and currently uninhabitable.



1st Floor
100.0'
50.0'



2nd/3rd Floors
40.0'
50.0'

**<u>BUILDING SKETCH</u>**

18

**ZONING:**

               The subject property is located within a district designated by the zoning ordinance of the City of New York as "R6, Medium Density Residence".

**R-6 (General Residence):** *"These districts are designed to provide for all types of residential buildings, in order to permit a broad range of housing types, with appropriate standards for each district on density, open space, and spacing of buildings. However, R4B Districts are limited to single- or two-family dwellings, and zero lot line buildings are not permitted in R3-2, R4 (except R4-1 and R4B), and R5 (except R5B) Districts. The various districts are mapped in relation to a desirable future residential density pattern, with emphasis on accessibility to transportation facilities and to various community facilities, and upon the character of existing development. These districts also include community facilities and open uses which serve the residents of these districts, or benefit from a residential environment."*

               The principal allowable uses within the "R-6" zone include the following:

Residential (Use Groups 1-2)
Community Facility (Use Groups 3-4)

               The maximum height and bulk regulations for the "R6" zone are presented on the following tables:



13-story building
Maximum FAR: 2.43
Minimum OSR: 33.5%

Buildings do not have height limits but cannot penetrate sky exposure plane, which begins 60' above street line

7-story building
Maximum FAR: 2.23
Minimum OSR: 30.5%

Zoning lot line

60'

Off-street parking may be located anywhere on the zoning lot, but cannot occupy more than half the required open space.

| R6 Height Factor Regulations | | | | |
|---|---|---|---|---|
| **R6** | **FAR** (range) | **OSR** (range) | **Building Height** | **Required Parking¹** (min) |
| | 0.78–2.43 | 27.5–37.5 | Governed by sky exposure plane | 70% of dwelling units |

¹ *50% if zoning lot is 10,000 square feet or less; waived if 5 or fewer spaces required*



Base height:
30' minimum
45' maximum

55' maximum building height
beyond 100' of a wide street

Above the maximum base height,
building must be set back at least 10'
from the street wall when facing a wide
street or 15' when facing a narrow street

70' maximum building height
within 100' of a wide street

Base height:
40' minimum
60' maximum

Street line

NARROW STREET

WIDE STREET

Off-street parking only
permitted within, or to the side
or rear of a building; never
in front of a building

All open areas between the
street wall and the street line
must be planted

| R6 Quality Housing Option | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | FAR (max) | Lot Coverage (max) | | Base Height (min/max) | Building Height (max) | Required Parking[4] (min) |
| | | | Corner Lot | Interior/Through Lot | | | |
| **R6** | Wide Street[1] | 3.0[3] | 80% | 65% | 40–60 ft | 70 ft | 50% of dwelling units |
| | Wide Street[2] | 2.43 | 80% | 60% | 40–55 ft | 65 ft | |
| | Narrow Street | 2.2[3] | 80% | 60% | 30–45 ft | 55 ft | |

[1] Outside the Manhattan Core

[2] Within the Manhattan Core

[3] 3.6 FAR with Inclusionary Housing designated area bonus on a wide street; 2.42 FAR on a narrow street

[4] Waived if 5 or fewer spaces required

**Zoning Comparison**

| | R5A* | R5 | R6 | R7-1 |
|---|---|---|---|---|
| **Housing Type** | One and two family Detached | All housing types | All housing types | All housing types |
| **Residential FAR** | 1.1 + 300 sf. increase for providing detached garage in backyard (approx. 1.2 – 1.22, depending on lot size) | Max. 1.25 | Max. 2.43 (3.0 under Quality Housing) | Max. 3.44 (4.0 under Quality Housing) |
| **Minimum Lot Width** | 30 ft. | 40 ft. detached (18 ft. others) | 40 ft. detached 18 ft. other | 40 ft. detached 18 ft. other |
| **Max. Height** | 35 ft. | 40 ft. | (Regulated through Sky Exposure Plane) | (Regulated through Sky Exposure Plane) |
| **Perimeter Wall or Setbacks** | 25 ft. | Max. height of street wall above the base plane: 30 ft. with 15 ft. set back at such height | (Regulated through Initial Setback Distance) | (Regulated through Initial Setback Distance) |
| **Side Yard** | 2 required; 10 ft. total (minimum); 2 ft. minimum; min. 8ft. between buildings | 2 required; 13 ft. total; 5ft. minimum | Detached: 2 required; 13 ft. total; 5 ft. minimum | Detached: 2 required; 13 ft. total; 5 ft. minimum |
| **Front Yard** | 10 ft. exactly or at least as deep as adjacent front yard | 10 ft. exactly or 18 ft. minimum | N/A | N/A |
| **Residential Parking** | 1 per DU | 1 per DU without group parking facility or 85% of total DU with group parking facilities | 1 per DU without group parking facility or 70% of total DU with group parking facilities | 1 per DU without group parking facility or 60% of total DU with group parking facilities |



**ZONING MAP**

## **ASSESSMENT AND REAL ESTATE TAX DATA:**

The subject property is known and designated on the Assessment Roll of the City of New York and Borough of the Bronx as Block 4550, Lot 101. The property's assessment for is as follows:

### Market Value

The first step is for the City Assessor to determine the *market value* of the property. While the term *market value* would seemingly refer to how much the property would sell for on the open market, in reality the *market value* established by the City Assessor is almost always substantially lower.

