**BID PROCEDURES HEARING DATE AND TIME: JUNE 18, 2020 at 10:00 a.m.**
**OBJECTION DEADLINE: JUNE 11, 2020 at 5:00 p.m.**

**SALE HEARING DATE AND TIME:  TBA**

TARTER KRINSKY & DROGIN LLP
*Attorneys for Deborah J. Piazza, as Chapter 11 Trustee*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
smarkowitz@tarterkrinsky.com
Deborah J. Piazza, Esq.
dpiazza@tarterkrinsky.com
Jill Makower, Esq.
jmakower@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

In re:

                             Chapter 11

BRONX MIRACLE GOSPEL TABERNACLE
WORD OF FAITH MINISTRIES, INC.         Case No. 19-12447 (SMB)
*aka* Bronx Miracle Gospel Tabernacle, Inc.

               Debtor.
---------------------------------------------------------------x

**TRUSTEE'S MOTION FOR ORDERS PURSUANT TO SECTIONS 105(a),  363  AND 506(c) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004, (I) APPROVING AUCTION PROCEDURES AND NOTICE OF THE AUCTION RELATING THERETO, (II) APPROVING SALE OF REAL ESTATE FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) APPROVING FORM OF PURCHASE AGREEMENT, (IV) APPROVING CARVE-OUT AGREEMENT, AND (V) GRANTING RELATED RELIEF**

TO:    THE HONORABLE STUART M. BERNSTEIN
       UNITED STATES BANKRUPTCY JUDGE

       Deborah J. Piazza, as Chapter 11 trustee (the "Trustee") for Bronx Miracle Gospel

Tabernacle Word of Faith Ministries, Inc. *aka* Bronx Miracle Gospel Tabernacle, Inc. (the

"Debtor"), hereby submits this motion (the "Motion") pursuant to sections 105(a), 363 and

506(c) of title 11, United States Code (the "<u>Bankruptcy Code</u>"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the amended guidelines adopted by General Order M-383, (i) for entry of an order substantially in the form annexed hereto as **Exhibit "A"** (the "<u>Procedures Order</u>"): (a) approving auction procedures in connection with the sale (the "<u>Sale</u>") of certain real estate, as more particularly described herein, to the highest or best bidder, (b) scheduling an auction (the "<u>Auction</u>") and a Sale hearing (the "<u>Sale Hearing</u>"), (c) approving the form of notice of such auction procedures, the Auction and the Sale, (d) authorizing certain break-up fee/expense reimbursement for a potential purchaser of the Property, (e) approving a certain carve-out agreement between the Trustee and the Debtor's lender/mortgagee; and (ii) after completion of the Sale Hearing, entry of an order (the "<u>Sale Order</u>") pursuant to Bankruptcy Code sections 105(a) and 363 and Bankruptcy Rule 6004: (a) authorizing and approving the Sale to the qualified bidder submitting the highest or otherwise best cash offer (the "<u>Successful Bidder</u>") or to the Debtor's secured lender if it credit bids an amount greater than the highest and best cash bid, free and clear of all liens, claims, encumbrances and interests, (b) approving the form of the purchase and sale agreement to be used for a cash buyer, and (c) granting related relief. In support of this Motion, the Trustee respectfully states as follows:

### JURISDICTION AND VENUE

1.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this proceeding is proper in this district and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363 and 506(c), and Bankruptcy Rule 6004. The Trustee also relies upon the amended guidelines adopted pursuant to General Order M-383.

**BACKGROUND**

**A.  General**

3.     On July 28, 2019 (the "Petition Date"), the Debtor filed a voluntary Chapter 11 petition (ECF No.1) in the United States Bankruptcy Court for the Southern District of New York (the "Court").

4.     The Debtor is a religious corporation organized pursuant to Article 10 of the Religious Corporations Law of the State of New York[1] and a not for profit corporation exempt from taxation pursuant to section 501(c)(3) of the Internal Revenue Code.

5.     The Debtor's primary asset is real property known as and located at 2910 Barnes Avenue, Bronx, New York (Block 4550, Lot 10) (the "Property"), situated on which is a church (formerly a synagogue) and a small, stand-alone garage.

6.     On December 9, 2019, Newell Funding LLC ("Newell" or "Lender"), the holder of the existing mortgage on the Property, moved (the "Lender Motion") for the appointment of a Chapter 11 trustee or an order lifting the automatic stay (ECF No. 39). The Lender Motion detailed the long and tortured history of the litigation between the Debtor and Lender, including proceedings in the Debtor's previous Chapter 11 case in this Court (Case No. 17-11395-SMB,

---

[1] The certificate of incorporation for Bronx Miracle Gospel Tabernacle, Inc. was originally filed with Bronx County, New York on April 25, 1980 under index number 598-80. On or about June 30, 2005, the name of the corporation was changed to Bronx Miracle Gospel Tabernacle Word of Faith Ministries, Inc.

which the Court dismissed on May 24, 2018), numerous state court foreclosure proceedings and proceedings in this case (the Debtor's second Chapter 11 case).

7.      On January 8, 2020, the Court entered an order directing the United States Trustee to appoint a Chapter 11 trustee, and on January 27, 2020, the Court entered an order (ECF No. 45) confirming the appointment of Deborah J. Piazza as the Chapter 11 Trustee.

8.      The Debtor operated its ministry from the Property until approximately March 24, 2020, when the Trustee shut down the Property due to the COVID-19 pandemic and to comply with Executive Orders of Governor Cuomo.

9.      The Trustee filed an application to retain Tamerlain Realty Corp. as her real estate broker ("Tamerlain") and the Court approved such application by order entered on April 2, 2020 (the "Broker Retention Order").  Tamerlain has been marketing the Property, and various parties have expressed an interest in making an offer to purchase the Property.  However, as of the date of this Motion, no formal offers have been received.

10.      By this Motion, the Trustee seeks approval of bidding and auction procedures in connection with the Sale of the Property.  At this juncture, the Trustee has not yet decided whether she will sign a stalking horse purchase agreement or simply schedule an auction with a minimum bid.  In either event, the bid procedures provide for an orderly auction pursuant to customary bid procedures, and the Trustee requests the authority to execute a stalking horse purchase agreement and provide the stalking horse purchaser with customary bid protections, including a break-up fee/expense reimbursement.

**B.  The Property**

11.      The Property is located in the Allerton neighborhood of the Bronx, NY and runs street to street from Barnes Ave to Matthews Ave. The total lot size of the Property is approximately 50' x 200' consisting of an approximately 13,500 square foot church

(formally a synagogue) (50' x 90') and approx..5,500 square feet of land with a small, stand-alone garage. The zoning is R6, with an M1 building class, and is under-built as there is an additional approximately 10,800 buildable square feet.