For this property the City Assessor has assigned this market value:

| | | |
|---|---|---|
| Land market value | | $336,000 |
| Building market value | + | $2,842,000 |
| **Market value** | = | **$3,178,000** |

### Assessed Value

Next, the market value is used to compute the assessed value, which is a percentage of the market value. The exact percentage is determined by the tax class of the property. Tax class 1 is assessed at 6% of the market value, and tax classes 2,3 and 4 are assessed at 45%.

| | | |
|---|---|---|
| Market value | | $3,178,000 |
| Assessment ratio | x | 45% |
| **Maximum assessed value** | = | **$1,430,100** |

### Transitional Value

To protect property owners from sudden large increases in property tax, the state limits how quickly the city can increase the assessed value. Typically these limits are applied when the City Assessor makes a big increase to the market value. Without the limits the assessed value would increase by a similar percentage. Instead, the change to the assessed value is phased in over a number of years.

| | | |
|---|---|---|
| **Transitional value** | | $1,298,070 |
| Transitional exemption value | - | $0 |
| **Transitional net assessed value** | = | **$1,298,070** |

### Taxable Value

The *taxable value*, for 2019/2020, is the smaller of the city's *maximum assessed value* and the *transitional net assessed value*.

| | | |
|---|---|---|
| Taxable value | = | $1,298,070 |

### Property Tax

*Current tax* is calculated by multiplying the taxable value (the assessed value minus any exemptions) by the tax rate. The city also grants some properties incentives called tax abatements, which are subtracted directly from the current tax. This results in the property tax, the amount the current owner pays.

| Tax description | Billable value | Tax rate as billed June 2019 | | Tax bill |
|---|---|---|---|---|
| Current tax | $1,298,070 | x 10.5140% | = | $136,479 |
| Total abatements | | | - | $0 |
| **Property tax as billed june 2019** | | | = | **$136,479** |

After issuing the final tax assessment and issuing first quarter tax bills, the city typically adjusts the tax rate. This results in an adjustment to the property tax.

| Tax description | Billable value | Final tax rate 19/20 | | Tax bill |
|---|---|---|---|---|
| Current tax | $1,298,070 | x 10.5140% | = | $136,479 |
| Total abatements | | | - | $0 |
| **Property tax with final tax rate** | | | = | **$136,479** |

The subject property is currently tax-exempt as a religious facility.

**HIGHEST AND BEST USE ANALYSIS:**

Highest and Best Use is defined by the Appraisal Institute in **The Appraisal of Real Estate**, 14th Edition (2013) as *"the reasonably probable and legal use of vacant land or an improved property that is physically possible, legally permissible, appropriately supported, financially feasible, and that results in the highest value."* It may also be defined as that available use and program of future utilization which produces the highest present value.

Because the use of the land can be limited by the presence of improvements, Highest and Best Use is determined separately for the land or site as though vacant and available to be put to its Highest and Best Use, and for the property as improved. The need to determine the Highest and Best Use of the land as if vacant reflects the fact that land value is derived from potential land use. The Highest and Best Use of a property as improved refers to the optimal use that could be made of the property including all existing structures. The determination of the Highest and Best Use of land as though vacant is useful for land or site valuation. Determining the Highest and Best Use of an improved property provides a decision regarding continued use or demolition of the property.

Any estimate of Highest and Best Use is of critical importance in the appraisal process, as value is created and supported by it. The Highest and Best Use of both land as if vacant and property as improved must meet four criteria. The four criteria are as follows:

1) Physically Possible: What uses of the site are physically possible?

2) Legally Permissible: What uses are permitted by zoning and deed restrictions on the site in question?

3) Financially Feasible: Which possible and permissible uses are appropriate, and which produce the highest value?

4) Maximally Productive: Among the feasible uses, which use will produce the highest net return, or the highest present worth?

**HIGHEST AND BEST USE OF THE SUBJECT PROPERTY:**

In determining the Highest and Best Use of the site we have considered its size, shape, topography and configuration, the current trends of supply and demand in the market, current zoning and other land use regulations. We have evaluated the four criteria of Highest and Best Use analysis on an individual basis as they pertain to the subject property as follows:

**LEGALLY PERMISSIBLE:** This criterion restricts the type and bulk of possible development uses. We have determined that the site is primarily restricted to residential uses, among other options. Of the legally permissible options, the most logical would be to continue development of the area in a manner consistent with its existing character. This type of development would include apartment buildings.

**PHYSICALLY POSSIBLE:** The subject site consists of 10,000+/- square feet of land which is currently improved with a 9,000+/- square foot building which shows signs of neglect, and was in need of significant renovations and upgrades. The building has an odd layout and would be difficult to convert to residential uses. The site as vacant could accommodate a good size building. It has road frontage on Barnes and Mathews Avenues, and the topography and configuration are suitable for development. In addition, the property is not located in a designated flood zone.

**FINANCIALLY FEASIBLE:** The subject site is located in an established residential district of the Bronx. The immediate area surrounding the

site is improved primarily with residential uses, and there appears to be adequate demand for these types of properties.  Therefore, it is logical to continue development of the area in a manner consistent with its existing character.  This type of use would be in the residential category.