**C. Lender's Secured Debt**

12.     On March 6, 2008, Lender made a loan to the Debtor in the principal amount of $425,000 (the "Loan") secured by a mortgage (the "Mortgage") upon the Property.[2]  The Loan matured on March 5, 2009 and was not repaid. (Lender Motion, ¶ 3).

13.     On January 23, 2015, Lender commenced a mortgage foreclosure action and was granted a judgment of foreclosure on March 2, 2017 (the "Foreclosure Judgment"), which determined the amount owed to Lender was $1,196,033.99, together with interest from October 16, 2015 plus additional amounts provided for in the Foreclosure Judgment aggregating $1,354,338.50 (the "Judgment Amount").  (See Lender Motion, ¶ 5).  The Lender asserts it is owed $1,713,330.98 for the Judgment Amount plus statutory post-judgment interest of $358,992.48 through February 12, 2020.

**D. The Proposed Carve-out Agreement**

14.     The Trustee and Newell negotiated a carve-out of Newell's lien on the Property to assure payment of a certain amount of administrative expenses.  The Trustee and Newell have agreed on the following carve-out agreement (the "Carve-out Agreement"), subject to the approval of the Court:

    a.  If Newell purchases the Property pursuant to a successful credit bid of less than $1.6 million: $85,000 carve-out to be paid by Newell to the estate and Newell will waive any claim against the estate for any deficiency. The Trustee's broker (Tamerlain) waives any right to a commission if Newell purchases the Property pursuant to a credit bid of any amount under this clause a. or clause b. below.[3]

---

[2]  The Debtor's pastor, Rev. Dr. Keith Elijah Thompson ("Rev. Thompson") and his wife, Yvonne Thompson, guaranteed the Loan.
[3]  Tamerlain has agreed to this provision.

b. <u>If Newell purchases the Property pursuant to a successful credit bid of $1.6 million or more</u>: $90,000 carve-out to be paid by Newell to the estate, and carve-out will be raised an additional $10,000 for each $100,000 increment for which Newell successfully credit bids above $1.6 million (e.g., at a credit bid of $1.7 million, carve-out is increased to $100,000, at a credit bid of $1.8 million, carve-out is increased to $110,000, etc.), but for each $100,000 increment above $2 million, the increase will be $15,000 (e.g., a purchase price of $2,100,000 would increase the carve-out to $145,000).

c. <u>If the Property is sold to a cash buyer</u>: $85,000 carve-out from sale proceeds (the "<u>Proceeds</u>") to the estate, plus in all cases the 4% commission to the broker (inclusive of any 2% co-brokerage commission) with remainder to be paid to Newell at closing. $85,000 carve-out increased by $10,000 for each $100,000 increment for which cash purchase price exceeds $1.6 million (e.g., at a sale for $1.7 million, carve-out is increased to $95,000, at a sale for $1.8 million, carve-out is increased to $105,000, etc.), but for each $100,000 increment above $2 million, the increase will be $15,000 (e.g., a purchase price of $2,100,000 would increase the carve-out to $140,000).

d. In the event any lien is asserted against the Debtor's bankruptcy estate for transfer taxes or real estate taxes, county taxes, municipal taxes, assessments, special assessments or the like (referred to here as a "tax lien"), which would constitute a lien senior to that of Newell and have to be paid at any foreclosure sale or any bankruptcy sale (or remain a lien on the Property), the amount of the tax lien for which the estate is actually liable, along with any accrued interest, shall be paid (i) in cash by Newell if Newell purchases the Property by credit bid, or (ii) from the Proceeds if the sale is made to a cash buyer. (Any amounts that Newell shall be required to pay under this Section 14 are referred to as "<u>Carve-out Amounts</u>.") Newell will have standing to object to any such tax lien but no obligation to do so. If Newell elects to object to the any such tax lien, such objection will be handled by its own counsel unless Newell and the Trustee agree otherwise in writing. If Newell elects not to object, but requests that the Trustee do so, the Trustee will have no obligation to do so unless the Trustee and Newell reach a mutually satisfactory agreement for an additional carve-out for legal fees associated with any such objection. Regardless of whether Newell objects or requests that the Trustee object (pursuant to a mutually satisfactory additional carve-out agreement), the Trustee may object if she deems it necessary or appropriate, but Newell will have no liability to the estate for fees relating to any such Trustee objection unless it agrees otherwise in writing. In the event that Newell objects to any tax lien, the Trustee shall cooperate with Newell by providing copies of such books and records that may be requested by Newell relating to any such tax lien.

e. The Trustee shall pay all Proceeds to Newell at the Closing, less any applicable Carve-Out Amounts. Notwithstanding anything to the contrary herein, any

Carve-Out Amounts shall first be paid out of any Proceeds before Newell shall be obligated to pay any Carve-Out Amounts.

## RELIEF REQUESTED

15. By this Motion, the Trustee seeks entry of two separate orders, as follows:

   a. the Procedures Order, substantially in the form attached hereto as **Exhibit "A"**:

   (i) approving procedures for submitting bids for the Property (the "Bids"), including setting a date on or about July 15, 2020 at 5:00 p.m. prevailing Eastern Daylight Time as the deadline for any Qualified Bidder (as defined below) to submit a Qualified Bid (as defined below) for the Property,

   (ii) authorizing the Trustee to conduct an auction on or about July 20, 2020 (the "Auction") with respect to the Property,

   (iii) approving certain notice procedures with respect to the Sale of the Property,

   (iv) approving the form of the purchase and sale agreement (the "Purchase Agreement" or "PSA"),

   (v) authorizing the Trustee, in consultation with the Lender, to enter into a stalking horse contract substantially in the form of the Purchase Agreement, no later than June 30, 2020 and in the event the Trustee executes a stalking horse contract, authorizing the Trustee to provide a break-up fee (the "Break-Up Fee") of $30,000 to the stalking horse purchaser in the event the stalking horse purchaser is out bid for the Property at the Auction, and

   (vi) setting the Sale Hearing at the Court's earliest convenience but not later than July 23, 2020.

16.     The Trustee believes, under the circumstances detailed in this Motion and in light of the continued accrual of administrative expenses in this case, it is in the best interest of the Debtor's estate and creditors to promptly pursue the sale of the Property in accordance with the proposed auction procedures (the "Auction Procedures") attached hereto as **Exhibit "B"**.

## SUMMARY OF THE PROPOSED AUCTION
## TERMS AND PURCHASE AGREEMENT

17.     The Trustee requests that the following Auction Procedures be established to govern the Sale process.[4]  The proposed form of Purchase Agreement, which is annexed hereto as **Exhibit "C"**, is consistent with these Auction Procedures and is relatively straightforward purchase and sale agreement providing for a prompt closing with no contingencies.