**MAXIMALLY PRODUCTIVE:**  This last test indicates that the Highest and Best Use for the property is that use that returns to the land the highest net return for the longest period of time.  Based on the site's location in an established residential area with good access to local thoroughfares and interstate highways, the property should take advantage of the demand for apartment buildings.  The development of the property with an apartment building would be a productive use of the site.

**CONCLUSION:**  Based upon the above, it is our opinion that the Highest and Best Use of the subject site is to demolish and remove the existing improvements and for the development of an apartment building in accordance with the current zoning requirements.

**APPRAISAL PROCESS:**

In arriving at an estimate of market value of a given property, an established and systematic procedure is followed. Among the steps required are a definition of the problem, the accumulation of data in the analysis, and interpretation of the data based upon the three approaches to value. Finally, the results are correlated into an estimate of market value.

In the appraisal process there are three recognized approaches to value available, and they are as follows: the Sales Comparison Approach, Income Capitalization Approach, and the Cost Approach.

**The Sales Comparison Approach:** is a process of comparison of similar properties which have recently sold with various items of similarity or dissimilarity noted, and then the comparable properties are adjusted to the subject in order to indicate a range of value for the property being appraised.

**The Income Capitalization Approach:** is a process in which a value indication is derived by estimating the present worth of future income through a capitalization process. This is essentially a discounting process, and involves the capitalization of annual net income before recapture utilizing interest rates and capitalization techniques commensurate with quantity, quality and durability of the income stream. In order to utilize this approach, an estimate of potential gross income is made via a comparison with similar properties. Reasonable expenses derived from typical or market experiences are then subtracted in order to arrive at a projected net income. The

resultant net income stream is capitalized via rates which have been extracted from data derived in the market.

**The Cost Approach:** involves the valuation of the land based on comparisons with similar sites which have recently sold. Next, the reproduction cost new of the improvements is determined, and then depreciation from all causes is subtracted. The resultant depreciated reproduction cost is added to the estimate of land value, producing an indicated value via the Cost Approach to Value. It is our opinion that this approach is not a reliable indicator of value for the subject property. This is especially true for the subject property, as the building is an older structure, and it would be difficult to estimate its accrued depreciation. Also, purchasers of property similar to the subject are most often concerned with the income producing capability of the property in terms of investment yield, and not with replacement cost.

**Correlation:** The three approaches are then evaluated by the appraisers in order to determine which should be given greatest weight. Once the three approaches are evaluated, a final estimate of value is obtained.

**SALES COMPARISON APPROACH –**

**ANALYSIS OF THE EXISTING 9,000+/- SQUARE FOOT BUILDING CURRENTLY UTILIZED AS A HOUSE OF WORSHIP:**

The subject property is currently improved with a house of worship. The building was constructed circa 1943, and contains 9,000+/- square feet of gross floor area. At the time of inspection, the building showed signs of neglect, and was in need of significant renovations and upgrades. It is our contention that the Highest and Best Use of the property is to demolish and remove the existing improvements and for the development of an apartment building in accordance with the current zoning requirements, as this would likely offer the greatest financial return over the long term.

In attempting to apply the Sales Comparison Approach to the existing improvements we will provide several recent sales of house of worships in Bronx.  The comparable sales are summarized as follows:

**LOCATION:**          327 Bolton Avenue
                       Bronx, New York
                       (Block 34733, Lot 49)

**GRANTOR:**           Beth Luth Church

**GRANTEE:**           New Move-God Pentecostal

**SALES PRICE:**       $550,000.00

**DATE OF SALE:**      March 24, 2017

**DESCRIPTION:**       This sale concerns 7,500+/- square feet of
                       land which is improved with a 3,520+/- square
                       foot building which was built circa 1938 and
                       was utilized as a house of worship.  The
                       property is located on the western side of
                       Bolton Avenue between O'Brien and Soundview
                       Avenues.

**PRICE PER
SQUARE FOOT:**         $156.25



**COMPARABLE SALE NUMBER ONE**

327 Bolton Avenue
Bronx, New York

**LOCATION:**                      3780 3rd Avenue
                                   Bronx, New York
                                   (Block 2927, Lot 13)


**GRANTOR:**                       Christopher J Marengo


**GRANTEE:**                       188 Crescent Holdings LLC.


**SALES PRICE:**                   $1,301,000.00


**DATE OF SALE:**                  September 25, 2017


**DESCRIPTION:**                   This sale concerns 7,500+/- square feet of
                                   land which is improved with a 15,000+/-
                                   square foot building which was built circa
                                   1931 and was utilized as a house of worship.
                                   The property is located eastern side of 3rd
                                   Avenue between East 171st Street and Corona
                                   Park South. The property was in foreclosure
                                   and purchased at auction.


**PRICE PER**
**SQUARE FOOT:**                   $86.73



**COMPARABLE SALE NUMBER TWO**

3780 3rd Avenue
Bronx, New York

**COMPARABLE SALE NUMBER THREE**

**LOCATION:**

4390 Katonah Avenue
Bronx, New York
(Block 3390, Lot 1)

**GRANTOR:**

Community Full Gospel Church LLC.

**GRANTEE:**

Jesus is Lord Global Ministry

**SALES PRICE:**

$800,000.00

**DATE OF SALE:**

July 23, 2018

**DESCRIPTION:**

This sale concerns 10,000+/- square feet of land which is improved with a 4,410+/- square foot building which was built circa 1930 and was utilized as a house of worship.  The property is located on the northeast corner of Katonah Avenue and East 241st Street.