18.     The Trustee seeks to establish a date on or about July 15, 2020 as the deadline (the "Bid Deadline") by which prospective bidders must submit a $150,000 cash deposit and written binding Bids to purchase the Property.  Only timely Bids meeting all of the requirements of a Qualified Bid made by a Qualified Bidder (as defined below) will be eligible for participation in the Auction.

19.     The Auction Procedures provide for potential bidders to conduct due diligence until the Bid Deadline.  Potential bidders will be required to provide current financial information demonstrating the party's financial capability to consummate the Sale before conducting the due diligence, to the extent not already done.  Due diligence access may include access to due diligence materials, on-site inspections, and such other matters which a potential bidder may reasonably request and as to which the Trustee, in her sole discretion, may agree consistent with the Auction Procedures.

---

[4] This summary is provided for convenience only and is qualified in its entirety by the Auction Procedures attached hereto as **Exhibit "B"**.  To the extent that there is any discrepancy, the terms and conditions of the Auction Procedures shall control.  Interested parties are urged to read the Auction Procedures in full.

20. The Lender shall be deemed a Qualified Bidder and shall be entitled to credit bid the portion of its secured claim consisting of the Judgment Amount plus statutory interest as of the Auction Date. For all other bidders, to be a Qualified Bidder a party must submit a Qualified Bid (as defined in the Auction Procedures) and be deemed by the Trustee in the exercise of her reasonable business judgment to be financially able to consummate the purchase of the Property.

21. The Trustee seeks to establish a date on or about July 20, 2020 as the Auction date in the event a Qualified Bid is timely received by the Trustee. Upon the conclusion of any bidding at the Auction, the Trustee will determine the Successful Bidder unless the highest bid is a credit bid by the Lender, in which case the Property shall be sold to the Lender. The Court shall hold the Sale Hearing as promptly as possible, to confirm the results of the Auction, if any.

22. The Trustee shall, after consultation with the Lender, determine, in her business judgment, which Qualified Bid at the Auction is the highest and otherwise best offer if any such bids exceed any credit bid made by the Lender. This determination shall take into account any factors the Trustee reasonably deems relevant to the value of the Qualified Bid to the estate and may include, among other things, the following: (a) the amount and nature of the consideration; (b) the number, type and nature of any changes to the PSA; (c) the extent to which such modifications are likely to delay closing of the sale of the Property and the cost to the Debtor's estate of such modifications or delay; (d) the amount and nature of the consideration to be received by the Trustee; (e) the likelihood of the Bidder's ability to close a transaction and the timing thereof; and (f) the net benefit to the estate, taking into account any potential purchaser's right to the Break-up Fee as well as the amount of the Lender's allowed secured claim.

23. Once the Successful Bidder is identified or if Newell is the highest bidder with a credit bid, the Trustee will submit its bid (the "Successful Bid") for approval by the Court at the Sale Hearing.

24. The Auction Procedures contain the following provisions, which are more fully described in the Auction Procedures attached as **Exhibit "B":**

(a) **Qualification to Bid:** To qualify to participate in the Auction, a bidder must (i) bid at least $1.2 million cash on or before the Bid Deadline and provide to the Trustee's undersigned counsel by such date a cashier's or certified check or wire transfer made payable to Tarter Krinsky & Drogin LLP (the **"Deposit"**) in the amount of $150,000 with respect to the Property; (ii) inspect (or have its agent inspect) the Property; and (iii) purchase or receive a bidder's information Packet (as defined below).

(b) **Qualified Bidders:** Any bidder that so qualifies will be a "Qualified Bidder." Only Qualified Bidders and the Lender will be permitted to be present at the Auction and participate in bidding for the Property at the Auction. The Trustee, by her bankruptcy counsel, shall act as auctioneer (the "Auctioneer"). The Auctioneer, after consultation with Newell's bankruptcy counsel, shall reasonably determine in good faith, whether any bidder is a Qualified Bidder.

(c) **Breach of The PSA:** Any Deposit will be forfeited as liquidated damages if the Successful Bidder fails to close for any reason other than the Trustee's/Seller's default and shall be considered Proceeds for all purposes.

(d) **No Contingent Bids:** Bids may not be subject to financing, due diligence, zoning, environmental or any other contingency of any kind whatsoever except the entry of an order of this Court approving the Sale pursuant to section 363(b) and (f) of the Bankruptcy Code.

(e) **The Auction Format:** The Auction will be held telephonically and/or by video conference via Zoom or similar platform. To bid during the Auction, a Qualified Bidder need only raise their hand, shout out their bid or instruct an Auctioneer's bidder assistant to call out a bid on behalf of the Qualified Bidder.

(f) **Bidding at the Auction:**

i. After the initial opening bid, all subsequent competing bids shall be in increments at the direction and discretion of the Auctioneer. No bid

shall be of the same amount as any existing bid.

ii. Auctioneer reserves the right to reopen the bidding and re-bid the Property, in the event of a bidding dispute occurring at the Auction.

iii. Oral and written announcements made by the Auctioneer before the commencement of the bidding take precedence over any previously distributed materials.

iv. In the event no stalking horse contract is executed, the first bid after the opening bid shall be at least $25,000 more than the initial opening bid and all subsequent bids shall be $10,000 higher than the previous bid.

v. In the event a stalking horse contract is executed, the initial opening bid at the Auction shall be $50,000 above the purchase price in the stalking horse contract, and subsequent bids shall be $10,000 higher than the previous bid.

vi. In the event the stalking horse buyer is out bid at the Auction (other than by Newell as a credit bidder with a Successful Bid of $1.5 million or more), the stalking horse buyer shall be entitled to receive a break-up fee of $30,000.

(g) **Additional Requirements Of The Successful Bidder:** The Successful Bidder will also be required to sign the bidder's card upon the conclusion of bidding, acknowledging the purchase, and tender the required certified or cashier's check as initial down payment to the Trustee. The Successful Bidder shall immediately sign the PSA and the Trustee shall deposit the initial down-payment in a separate Trustee-maintained escrow account. The initial down payment MUST together with the Deposit equal 10% of the Total Purchase Price (as defined in the PSA) and be paid by cashier's or certified check, if applicable, either at the Auction or within two (2) business days following the Auction. No third party checks will be accepted. The Successful Bidder may also be asked to sign a statement that the Successful Bidder has inspected the Property. If the PSA is to be signed with the purchaser being a corporation or partnership or trust, there may be additional bidding requirements and the Successful Bidder should contact the Auctioneer to discuss these requirements in advance of the Auction. In the sole discretion of the Auctioneer, the Trustee may qualify the next highest and best Successful Bidder (the **"**Next Successful Bidder**"**) in accordance with this provision and the PSA to close the sale in the event the Successful Bidder defaults under the PSA. For the avoidance of doubt, this provision does not apply to Newell, and a closing of such a credit bid sale shall be in accordance with the Auction Procedures and Procedures Order..