**PRICE PER
SQUARE FOOT:**

$181.40



**COMPARABLE SALE NUMBER THREE**

4390 Katonah Avenue
Bronx, New York



**LOCATION MAP - COMPARABLE LAND SALES**

**ADJUSTMENT CRITERIA FOR THE COMPARABLE SALES:**

                    A sales grid has been utilized as a format to present those factors which have an effect upon the value of the subject property. The **motivation** adjustment analyzes any factor which may have a tendency to motivate a purchaser and/or seller to act in a manner inconsistent with typical market behavior. The **financing** category acknowledges any atypical financing arrangements at the time of sale which may have an impact on the price paid. The terms of atypical financing are reduced to a dollar adjustment through a cash equivalency analysis. Consideration has been given to the difference in **time** between the date of sale of the comparable properties and the date of valuation of the subject. The **location** factor includes both the positive and negative influences affecting each of the properties. Location is one of the basic elements contributing to the value of a property. An analysis of various factors such as population trends, supply and demand, neighborhood cycle, municipal and transportation services, and various other factors are considered. The **quality of construction** adjustment accounts for variations in overall building quality. The adjustment for **functional utility** considers the overall layout and design of the property, and factors in the existence or lack of modern facilities. The **age/condition** factors consider the building's vintage, and the amount of physical depreciation attributable to the comparable properties at the time of sale. The adjustment for **Design/Appeal** considers the appearance of the improvements on the

property.  Adjustments have also been made for **building size**.  This adjustment recognizes the overall floor area of the improvement, with the typical purchaser normally paying more per square foot for a smaller building than a larger one.

**SALES GRID**

|  | SALE # 1 | SALE # 2 | SALE # 3 |
|---|---|---|---|
| **DATE OF SALE:** | 3/24/17 | 9/25/17 | 7/23/18 |
| **SALES PRICE PER SF:** | $156.25 | $86.73 | $181.40 |
| **TIME:** | 7.75% | 6.25% | 3.75% |
| **FINANCING:** | 0% | 0% | 0% |
| **MOTIVATION:** | 0% | 0% | 0% |
| **ADJUSTED PRICE/SF:** | $168.36 | $92.15 | $188.20 |
| **LOCATION:** | 0% | 0% | 0% |
| **AGE/CONDITION:** | -30% | 0% | -30% |
| **CONSTRUCTION:** |  |  |  |
| **QUALITY:** | 5% | 0% | 0% |
| **FUNCTIONAL UTILITY:** | 0% | 0% | 0% |
| **DESIGN/APPEAL:** | -20% | 0% | -20% |
| **BUILDING SIZE:** | -6% | 6% | -6% |
| **NET ADJUSTMENT:** | -51% | 6% | -56% |
| **INDICATED VALUE PER SQUARE FOOT FOR THE SUBJECT PROPERTY:** | $82.50 | $97.68 | $82.81 |

**EXPLANATION OF THE ADJUSTMENTS FOR THE COMPARABLE SALES:**

In an analysis of the preceding land sales, consideration was given to the passage of time since the dates of sale. Due to stable market conditions in recent years, time adjustments of 3% per annum were applied to the comparable sales. No favorable financing or undue motivation were evident in any of these transactions, therefore no adjustments were made in these categories.

**LOCATION:** All the sales are located in similar areas of the Bronx, and no adjustments were deemed necessary.

**AGE/CONDITION:** Negative adjustments were made to sales one and three to reflect their superior condition at the time of sale.

**QUALITY OF CONSTRUCTION:** The subject and comparable sales two and three are of superior masonry construction. Sale one was inferior quality of construction and a positive adjustment was made.

**DESIGN/APPEAL:** Negative adjustments were made to sales one and three to reflect their superior design and appeal. They are both designed as traditional houses of worship.

**BUILDING SIZE:** The subject building contains a total of 9,000+/- square feet of floor area. Sale two, is larger than the subject, and a positive adjustment was applied and sales one and three are smaller in size and negative adjustments were deemed necessary.

**USE VALUE CONCLUSION BY THE SALES COMPARISON APPROACH:**

                        After allocating adjustments for various economic and physical factors, the range of value indicated for the subject property was from $82.50 to $97.68 per square foot of building area.  Weighing the degree of similarity between the comparable properties and the subject, it is our opinion that a value at $85.00 per square foot of building area would be a reasonable estimate of market value for this property.  Therefore, the estimated **Use value** (value of a specific property has for a specific use) of the subject property as indicated by the Sales Comparison Approach is as follows:

**Estimated Value**
**Per Square Foot:**         $85.00  x 9,000  =  $765,000.00

                        **SEVEN HUNDRED SIXTY-FIVE THOUSAND**

**SALES COMPARISON APPROACH –**

**VALUATION OF THE SUBJECT LAND AS IF VACANT:**

            The following land sales have been utilized in estimating the market value of the subject land as if vacant.  In order to compensate for the differences that exist between the subject and the comparable sales we have employed a sales analysis grid, which reflects those factors which have an influence upon value.  Summaries of the comparable land sales precede the analysis grid as follows:

<u>**COMPARABLE LAND SALE NUMBER ONE**</u>

<u>**LOCATION:**</u>  3750 Barnes Avenue
Bronx, New York
(Block 4677, Lot 36)

<u>**GRANTOR:**</u>  Greater New York Corporation of Seventh-Day Adventists

<u>**GRANTEE:**</u>  3750 Barnes Development LLC.