(h)     **Appearance at Auction:**   All Qualified Bidder(s) must appear via telephone or video through a duly authorized representative or by submitting a bid prior to the Auction to be entered into the bidding at the Auction.

(i)     **Jurisdiction of Court:**   The Auctioneer shall conduct the Sale for and as directed by the Court for the benefit of the parties.   The Auctioneer, all bidders and their brokers or representatives are deemed to have submitted to the exclusive jurisdiction of the Court with respect to any dispute relating to all matters related to the Auction and all terms and conditions of the transfer of the Property.

(j)     **Successful Bidder Default:**   If any Successful Bidder fails to close the sale contemplated herein, it will be liable for and forfeit any Deposit and, in the sole discretion of the Auctioneer, the Auctioneer may close the sale with the Next Successful Bidder in accordance with the PSA.

(k)     **Closing:**   The closing of the Sale pursuant to the Auction (the **"**Closing**"**) shall take place in accordance with the terms of the PSA unless the Sale is to be to Newell based on a credit bid, in which case the Sale shall close in accordance with the terms of the Auction Procedures and Procedures Order.

(l)     **Bankruptcy Court Approval:**   The Sale of the Property contemplated herein shall be subject to the entry of an order, or orders as the case may be, by the Court: (a) approving the Sale and transfer of the Property; and (b) containing a finding that the Successful Bidder or Newell if the Property is to be sold pursuant to a credit bid, is a good faith Purchaser, pursuant to section 363(m) of the Bankruptcy Code.

(m)     **Realtor®/Broker Participation Invited:**   A co-brokerage commission of two (2%) percent of a Successful Bid cash price (the **"**Cooperating Broker Fee**"**), will be paid by the Trustee, to the real estate broker acting as a "Buyer Broker" whose client pays and closes on the Property.   To qualify for the Cooperating Broker Fee, the real estate agent must:   (a) be a licensed real estate broker in the state of New York who will abide by the National Association of Realtors® Code of Ethics; (b) register the client by certified mail, return receipt requested, on company stationery, which must be signed by both the broker and the client and confirm the Buyer Broker arrangement, with **Tamerlain Realty Corp., 629 Fifth Avenue, Suite 219, Pelham, New York 10803, New York, Attention: Nico V. Rossi**, received no later than three (3) business days prior to the Auction date; (c) ensure the registration letter is received before any inspection of the Property by the client; (d) sign in and inspect the Property with the client during a scheduled site inspection; and (e) attend the Auction with the client and bid with or for the client.   All registrations accepted will be

acknowledged; each acknowledged broker must bring his or her registration acknowledgment to an open house (if any) and to the Trustee for registration verification purposes. A complete registration file on all prospects will be maintained. No REALTOR®/Broker will be recognized for a client who has previously contacted or been contacted by the Debtor or its representative or the Auctioneer or Newell or Tamerlain Realty Corp. No Cooperating Broker Fees will be paid by the Trustee if the broker, the broker's agents or a member of the broker's immediate family is participating in the purchase of the Property or is an employee or partner or equity holder of the Purchaser. An affidavit will be required certifying that the agent is serving only as a broker and not as a principal. There can be NO EXCEPTIONS to this procedure and no oral registrations will be accepted. If a broker has not met all of these requirements, no Cooperating Broker Fee will be paid to the broker, even if the broker's client purchases the Property.

(n)     **Documents Available:**  A bidder's information packet (the **"**Packet**"**) will be assembled and may include such items as detailed Auction information, property description, legal description, the PSA, preliminary title examination report, operating costs, detailed property information, environmental and other third party reports, real estate tax bill, local zoning information, rent roll, leases, local market information, survey, terms of sale, bidder's affidavit and other applicable information. The Packet is available by requesting same via telephone or email from Tamerlain, or by requesting same at the on-site inspection. Obtaining a copy of a Packet is required prior to registering to bid at the Auction. Auctioneer shall not be liable for any inaccuracy contained in any reports furnished to buyers, including those originating from third party experts.

(o)     **Attorney Review Recommended:** All information contained in auction-related material, such as the Packet, should be carefully reviewed by a bidder's attorney prior to the Auction and is subject to and may be superseded by the PSA and announcements made from the podium prior to the commencement of bidding.

(p)     **Conduct Of The Auction:**  Conduct of the Auction and increments of bidding are at the direction and discretion of the Auctioneer. Auctioneer reserves the right to refuse admittance to anyone other than a Qualified Bidder, counsel or other professional acting on behalf of such Qualified Bidder, Newell and its principals and counsel, or to expel anyone admitted from the Auction premises for interference with Auction activities, nuisance, canvassing, soliciting, or other reasons deemed necessary by the Auctioneer. In the event of a dispute between bidders, the Auctioneer shall make the final decision to accept the final bid, to re-offer and/or re-sell the Property. If any disputes should arise following the Auction, the Auctioneer's records shall be conclusive in all respects.

(q) **Disclaimer:** Each Qualified Bidder, by submitting a bid for the Property, shall be deemed to acknowledge and represent:

- That it is bound by the Auction Procedures contained herein;

- That it had an opportunity to inspect and examine the Property and to review all pertinent documents and information with respect to the Property prior to making its offer and that it relied solely upon its own investigation, own independent review, investigation and/or inspection of any documents and/or the Property in making its bid; and

- That it did not rely upon any written or oral statements, warranties or representatives of the Auctioneer, the Debtor, or the Debtor's agents regarding the Property, or the completeness of any information provided in connection with the Property, the bidding process or the Auction.

25.     Any and all disputes related or pertaining to or resulting or arising from the marketing process, the Auction, the Sale, and/or the conduct of the Auctioneer, and/or any of the Trustee's professional advisors shall be adjudicated solely by the Court. The submission of a Bid shall constitute an express consent by the bidder to the exclusive jurisdiction of the Bankruptcy Court for all such matters. Nothing herein shall be deemed an admission or acknowledgement that any party has standing in respect of such disputes.

26.     The closing of the Sale of the Property to the Successful Bidder will occur in accordance with the terms of the executed PSA or, in the event Newell is the purchaser pursuant to a credit bid, the Procedures Order and the Sale Order. If for any reason the party making the Successful Bid fails to consummate the Sale, then the offeror of the second highest and best Qualified Bid will be deemed to have submitted the highest and best Successful Bid, and the Successful Bid shall be the bid which immediately preceded the original, but unconsummated, Successful Bid. Deposits by Qualified Bidders will be returned or forfeited, as the case may be, as set forth in the Auction Procedures.