<u>**SALES PRICE:**</u>  $425,000.00

<u>**DATE OF SALE:**</u>  January 7, 2019

<u>**PROPERTY DESCRIPTION:**</u>  This sale concerns a 6,003+/- square foot parcel of vacant land, situated on the northeast corner of Barnes Avenue and East 218th Street in the Williamsbridge section of the Bronx. This lot is rectangular in configuration and has 57.16 feet of frontage on Barnes Avenue, and 105.17 feet on East 218th Street. There were no permits issued for development at the time of sale.

<u>**LOT SIZE:**</u>  6,003+/- square feet

<u>**ZONING:**</u>  "R5, General Residence District"

<u>**SALES PRICE PER
SQUARE FOOT OF
LAND AREA:**</u>  $70.80



**COMPARABLE LAND SALE NUMBER ONE**

3750 Barnes Avenue
Bronx, New York

## COMPARABLE LAND SALE NUMBER TWO

**LOCATION:**            2401 Bathgate Avenue
                         Bronx, New York
                         (Block 3057, Lot 37)

**GRANTOR:**             PDSB Realty Corporation

**GRANTEE:**             Apex Apartments, LLC

**SALES PRICE:**         $290,000.00

**DATE OF SALE:**        July 10, 2017

**DESCRIPTION:**         This sale concerns a vacant lot containing
                         2,500+/- square feet of area.  This
                         rectangular shaped parcel is an corner lot
                         with 25 feet of frontage on East 187th Street,
                         and 100 feet on Bathgate Avenue. The property
                         has a level topography.

**LOT SIZE:**            2,500+/- square feet

**ZONING:**              "R6, General Residence District"

**SALES PRICE PER
SQUARE FOOT OF
LAND AREA:**             $116.00



**COMPARABLE LAND SALE NUMBER TWO**

2401 Bathgate Avenue
Bronx, New York

**COMPARABLE LAND SALE NUMBER THREE**

**LOCATION:**

746 East 214th Street
Bronx, New York
(Block 4661, Lot 53)

**GRANTOR:**

47-35 Niko, LLC

**GRANTEE:**

746 East 214th Street, LLC

**SALES PRICE:**

$300,000.00

**DATE OF SALE:**

May 3, 2017

**PROPERTY DESCRIPTION:**

This sale concerns a lot located in a multifamily residential neighborhood. The level interior parcel measures 25' x 100', with a total of 2,500 square feet. Since the time of sale, the property was approved for a 10-unit walk-up apartment building. The building will contain 6,921+/- square feet of gross floor area (not including the basement).

**LOT SIZE:**

2,500+/- square feet (25' x 100')

**ZONING:**

"R6A, General Residence District"

**SALES PRICE PER SQUARE FOOT OF LAND AREA:**

$120.00



**COMPARABLE LAND SALE NUMBER THREE**

746 East 214th Street
Bronx, New York

## COMPARABLE LAND SALE NUMBER FOUR

**LOCATION:**                835-837 Tilden Street
                             Bronx, New York
                             (Block 4671, Lot 7)


**GRANTOR:**                 835 Tilden Street Holding Corp.


**GRANTEE:**                 Tilden Development LLC


**SALES PRICE:**             $1,493,862.00


**DATE OF SALE:**            November 27, 2018


**DESCRIPTION:**             This sale concerns an interior lot containing
                             21,078+/- square feet which was previously
                             developed with a 4,308+/- square foot
                             warehouse. It is adjacent to new development
                             which will contain 56 affordable co-op units.


**LOT SIZE:**                21,078+/- square feet


**ZONING:**                  "R6A, General Residential"


**SALES PRICE PER
SQUARE FOOT OF
LAND AREA:**                 $70.88



**COMPARABLE LAND SALE NUMBER FOUR**

835-837 Tilden Street
Bronx, New York

**COMPARABLE LAND SALE NUMBER FIVE**

**LOCATION:**                 3365 Cruger Avenue
                              Bronx, New York
                              (Block 4629, Lot 20)

**GRANTOR:**                  712 E 214 Corp.

**GRANTEE:**                  3365 Cruger LLC

**SALES PRICE:**              $950,000.00

**DATE OF SALE:**             April 8, 2016

**DESCRIPTION:**              This sale concerns a corner lot
                              containing 11,403+/- square feet of vacant
                              land area. Since the sale, plans have been
                              filed for a seven story building with 50
                              apartments on top of commercial and community
                              facility spaces.