27.     The Auction Procedures are designed to maximize value for the Debtor's estate and will enable the Trustee and her professionals to review, analyze and compare all bids received to determine which bids are in the best interests of the Debtor's estate. The Trustee submits that the Auction Procedures afford the Trustee on behalf of the Debtor's estate a sufficient opportunity to pursue a sale process that will maximize the value of the estate.

## BASIS FOR THE RELIEF REQUESTED

### A.     The Bankruptcy Court Has Authority To Approve The Sale Of The Property

28.     Section 363(b) of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

29.     The Bankruptcy Court has authority to approve a sale of property (including real property) owned by a debtor that is a not for profit corporation, and no approval by the New York Attorney General or a New York state court is required. See In re HHH Choices Health Plan, LLC, 554 B.R. 697, 700–01 (Bankr. S.D.N.Y. 2016)(MEW)("However, I have exclusive jurisdiction over the estate and the disposition of its assets. While a transfer must comply with the substantive requirements of state law, my interpretation of section 363 is that any determination that would be made by a state court, under section 511 of the Not-For Profit Corporation Law, in the absence of a bankruptcy case, is now a determination to be made by me, and not by the state court.");[5] In re Congregation Achpretvia Tal Chaim Shar Hayushor, Inc.,

---

[5] As Judge Wiles opined in HHH Choices Health Plan:

> The provisions in sections 363 and 541 that I have cited were added to the Bankruptcy Code by section 1221 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. That

Case No. 16-10092 (MEW) [ECF No. 370] (order granting debtor religious corporation's motion to sell its synagogue). See also In re Advanced Contracting Sols., LLC, 582 B.R. 285, 297–98 (Bankr. S.D.N.Y. 2018)(SHL)("As a threshold matter, the Court has authority to entertain the Debtor's Sale Motion and requests for related relief. As Judge Wiles explained in *In re HHH Choices Health Plan, LLC*... a bankruptcy court has exclusive jurisdiction over the estate and the disposition of its assets. So while a transfer must comply with the substantive requirements of state law—in his case New York's not-for-profit law and in this case the labor laws and law on alter ego—Section 363 permits that any determination that would be made by a non-bankruptcy court in the absence of a bankruptcy case, is made by the bankruptcy court to the extent that it implicates the ability to sell a debtor's assets."); Pub. L. No. 109-8, § 1221(e) (2005)("Nothing in this section shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or

---

statute contained an additional provision, section 1221(e), that does not appear in the Bankruptcy Code itself, but that, nevertheless, is an enforceable part of the statute, and that governs the interpretation of these provisions.

Section 1221(e) says, as a rule of construction, that:

> Nothing in this section shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property.

Pub. L. No. 109-8, § 1221(e) (2005).

The section that is referred to there, section 1221, is the same section that included the amendments to section 363 and 541 of the Bankruptcy Code.

In the case of an insolvent not-for-profit corporation, section 511 of the New York Not-For-Profit Corporation Law ordinarily, would require the approval of the New York State Supreme Court for a transfer of assets. But clearly, the amendments to the Bankruptcy Code do not mean that that state court approval is still required because section 1221(e) of the BAPCPA explicitly says otherwise; it says I cannot interpret those provisions of the amended statute to require the approval of any other court for the transfer of property. My interpretation of the statute is that substantive state law requirements are applicable, but that I am the one who is supposed to apply them, not the New York State Court.

HHH Choices Health Plan, 554 B.R. at 699–700.

controversy to any other court or to require the approval of any other court for the transfer of property.").[6]

## B.     The Sale of The Property Pursuant to the Sale Procedures is in the Best Interests of the Estate and Creditors

30.     As set forth above, Bankruptcy Code section 363(b) provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Courts in the Second Circuit and others, in applying section 363(b), have required that the sale of debtor's assets be based upon the sound business judgment of the debtor in possession or trustee.  See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); In re Gen. Motors Corp., 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009).

31.     The business judgment of a trustee is entitled to great deference. In re MF Glob. Inc., 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015); see also In re Borders Grp., Inc., 453 B.R. 477, 483 (Bankr.S.D.N.Y.2011). A trustee generally satisfies the business judgment standard if he or she "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr.S.D.N.Y.1992) appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van

_____

[6] Notably, under NY N-PCL section 511-a, an insolvent not for profit corporation has no right to seek approval from the Attorney General for a sale of all or substantially all of its assets.  NY N-PCL § 511-a provides:

> (a) In lieu of obtaining court approval under section 511 (Petition for court approval) of this article to sell, lease, exchange or otherwise dispose of all or substantially all of its assets, the corporation may alternatively seek approval of the attorney general by verified petition, except in the following circumstances:  (1) **the corporation is insolvent, or would become insolvent as a result of the transaction**, and must proceed on notice to creditors pursuant to paragraph (c) of section 511 of this article;  or (2) the attorney general, in his or her discretion, concludes that a court should review the petition and make a determination thereon.

NY N-PCL § 511-a [emphasis added].

*Gorkom*, 488 A.2d 858, 872 (Del.1985)). "Courts should not generally interfere with business decisions absent a showing of 'bad faith, self-interest, or gross negligence.' " <u>Borders</u>, 453 B.R. at 482 (quoting <u>Integrated Res.</u>, 147 B.R. at 656).

32.     A debtor in possession's or trustee's business judgment is entitled to great deference with respect to the procedures to be used in selling assets from the estate.  <u>See, e.g.</u>, <u>Integrated Res., Inc.</u>, 147 B.R at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor in possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

33.     Bankruptcy courts applying section 363 frequently have considered and approved bidding procedures in advance of a proposed sale of property of the estate.  <u>See, e.g.</u>, <u>In re Adelphia Communications Corp.</u>, 336 B.R. 610, 629-30 (Bankr. S.D.N.Y. 2006) ("It is the common practice for bankruptcy courts, in connection with the sales of businesses or lines of business, to enter orders approving bidding procedures and bidding-related obligations . . . before being asked to approve the resulting sale itself."); <u>In re Crowthers McCall Pattern, Inc.</u>, 114 B.R. 877, 878-879 (Bankr. S.D.N.Y. 1990) (noting that the bankruptcy court had entered an order requiring that overbids be made in specified minimum increments with deposits); <u>Doehring v. Crown Corp. (In re Crown Corp.</u>), 679 F.2d 774, 775 (9th Cir. 1982) (noting that the district court had required specified minimum overbid amounts, deposits, and the form of purchase agreement to be used by bidders).

34.     In analyzing the propriety of bidding procedures, a court will examine whether such procedures allow third parties to submit higher and better bids and whether potential bidders have sufficient time to conduct their own due diligence.  <u>In re Fin. News Networks, Inc.</u>,

126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), appeal dismissed, 931 F.2d 217 (2d Cir. 1991); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (requiring bid procedures that allow for "an open and fair public sale designed to maximize value for the estate."). Moreover, the hallmarks of good faith in any sale procedure are the receipt of adequate value through higher and better offers and full and accurate disclosure of the terms of the proposed sale to third parties invited to bid.