**LOT SIZE:**                 11,403+/- square feet

**ZONING:**                   "R6, General Residential"

**SALES PRICE PER**
**SQUARE FOOT OF**
**LAND AREA:**                $83.31



**COMPARABLE LAND SALE NUMBER FIVE**

3365 Cruger Avenue
Bronx, New York



**LOCATION MAP - COMPARABLE LAND SALES**

**ADJUSTMENT CRITERIA FOR THE COMPARABLE LAND SALES:**

A sales analysis grid has been utilized as a format to present those factors which have an effect upon the value of the subject parcel.  Consideration has been given to the difference in **time** between the date of sale of the comparable properties, and the date of valuation of the subject.  The **motivation** adjustment analyzes any factor which may have a tendency to motivate a purchaser and/or seller to act in a manner inconsistent with typical market behavior.  The **financing** category acknowledges any atypical financing arrangements at the time of sale which may have an impact on the price paid.  The terms of atypical financing are reduced to a dollar adjustment through a cash equivalency analysis.  The **location** factor acknowledges neighborhood influences affecting each of the parcels.  Location is one of the basic elements contributing to the value of a property.  An analysis of various factors such as population trends, supply and demand, neighborhood cycle, potential development, municipal and transportation services, and various other factors are considered.  The **topography and configuration** adjustments analyze the shape and surface configurations of an area for maximum site development and utilization.  The **size** adjustment recognizes the area of a property and the market condition whereas on a per square foot basis, a typical purchaser would pay more per square foot for a smaller lot than a larger one.  Adjustments are considered for differences in the **view amenity**.  **Zoning** analyzes the various uses permitted in different zoning districts with respect to items such as coverage potential, and the restrictions governing those uses.  The **utilities** adjustment recognizes the availability, or lack of

public utilities to the sites at the time of sale.  The adjustment for **frontage/corner location** acknowledges the advantage of being on a corner for a potential apartment building, which would be afforded additional street frontage, better exposure and superior fenestration.

# SALES GRID

| | SALE # 1 | SALE # 2 | SALE # 3 | SALE # 4 | SALE # 5 |
|---|---|---|---|---|---|
| **DATE OF SALE:** | 1/7/19 | 7/10/17 | 5/3/17 | 11/27/18 | 4/8/16 |
| **SALES PRICE PER SQUARE FOOT:** | $70.80 | $116.00 | $120.00 | $70.88 | $83.31 |
| **TIME:** | 10% | 23% | 25% | 10% | 36% |
| **FINANCING:** | 0% | 0% | 0% | 0% | 0% |
| **MOTIVATION:** | 0% | 0% | 0% | 0% | 0% |
| **ADJUSTED PRICE** | $77.88 | $142.68 | $150.00 | $77.97 | $113.30 |
| **LOCATION:** | 0% | 0% | 0% | 0% | 0% |
| **TOPOGRAPHY:** | 0% | 0% | 0% | 0% | 0% |
| **VIEW:** | 0% | 0% | 0% | 0% | 0% |
| **UTILITIES:** | 0% | 0% | 0% | 0% | 0% |
| **SIZE:** | -6% | -10% | -10% | 12% | 0% |
| **CONFIGURATION:** | 0% | 0% | 0% | 0% | 0% |
| **ZONING:** | 25% | 0% | 0% | 0% | 0% |
| **FRONTAGE:** | 0% | 0% | 10% | 10% | 0% |
| **NET ADJUSTMENT:** | 19% | -10% | 0% | 22% | 0% |
| **ADJUSTED SALES PRICE PER SQUARE FOOT:** | $92.68 | $128.41 | $150.00 | $95.12 | $113.30 |

**EXPLANATION OF THE ADJUSTMENTS**

**FOR THE VACANT LAND SALES:**

In an analysis of the preceding land sales, consideration was given to the passage of time since the dates of sale. Due to stable market conditions in recent years, time adjustments of 10% per annum were applied to the comparable sales. No favorable financing or undue motivation were evident in any of these transactions, therefore no adjustments were made in these categories.

**LOCATION:** All the sales are located in similar areas of the Bronx, and no adjustments were deemed necessary.

**ZONING:** Sales one is situated within more restrictive zoning districts, and a positive adjustment was deemed necessary.

**FRONTAGE:** The subject has road frontage on Barnes and Mathews Avenues and sales one, two and five are situated on corners. Positive adjustments were made to sales three and four to account for its inferior interior location, which provides for inferior frontage and exposure.

**SIZE:** The subject consists of a 10,000+/- square foot parcel of land. Sale four, is larger than the subject, and a positive adjustment was applied and sales one, two and three are smaller in size and negative adjustments were deemed necessary.

**VALUE CONCLUSION VIA THE SALES COMPARISON APPROACH:**

After adjusting for those factors which tend to have an influence upon value, the comparable land sales indicated an estimated value range for the subject land as if vacant of $92.68 to $150.00 per square foot. After an analysis and consideration of each of the sales in relation to the subject, it is our opinion that a market value of $115.00 per square foot for the subject land is appropriate. At $115.00 per square foot, the estimated value of the subject property, which consists of 10,000+/- square feet, is $1,150,000.00.

$115.00 x 10,000 = $1,150,000.00

The above value estimate assumes that the improvements on the site were removed and the parcel was vacant. We have estimated demolition costs of the 9,000+/- square foot building at $10/SF, or $90,000. After deducting the above estimated expense, the indicated value estimate by the Sales Comparison Approach is $1,060,000.00.

**ONE MILLION SIXTY THOUSAND ($1,060,000) DOLLARS**

**RECONCILIATION:**

   The subject property consists of a 10,000+/- square foot parcel of land (50' x 200'), improved with a building currently being utilized as a house of worship. The building was constructed circa 1943, and contains 9,000+/- square feet of gross floor area. The site has 50+/- feet of road frontage along Barnes Avenue and 50+/- feet of road frontage along Mathews Avenue. There is outdoor on-site parking for 8+/- cars in the rear of the property.

   At the time of inspection, the building showed signs of neglect, and was in need of significant renovations and upgrades. It is our contention that the Highest and Best Use of the property is to demolish and remove the existing improvements and for the development of an apartment building in accordance with the current zoning requirements, as this would likely offer the greatest financial return over the long term.