### 1. The Proposed Auction Procedures Will Maximize Value of the Property by Allowing Competing Bidders to Participate in an Auction

35. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See, e.g., Integrated Res.. Inc., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1998)); Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

36. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales. See, e.g., Integrated Res., Inc., 147 B.R. at 659 (stating such procedures should "encourage bidding and [ ] maximize the value of the Debtors' assets"); Financial News Network, Inc., 126 B.R. at 156 (S.D.N.Y. 1991) (stating that "court-imposed rules for the disposition of assets ... [should] provide an adequate basis for comparison of offers, and [ ] provide for a fair and efficient resolution of bankrupt estates").

37.     Here, the proposed Auction Procedures will allow and encourage interested parties to submit competing Bids for the Property, thereby maximizing the value the Trustee may receive for the Property.  By inviting others to participate in the Auction, the Trustee will be able to determine the highest and best price possible for the Property. The Auction Procedures will increase the likelihood the Trustee will receive the greatest consideration possible for the Property and will facilitate a competitive and fair bidding process, while promoting the goals of administrative solvency and a recovery to general unsecured creditors.

38.     The proposed Auction Procedures will allow the Trustee to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  The Auction Procedures (1) will encourage, rather than hinder, bidding for the Property, (2) are consistent with other procedures previously approved by courts in this district, and (3) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Accord Integrated Res., Inc., 147 B.R. at 650-56; In re Randall's Island Family Golf Ctrs., Inc., 261 B.R. 96 (Bankr. S.D.N.Y. 2001) aff'd, 272 B.R. 521, (S.D.N.Y. 2002); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24 (Bankr. S.D.N.Y. 1989).

### 2.     Potential Bidders Will Have Time to Conduct Due Diligence

39.     The Trustee, with the assistance of her retained broker, Tamerlain Realty Corp., has marketed and will continue to market the Property.  Tamerlain will send notice of this Motion and the Auction Procedures to all parties Tamerlain believes may be potentially interested in acquiring the Property promptly after the Court's consideration of the proposed Auction Procedures.  The Auction Procedures will allow any prospective bidders and other interested parties time before the Bid Deadline to conduct any due diligence required.  If other interested parties are discovered, the Trustee and Tamerlain will provide every possible

opportunity to such parties to conduct the due diligence such parties need to submit the best possible Qualified Bid. Therefore, potential bidders will have time to conduct due diligence with respect to the Property, to the extent not already concluded.

### 3. The Trustee Will Provide Full and Accurate Disclosure of the Terms of the Sale to Potential Bidders

40.     The terms of the Sale of the Property are contained in the PSA, the form of which is attached hereto as **Exhibit "C"** and will be provided to each potential bidder (including in Word format for blacklining). Potential bidders will also receive a copy of the Procedures Order and the Auction Procedures. Therefore, the Trustee will have provided full and accurate disclosure of the terms of the prospective Sale of the Property to all potential bidders.

41.     For all of these reasons, the Court should approve the Auction Procedures as a sound exercise of the Trustee's business judgment.

### 4. The Break-up Fee is Appropriate

42.     The Trustee is seeking authorization to, in consultation with the Lender, enter into a stalking horse contract substantially in the form of the Purchase Agreement.

43.     In order to compensate any stalking horse purchaser for the time, effort, expense, and risk that it incurred in negotiating, documenting, and seeking to consummate the sale of the Property, the Auction Procedures provide that in the event the stalking horse buyer is out bid at the Auction (other than by Newell with a credit bid of $1.5 million or more), the stalking horse buyer shall be entitled to receive a Break-Up fee of $30,000.

44.     Bid protections are a common and, in many cases, necessary component of sales conducted under the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets .... In fact, because the... corporation ha(s) a duty to encourage bidding, break-up fees can be *necessary* to discharge [such] duties to maximize values.

Integrated Resources, 147 B.R. at 659-60 (emphasis in original). Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." 995 Fifth Ave., 96 B.R. at 28 (quotations omitted). See also Integrated Resources, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); In re Hupp Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

45.     As a consequence, courts frequently approve bid protections in connection with proposed bankruptcy sales. Courts considering the propriety of proposed bid protections typically consider "(1) whether the relationship of the parties who negotiated the fee is marked by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is reasonable in relation to the proposed purchase price." In re Twenver, Inc., 149 B.R. 954, 956 (Bankr. D. Colo. 1992); accord, In re Bidermann Indus. U.S.A., Inc., 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997); Integrated Resources, 147 B.R. at 657.

46.     The Trustee submits the Break-up Fee here is fair and reasonable in amount. Moreover, the Trustee and the Lender believe the willingness of a stalking horse purchaser to commit to a purchase of the Property, subject to higher and better offers, may encourage other parties to submit bids for the Property. The Trustee believes the Break-up Fee will not deter or chill bidding.

47.     Accordingly, the proposed bid protections are reasonable and appropriate under the circumstances and, respectfully, should be approved.

## C. The Trustee Has Articulated a Reasonable Business Justification for the Sale of the Property

48. Ample justification exists for approval of the proposed Sale of the Property. Section 363 of the Bankruptcy Code authorizes a trustee, after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

49. A sale of a debtor's assets outside of the ordinary course of business should be approved if supported by a sound business purpose. See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Global Crossing Ltd., 295 B.R. 726 (Bankr. S.D.N.Y. 2003); see also Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines, Inc., No. 01-00056 (PJW), 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

50. Courts typically consider the following factors in determining whether to approve a sale under section 363: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. See In re Del. & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); In re United Healthcare Sys., Inc., No. 97¬1159, 1997 WL 176574, at *4 and n.2 (D.N.J. Mar. 26, 1997).

51. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors, or interest holders. See, e.g., In re Abbotts Dairies of Pa. Inc., 788

F.2d 143 (3d Cir. 1986); <u>Lionel Corp.</u>, 722 F.2d 1063.  In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  <u>See Four B Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.</u>), 107 F.3d 558, 564-65 (8th Cir. 1997) (In bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); <u>Integrated Res., Inc.</u>, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (quoting <u>Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc</u>.), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988))), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

52.    Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." <u>Comm. of Asbestos Related Litigants and/or Creditors v. Johns Manville Corp. (In re Johns Manville Corp.</u>), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." <u>Integrated Res</u>., 147 B.R. at 656 (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a trustee's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, as set forth above, when applying the "business judgment" standard, courts show great deference to a trustee's business decisions.

53.    Here, one of the purposes for which the Trustee was appointed was to market the Property for sale so that the maximum value of the Property and other assets of the Debtor can be achieved.