   The purpose of this investigation and analysis was to estimate the *as is* market value of the fee simple interest of the subject property as of October 21, 2019. In addition, at the request of the client we have also estimated the **Use value** (value of a specific property has for a specific use) as of October 21, 2019.

   The Sales Comparison Approach was used in the valuation of the subject property, as it is the most appropriate method for valuing vacant land.  This valuation method is predicated upon prices paid for actual sales of similar type properties equivalent to that of the subject.  We attempted to uncover the best data for use in

this analysis, with the comparable sales delineated on a price per square foot.  After adjustments were made for the differences in location, date of sale and other salient features, the adjusted prices formed a close range, which was then developed into a final value estimate for the subject.

The Income Capitalization Approach was omitted from the analysis, as vacant land in this area is not typically purchased for its income producing capability.  The Cost Approach is utilized in the valuation of improved sites and was omitted from this analysis.

In our determination of the final value estimate of the subject property we have relied on the Sales Comparison Approach, which is considered the most appropriate indicator of value.

**<u>FINAL ESTIMATE OF MARKET VALUE FOR THE SUBJECT PROPERTY:</u>**

The purpose of this investigation and analysis was to *as is* estimate the **market value** of the fee simple interest of the subject property as of April 24, 2017 which was as follows:

**ONE MILLION SIXTY THOUSAND ($1,060,000) DOLLARS\***

\*The above value reflects an estimated cost to raze and remove the existing 9,000 +/- square foot building at $90,000.00. As we are not experts in demolition costs, we strongly recommend that a professional in this field make an accurate cost estimate. Our final estimated value of the subject property may require modification after an expert demolition cost estimate is made.

At the request of the client we have also estimated the **Use value** (value of a specific property has for a specific use) of the subject property as of October 21, 2019, which was as follows:

**SEVEN HUNDRED SIXTY-FIVE THOUSAND ($765,000.00) DOLLARS**

## ADDENDA





**BARNES AVENUE**





FRONT OF BUILDING



SOUTH SIDE OF BUILDING



MATHEWS AVENUE



REAR OF BUILDING



REAR OF PROPERTY





REAR OF PROPERTY





**SANCTUARY**



SANCTUARY/BALCONY



STORAGE CLOSET BEHIND ALTER



**BALCONY**



**SANCTUARY**



MEETING ROOM



UPDATED BATHROOM



UPDATED BATHROOM



MEETING ROOM



MEETING ROOM



UPDATED BATHROOM



**INTERIOR OF APARTMENT**



**ROOF**



ROOF



MEN'S ROOM IN BASEMENT



**ELECTRIC PANELS**



**NON-WORKING BOILER IN BASEMENT**



**GENERAL PURPOSE ROOM IN BASEMENT**



**KITCHEN IN BASEMENT**



**KITCHEN IN BASEMENT**



**WOMEN'S ROOM IN BASEMENT**





FOYER AREA



INTERIOR STAIRCASE

## QUALIFICATIONS

### RICHARD D. FERRARONE, MAI, SRA

**THE LANDMARK APPRAISAL GROUP, INC**
**555 EAST BOSTON POST ROAD, MAMARONECK, NEW YORK  10543**
**914-422-3500      FAX: 914-422-3980**

## BUSINESS EXPERIENCE:

He is currently a principal with The Landmark Appraisal Group, Inc., an independent Real Estate Appraisal and Consulting firm with offices at 555 East Boston Post Road, Mamaroneck, New York 10543 and 31 Park Avenue, Suffern, New York  10901.  He has been engaged exclusively in the appraisal of real estate since 1977.

## SCOPE OF APPRAISAL AND CONSULTING ACTIVITIES:

His scope of work has included the appraisal of a variety of types of real property; feasibility and market studies; field inspections; cost analyses, conservation easements etc.  Mr. Ferrarone has also testified as an expert witness at the Supreme Court in Manhattan, Brooklyn and White Plains, New York, and in the State of Connecticut at Bridgeport, Hartford, Stamford, Danbury and Waterbury and Federal Court in Manhattan.

Appraisals have been made for a number of individual clients, attorneys, financial institutions and industrial corporations.  The primary area of study has been Westchester, Putnam, Rockland, Dutchess, Orange and Ulster Counties, the Boroughs of the Bronx, Manhattan, Brooklyn, Queens and Staten Island in the City and State of New York, and Fairfield, Litchfield and New Haven Counties in Connecticut.   These assignments have been performed for mortgage investment, purchasing, sales, estate tax, etc.

## PROFESSIONAL DESIGNATIONS:

MAI:      Appraisal Institute, Chicago, Illinois

SRA:       Appraisal Institute, Chicago, Illinois

## ASSOCIATION MEMBERSHIPS:

State Certified General Real Estate Appraiser:  State of Connecticut, No. 0864

Certified General Real Estate Appraiser: State of New York, ID 46-8732

Licensed Real Estate Salesman:
State of New York, Westchester County Board of Realtors,
New York State Association of Realtors,
National Association of Realtors

Advisory Board: Westchester Land Trust

Member: Board of Assessment Review Committee
Housing and Community Development Committee
Town of Lewisboro, New York

FNMA: Federal National Mortgage Association Approved
Appraiser Level 3, #13.3827934

**EDUCATIONAL BACKGROUND:**

American International College: Bachelor of Arts, Economics

George Washington University: Master Business Administration

Mr. Ferrarone has successfully completed the continuing educational requirements of the Appraisal Institute, State of New York and State of Connecticut.