### 5. The Notice of the Sale of the Assets Will Be Accurate and Reasonable Under the Circumstances

54.    As set forth above, the Trustee will provide accurate and reasonable notice of the Sale of the Property under all of the facts and circumstances of this case.

### D. The Sale of the Property Should Be Free and Clear of Liens, Claims, Encumbrances, and Interests

55.    Section 363(f) of the Bankruptcy Code provides that the Court may authorize a sale of property of the estate, "free and clear of any interest in such property of an entity other than the estate," if:

(1)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in *bona fide* dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); In re General Bearing Corp., 136 B.R. 361, 363-64 (Bankr. S.D.N.Y. 1992).

56.    Pursuant to section 363(f)(2) of the Bankruptcy Code, a free and clear sale is permissible when the interest holder consents to it. 11 U.S.C. § 363(f)(2). Newell consents to the Trustee's sale of the property free and clear of Newell's lien. Therefore, section 363(f)(2) is satisfied as to Newell's lien.

57.    The Trustee does not believe the Debtor has any other significant secured creditors.[7] All creditors of the Debtor, including any holder of an alleged secured claim against

---

[7] The NYC Department of Finance filed a proof of claim asserting a secured claim in the amount of $15,949.96 based on prepetition real property taxes allegedly owed. The Trustee believes no taxes are owed by the Debtor because the Debtor is a tax exempt entity and has received tax exemptions from New York City relating to the

the Property, will be served with a copy of this Motion and will be given an opportunity to object to it. To the extent that they do not object to this Motion, they should be deemed to have consented to the proposed Sale under section 363(f)(2) of the Bankruptcy Code. See, e.g., FutureSource, LLC v. Reuters, Ltd., 312 F.3d 281 (7th Cir. 2002), cert. denied, 538 U.S. 962 (2003) (holding that failure to object may constitute consent, if there was adequate notice).

58.     Because the Trustee will satisfy one or more of the requirements of section 363(f) of the Bankruptcy Code, as will be demonstrated at the Sale Hearing, approving the Sale of the Property free and clear of all interests is warranted.

**E.      Newell Is Entitled To Credit Bid**

59.     Section 363(k) of the Bankruptcy Code provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k). Pursuant to section 363(k), Newell is entitled to credit bid up to the amount of its secured claim. See Radlax Gateway Hotel, LLC v. Amalgamated Bank, ___U.S. _, 132 S. Ct. 2065, 2070, 182 L. Ed. 2d 967 (2012) ("The ability to credit bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price. It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional costs to protect the loan."); In re Aeropostale Inc., 555 B.R. 369, 414 (Bankr. S.D.N.Y. 2016).

---

Property. See N.Y. RPTL § 420-a[1](a) ("Real property owned by a corporation or association organized or conducted exclusively for religious, charitable, hospital, educational, or moral or mental improvement of men, women or children purposes, or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association or by another such corporation or association as hereinafter provided shall be exempt from taxation as provided in this section.").

60. Under Section 363(k), a secured creditor is entitled to bid an amount up to its entire claim; the "offset" (i.e., credit) is not limited to the value of the collateral. See, e.g., Aeropostale Inc., 555 B.R. at 414 ("Credit bidding allows the secured creditor to bid for its collateral using the debt it is owed to offset the purchase price[,]' which ensures that, if the bidding at the sale is less than the amount of the claim the collateral secures, the secured creditor can, if it chooses, bid up the price to as high as the amount of its claim. ...It therefore provides a safeguard for secured creditors, by insuring against the undervaluation of their collateral at an asset sale.)(internal citations and quotations omitted); In re Submicron Sys. Corp., 432 F.3d 448, 459 (3d Cir. 2006) ("It is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 36(k)"); In re Suncruz Casinos, LLC, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) ("the plain language of [section 363(k)] makes clear that the secured creditor may credit bid its *entire claim*, including any unsecured deficiency portion thereof")(emphasis in original).

**F.      The Carve-out Agreement Is Reasonable And Appropriate**

61. Bankruptcy Code section 506(c) provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. 506(c).

62. As set forth above, the Trustee and Newell have agreed to the Carve-out Agreement subject to Court approval. The Trustee respectfully submits the Carve-out Agreement is reasonable and beneficial to the estate and should therefore be approved pursuant to Bankruptcy Code section 506(c).

## G.    The Sale of the Property Is Exempt From Transfer Tax

63.    The Trustee's proposed Sale of the Property is a conveyance pursuant to section 363 of the Bankruptcy Code, and the Property will be transferred from a not for profit corporation.  Accordingly, the Sale should not be subject to any New York City transfer tax or any New York State transfer tax.  <u>See</u> N.Y. Admin. Code § 11–2106(b)(2); <u>In re Cabrini Med. Ctr.</u>, No. 09-14398 (AJG), 2010 WL 2824566, at *3 (Bankr. S.D.N.Y. Feb. 11, 2010)("The Transfer of the Assets is exempt from New York City real property transfer tax, as it is a conveyance by a not-for-profit corporation.")(citing *See* N.Y. Admin. Code § 11–2106(b)(2) (2009));[8] <u>In re Caritas Health Care, Inc.</u>, No. 09-40901(CEC), 2009 WL 7215674, at *2 (Bankr. E.D.N.Y. Mar. 20, 2009)("The transfer of the Purchased Assets is exempt from New York City real property transfer tax insofar as it is a conveyance by and to not-for-profit corporations.")(citing N.Y. Admin. Code § 11–2106(b)(2) (2009)); N.Y. Tax Law § 1405(b)(8);[9] <u>Cabrini Med. Ctr.</u>, 2010 WL 2824566, at *3 ("The Transfer of the Assets is exempt

---

[8] N.Y. Admin. Code § 11–2106(b)(2) provides:

> b. The tax imposed by this chapter shall not apply to any of the following deeds, instruments or transactions:

> ****

> 2. **A deed, instrument or transaction conveying or transferring real property** or an economic interest therein **by** or to **any corporation, or association, or trust, or community chest, fund or foundation, organized or operated exclusively for religious, charitable, or educational purposes**, or for the prevention of cruelty to children or animals, and no part of the net earnings of which inures to the benefit of any private shareholder or individual and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation; provided, however, that nothing in this paragraph shall include an organization operated for the primary purpose of carrying on a trade or business for profit, whether or not all of its profits are payable to one or more organizations described in this paragraph[.]

New York City, N.Y., Code § 11-2106 [emphasis added].

[9] NY Tax Law § 1405(b)(8) states:

> (b) The tax shall not apply to the following conveyances:

> ****

from New York State real estate transfer tax, as it is a conveyance pursuant to the Bankruptcy Code.")(citing N.Y. Tax law § 1405(b)(8) (2009)); Caritas Health Care, Inc., 2009 WL 7215674, at *2 ("The transfer of the Purchased Assets is exempt from New York State real estate transfer tax insofar as it is a conveyance pursuant to the Bankruptcy Code.")(citing *See* N.Y. Tax Law § 1405(b)(8) (2009)).