Course 101 - "An Introduction to Appraising Real Property"
Course 201 - "Principles of Income Property Appraising"
R-2 Exam
Course 1A-1 - "Real Estate Appraisal Principles"
Course 1A-2 - "Basic Valuation Procedures"
Course 8-2 - "Residential Valuation"
Course 1B-A - "Capitalization Theory and Techniques" Part A
Course 1B-B - "Capitalization Theory and Techniques" Part B
Course 2-1 - "Case Studies in Real Estate Valuation"
Course 2-2 - "Valuation Analysis and Report Writing"
Course I&II420- "Standards of Professional Practice" Part A & B
Income Demonstration Appraisal Report
Comprehensive Exam
**Recent Seminars include the following:**
Valuing Land Affected By Conservation Easements
New York & Connecticut Fair Housing and Real Estate Appraisal Law
Real Estate Brokers and Salesman Course for New York
Land Valuation and Purchase Price Decisions
Review Appraisal under USPAP
Real Estate Appraisal Law Update

Appraisal of Retail Properties
Appraisal Regulations of the Federal Banking Agencies
The Appraiser's Legal Liabilities
Twenty Common Appraisal Errors
Appraisal Technology Trends
Subdivision Analysis
Income Valuation of Small, Mixed-Use Properties
GIS Technology in the Appraisal Industry
State Of New York City Real Estate Market
Standards of Professional Practice
Feasibility Analysis, Mkt. Value & Investment
Appraising Vacant Land
Litigation Analysis For The Appraiser
Case Studies In Hotel Valuation
Valuing Land Affected By Conservation Easements
400 USPAP Update 2003
Scope of Work: Expanding Your Range of Services
The Road Less Traveled: Special Purpose Properties
Condemnation Appraising: Basic Principles & Applications
USPAP Update Courses 2005, 2007, 2008
Mathematically Modeling Real Estate Data
Subdivision Valuation
Professional's Guide to Uniform Residential Appraisal Report
Real Estate Fraud: The Appraiser's Responsibilities & Liabilities
Business Practice and Ethics, 2009
Appraisal of Local Retail Properties
What Commercial Clients Would Like Appraisers to Know
New 2009 Fannie Mae Appraisal Policies
2009 Fair Housing
Commercial Appraisal Engagement and Review
Fannie Mae Appraisal Policies, Form 1004MC
Resolution of Real Estate Valuation Disputes; Negotiation, Mediation
Appraisal, Arbitration, Litigation
Loading Capitalization and Discount Rates for Tax Valuation
20 Years After FIREA: The State Of The Appraisal Profession

## QUALIFICATIONS

### MICHAEL H. LITSKY

**BUSINESS EXPERIENCE:**

He is currently employed at The Landmark Appraisal Group, Inc., an independent Real Estate Appraisal and Consulting firm with offices at 555 East Boston Post Road, Mamaroneck, New York  10543.

**SCOPE OF APPRAISAL AND CONSULTING ACTIVITIES:**

His scope of work includes the appraisal of different types of real property, including single and multifamily dwellings, condominium and co-operative apartments, office buildings, apartment buildings industrial properties, residential subdivisions, etc.  These reports include feasibility and market studies, field inspections, cost analyses, etc.
Appraisals have been made for a number of individual clients, attorneys, financial institutions and industrial corporations.  In New York State, the primary area of study has been Westchester, Putnam, Dutchess, Orange and Rockland Counties, as well as the five boroughs of New York City.  In Connecticut the primary areas are the counties of Fairfield and Litchfield.  These assignments have been performed for mortgage investment, purchasing, sales, estate tax, litigation, etc.

**ASSOCIATION MEMBERSHIPS:**

Member:                              Westchester County Society of Real Estate Appraisers
NY Certified General Appraiser: #46-47819

**EDUCATIONAL BACKGROUND:**

He is a graduate of Muhlenberg College, Allentown Pennsylvania with a Major in Business, Management and Economics. He is a graduate of Hamden Hall Preparatory School, Hamden, Connecticut.

Mr. Litsky has successfully completed the following educational requirements:

Course "R-1"   - Introduction to Real Estate Appraisal
Course "R-II"  - Valuation Principles and Procedures
Course "R-III" - Applied Residential Property Valuation
Course "R-IV"  - Introduction to 1-4 Family Income Capitalization
Course "G-I"   - Basic Income Capitalization
Course "G-II"  - General Applications
Course "G-III" – Applied Income Property Valuation
Ethics Course  - Standards of Professional Practice
AQ-1            - Fair Housing, Fair Lending and Environmental Issues

Recent Seminars include the following::

| PROGRAM NAME: | SPONSOR |
|---|---|
| Small Income Properly Valuation | Westchester Society of Appraisers |
| Government Impact of Real Estate on NYC Real Estate Trends | Appraisal Institute |
| 7-Hour National USPAP Update Course | Westchester Community College |
| How to Prepare the New FNMA Forms | Westchester Society of Appraisers |
| Understanding USPAP via Case Studies | Westchester Society of Appraisers |
| Valuation of 2 to 4 Family Residences and the Secondary Market | Westchester Community College |
| Applicability of the Cost Approach to Value | Westchester Community College |