## H. The Successful Bidder is Entitled to Good Faith Purchaser Status Pursuant to Section 363(m) of the Bankruptcy Code

64. The Trustee requests as part of the approval of the proposed Sale, that the Court find the Successful Bidder is qualified to acquire the Property and will do so in good faith within the meaning of section 363(m) of the Bankruptcy Code.

65. Pursuant to section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. See Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d Cir. 1997); In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Abbotts Dairies of Pa., Inc., 788 F.2d at 147; Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985)**.**

66. Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith...." 11 U.S.C. § 363(m). Under section 363(m), "an appeal of a bankruptcy court's ruling on a foreclosure action [or sale] generally cannot affect the rights of a good faith purchaser of the foreclosed property, unless the debtor or other complaining party] stays the foreclosure [or other] sale pending an appeal." Mann v.

---

8. Conveyances given pursuant to the federal bankruptcy act[.]

N.Y. Tax Law § 1405(b)(8).

Alexander Dawson, Inc. (In re Mann), 907 F.2d 923, 926 (9th Cir. 1990). Section 363(m) fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" Reloeb Co. v. LTV Corp (In re Chateaugay Corp., No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 3d Cir. 1986). See also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)…provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

67.     Finality of the Sale is important in this case because the Successful Bidder needs assurance that the purchase of the Property will not be subject to future attack by objecting creditors. Such assurance is necessary to generate the maximum purchase price for such Property.

## I.     The Court Should Waive the Fourteen Day Stay of the Sale Order

68.     The Trustee requests that the automatic fourteen (14) day stay under Bankruptcy Rules 6004(h) be waived. This is warranted due to the Debtor's obstructionist tactics over the past several years, including in this Chapter 11 case, which have delayed and hindered Newell's rights as a mortgage lender and the Trustee's obligations under Bankruptcy Law and applicable state law.

## J.     The Manner of Notice and Schedule for the Bid Deadline and the Auction and Sale Hearing Are Reasonable and Appropriate Under the Circumstances

69.     The Trustee also respectfully requests that the Court approve the manner of notice of the proposed Auction and Sale Hearing. The Trustee submits that this relief will facilitate the

Sale process and enable the Trustee to provide interested parties with adequate and sufficient notice of the Auction and related matters.

70.     The Trustee proposes to give notice of the Procedures Order, the Auction and the Sale Hearing in the following manner. Within three (3) business days after entry of the Procedures Order (the "Mailing Date"), the Trustee will serve notice of the Auction ("Notice of Auction and Sale Hearing"), substantially in the form attached hereto as **Exhibit "D"**, and a copy of the Procedures Order, which will contain various dates and deadlines, by first class mail, to those parties identified in the Procedures Order, including (i) the Office of the United States Trustee; (ii) the Office of the New York State Attorney General; (iii) Debtor's counsel; (iv) all creditors of the Debtor; (v) all taxing authorities having jurisdiction over the Property, including the Internal Revenue Service and the New York City Department of Finance; (vi) all governmental agencies that are an interested party with respect to the Sale and transactions proposed thereunder; (vii) all parties that are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Property; (viii) all parties that are known or reasonably believed to have expressed an interest in acquiring the Property; and (ix) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 (collectively, the "Auction and Sale Notice Parties").

71.     Those parties who desire a copy of the Procedures Order and/or the form of the PSA, and do not receive such papers pursuant to the preceding paragraph, may contact counsel for the Trustee, Tarter Krinsky & Drogin LLP.

72.     In addition, on or before seven days after the entry of the Procedures Order, subject to applicable submission deadlines, the Trustee will cause Tamerlain to publish an abbreviated version of the Notice of Auction and Sale Hearing once in a publication to be

determined after consultation with the Auctioneer. Additionally, the Trustee will cause Tamerlain to send an email blast to its database of potential purchasers and investors containing a version of the Notice of Auction and Sale Hearing.

73. The Trustee submits the foregoing notice is reasonably calculated to provide timely and adequate notice to the Debtor's creditors and other parties in interest, and also to all those who may bid on the Property. Accordingly, the Trustee submits that such notice constitutes good and sufficient notice under the circumstances with respect to this Motion, all proceedings to be held thereon, and the entry of an order or orders granting all of the relief requested herein. The Trustee further submits that no further notice need be given.

74. The Trustee submits the proposed notice of the Auction Procedures, Auction, Sale Hearing, and all related objection deadlines, comply fully with Bankruptcy Rule 2002 and constitutes good and adequate notice of the Sale. The Trustee respectfully requests that this Court approve the form of Notice of Auction and Sale Hearing, and notice procedures proposed above and in the proposed Procedures Order.

## NOTICE

75. The Trustee proposes to serve a Notice of the Hearing on this Motion and a copy of the Motion and all exhibits by first class mail upon (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel to the Debtor; (iii) counsel to the Lender; and (iv) all other parties that have filed a notice of appearance and demand for service of papers in this bankruptcy case under Bankruptcy Rule 2002 (the "Auction Procedures Notice Parties").

76. The Trustee believes the foregoing notice procedures to the Auction Procedures Notice Parties, the Auction and Sale Notice Parties and other parties in interest is sufficient to provide effective notice of the Auction Procedures, the Auction and the Sale to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest

possible participation while minimizing the costs to the estate. Accordingly, the Trustee requests the Court find that notice in this manner is sufficient and that no further notice of the Auction or the Auction Procedures is required.

**NO PRIOR REQUEST**

77.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Trustee respectfully requests that this Court after a hearing enter the Procedures Order (**Exhibit "A"**): (a) approving the Auction Procedures (**Exhibit "B"**); (b) scheduling an Auction and Sale Hearing; and (c) approving the Notice of Auction and Sale Hearing (**Exhibit "D"**)  In addition, the Trustee respectfully requests that this Court after the Sale Hearing enter the proposed Sale Order (annexed hereto as **Exhibit "E"**): (a) authorizing the Trustee to sell the Property free and clear of all liens, claims, encumbrances and interests, and (b) approving the Purchase Agreement. The Trustee further requests this Court grant such other and further relief as is just and proper.

Dated: New York, New York
       May 29, 2020

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Deborah J. Piazza,*
*as Chapter 11 Trustee*

By: /s/ Jill Makower
       Scott S. Markowitz, Esq.
       Deborah J. Piazza, Esq.
       Jill Makower, Esq.
       1350 Broadway, 11th Floor
       New York, New York 10018
       (212) 216-8000
       smarkowitz@tarterkrinsky.com
       dpiazza@tarterkrinsky.com
       jmakower@tarterkrinsky.com